# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEIFA XU, Individually and On Behalf of All Others Similarly Situated,<br><br>                 Plaintiff,<br><br>   v.<br><br>GRIDSUM HOLDING INC., GUOSHENG QI, MICHAEL PENG ZHANG, RAVI SARATHY, GUOFA YU, PERRY LIN CHUI, XIANG FAN, YANCHUN BAI, XUDONG GAO, THOMAS ADAM MELCHER, PETER ANDREW SCHLOSS, GOLDMAN SACHS (ASIA) L.L.C., CITIGROUP GLOBAL MARKETS INC., and STIFEL, NICOLAUS & COMPANY INCORPORATED,<br><br>                Defendants. | **Civil Action: 1:18-cv-03655 (ER)**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Court-appointed Lead Plaintiff William Barth ("Barth") and plaintiff Xuechen Li ("Li") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review and analysis of: (i) regulatory filings made by Gridsum Holding Inc. ("Gridsum" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) wire and press releases published by and regarding Gridsum; (iii) analysts' reports and advisories about the Company; and (iv) information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Gridsum securities between September 22, 2016 and April 20, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws, and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), against the Company, certain of its officers and directors, and the Underwriter Defendants (defined below).

2.      Gridsum is a holding company that designs and develops sophisticated data analysis software for multinational and domestic enterprises and government agencies in China. The Company offers software that allows customers to collect and analyze information that is collected, indexed, and stored in an organized manner.

3.      Founded in 2005, Gridsum is headquartered in Beijing, China, and its American Depositary Shares ("ADSs") trade on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "GSUM."

4.      Gridsum's initial public offering (the "IPO") took place in September 2016 and garnered the Company net proceeds of over $87.1 million.

5.      In the Company's IPO documents and throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose:  (i) the extent and magnitude of Gridsum's lack of effective internal control over financial reporting; (ii) that Gridsum was not addressing issues with its financial reporting raised by its auditor; (iii) that consequently, Gridsum's financial statements were inaccurate and

misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (iv) that as a result of the foregoing, Gridsum's public statements were materially false and misleading at all relevant times.

6.      On April 23, 2018, Gridsum issued a press release titled "Gridsum Reports Suspension of Audit Report on Financial Statements," announcing that its "***audit report for the Company's financial statements for the year ended December 31, 2016 should no longer be relied upon***"[1] and that the "Company's Audit Committee is fully investigating these issues with assistance from external legal and accounting advisors and is ***working diligently toward an expeditious conclusion of the investigation***."  According to the press release, Gridsum's auditor identified certain issues in conducting its audit of Gridsum's financial results for the year-ended December 31, 2017.  Those issues related to "***certain revenue recognition, cash flow, cost, expense items, and their underlying documentation which [the auditor] had previously raised***" with Gridsum.

7.      On April 30, 2018, the Company issued a press release titled "Gridsum Receives Nasdaq Notice Relating to Late Filing of Annual Report on Form 20-F," announcing receipt of a Nasdaq letter and a compliance plan for filing the Company's Form 20-F for the year-ended December 31, 2017 by October 29, 2018.  Gridsum announced on August 29, 2018 that Nasdaq approved the compliance plan.

8.      Gridsum and the Defendants ***filed nothing with the SEC on October 29, 2018***.  On October 31, 2018, the Company issued a press release announcing the receipt of a letter from Nasdaq stating that Gridsum's ADSs are subject to delisting as a result of the failure to file the

---

[1]  Unless otherwise stated, all emphasis is added.

3

Form 20-F for the year-ended December 31, 2017.  Gridsum stated that the Company intends to timely request a hearing before the Nasdaq Hearings Panel (the "Panel").

9.      The October 31, 2018 press release stated that the ***Audit Committee's investigation was complete***, and added that not only were the Company's financial statements for the year-ended December 31, 2016 being reviewed for inaccuracies, but also the financial statements for the year-ended December 31, 2015:

> The Company ***recently concluded its audit committee investigation***, announced on April 23, 2018.  The Company has made significant progress in implementing, and continues to action, a number of remedial steps to bolster substantially its financial controls and contract management processes as recommended by the audit committee. ***The Company continues to make significant progress in working with its independent auditors to finalize its audited financial statements as of and for the years ended December 31, 2015, 2016 and 2017.***

10.      On November 13, 2018, Gridsum issued a press release titled "Gridsum Announces Nasdaq Hearing Date," announcing the scheduling of the Company's hearing before the Panel for December 13, 2108, when the Company plans to request the continued listing of the Company's securities on Nasdaq.  According to the press release, Nasdaq "has indicated that the Panel will issue its determination regarding the Company's listing status likely within 30 days of the hearing." The Company stated that it "expects to receive a separate determination from the Panel regarding the Company's request for a further extension of the stay – at least pending the ultimate conclusion of the hearing process – prior to November 21, 2018."  The Company stated once again that "***[t]he Company continues to make significant progress in working with its independent auditors to finalize its audited financial statements as of and for the years ended December 31, 2015, 2016 and 2017***."

11.      On November 23, 2018, Gridsum issued another press release titled "Gridsum Announces Nasdaq Stay Request Granted," informing investors that Nasdaq had granted a stay of any suspension "pending the issuance of the Panel's determination regarding the Company's

listing status following the hearing [set for December 13, 2018]." And again, for the third time within thirty days, the Company stated, "***The Company continues to make significant progress in working with its independent auditors to finalize its audited financial statements as of and for the years ended December 31, 2015, 2016 and 2017***."

12.     As of the date of this Amended Complaint, ***over seven months*** since Gridsum's auditor allegedly informed the Gridsum Defendants (defined below) of the unreliability of the Company's financial statements for the year-ended December 31, 2016, the Company has still not provided investors with accurate financial statements and the Company's shares are at risk of delisting from Nasdaq.

## II.     <u>JURISDICTION AND VENUE</u>

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) and Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b). Gridsum's ADSs trade on the Nasdaq, located within this District.

16.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

III.    **PARTIES**

A.    **Plaintiffs**

17.    Lead Plaintiff William Barth, as set forth in his previously-filed certification (ECF No. 22-2), purchased Gridsum securities at artificially inflated prices during the Class Period and was damaged as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.    Named plaintiff Xuechen Li, as set forth in his certification filed in Case No. 1:18-cv-05749 in the United States District Court for the Southern District of New York (ECF No. 1), purchased Gridsum securities pursuant to and/or traceable to the Company's IPO at artificially inflated prices during the Class Period and was damaged as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

B.    **Defendants**

19.    Gridsum is a corporation organized and existing under the laws of the Cayman Islands with its principal place of business located in the People's Republic of China ("PRC") at Jade Palace Hotel Office Building, 76 Zhi Chun Road Haidian District, 8th Floor, Beijing, China 100086.

20.    Guosheng Qi ("Qi") co-founded Gridsum and has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board").  Qi serves as a member of the Board's Compensation and Nominating and Corporate Governance Committees.  According to a Schedule 13-G/A filed with the SEC on February 12, 2018, Qi owns 29.7% of the total ordinary shares of the Company.  Qi owns all of the Class A shares, giving him nearly 70% of the voting power as the Class A shares are entitled to ten votes per share.  Qi founded Beijing Gridsum Technology Co. Ltd. ("Beijing Gridsum") in 2005.  Qi signed the Company's Registration Statement (defined below), Gridsum's annual report on Form

20-F for the year-ended December 31, 2016 ("2016 Form 20-F"), and the certifications attached to the 2016 Form 20-F pursuant to SEC Rule 13(a) and Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

21.     Michael Peng Zhang ("Zhang") has served as the Company's Chief Financial Officer ("CFO") since February 2014.  Zhang signed the Company's Registration Statement and the certifications attached to the 2016 Form 20-F pursuant to SEC Rule 13(a) and Section 906 of SOX.

22.     Ravi Sarathy ("Sarathy") has served as Gridsum's Co-CFO since April 2017 and Chief Strategy Officer from October 2016 to April 2017.  Sarathy signed the certifications attached to the 2016 Form 20-F pursuant to SEC Rule 13(a) and Section 906 of SOX.

23.     Guofa Yu ("Yu") co-founded Gridsum and has served as the Company's Chief Operating Officer and a director since 2005.  According to the Schedule 13-G/A filed with the SEC on February 12, 2018, Yu owns 4.5% of the total ordinary shares of the Company.  Yu signed the Company's Registration Statement.

24.     Perry Lin Chui ("Chui") served as a director of Gridsum from 2010 until sometime before April 2017.[2]  Chui signed the Company's Registration Statement.

25.     Xiang Fan ("Fan") has served as a director of Gridsum since 2015.  Fan is a managing director of Goldman Sachs.  According to the 2016 Form 20-F, Fan owns 7.4% of the total ordinary shares of the Company.  Fan signed the Company's Registration Statement.

26.     Yanchun Bai ("Bai") has served as a director of Gridsum since 2012.  Bai singed the Company's Registration Statement.

---

[2] It is assumed Chui is no longer a director of the Company as he was not listed as a director in the 2016 Form 20-F.

27.   Xudong Gao ("Gao") has served as a director of Gridsum since 2006.  Gao is a member of the Board's Audit and Nominating and Corporate Governance Committees.  He is the Chair of the Compensation Committee.  Gao signed the Company's Registration Statement.

28.   Thomas Adam Melcher ("Melcher") has served as a director of Gridsum since 2008.  Melcher is member of the Board's Audit and Compensation Committees.  He is Chair of the Nominating and Corporate Governance Committee.   Melcher signed the Company's Registration Statement.

29.   Peter Andrew Schloss ("Schloss") has served as a director of Gridsum since 2016. He is Chair of the Board's Audit Committee and a member of the Compensation Committee. Schloss signed the Company's Registration Statement.

30.   Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") served as an underwriter in connection with Gridsum's IPO.  According to the Schedule 13-G/A filed with the SEC on February 14, 2018, Goldman Sachs and its related entities beneficially own approximately 7.2% of the ordinary shares of the Company.

31.   Citigroup Global Markets Inc. ("Citigroup") served as an underwriter in connection with Gridsum's IPO.

32.   Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter in connection with Gridsum's IPO.

33.   Qi, Zhang, Sarathy, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss are sometimes referred to herein as the "Individual Defendants."

34.   Gridsum and the Individual Defendants are sometimes referred to herein as the "Gridsum Defendants."

35.     Goldman Sachs, Citigroup, and Stifel are sometimes referred to herein as the "Underwriter Defendants."

36.     Gridsum, the Individual Defendants, and the Underwriter Defendants are referred to collectively herein as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.     Company Background And Structure

37.     Gridsum was founded in 2005 with the establishment of Beijing Gridsum in China. Between 2011 and February of 2016, Beijing Gridsum established five additional operating companies:  Beijing Moment Everlasting Ad Co., Ltd. ("Beijing Moment"), and its wholly owned subsidiary, Beijing Yunyang Ad Co., Ltd.; Guoxinjunhe (Beijing) Technology Co., Ltd. ("Guoxinjunhe"); Beijing Guoxinwangyan Technology Co., Ltd.; and Beijing Gridsum Yizhun Technology Co., Ltd.

38.     In preparation for entrance into the United States securities markets, Gridsum undertook a reorganization from July to December of 2014.  Gridsum Holding Inc. was incorporated under the laws of the Cayman Islands on July 21, 2014 as the parent holding company of Gridsum's related companies.  Gridsum established a wholly-owned subsidiary in Hong Kong, Gridsum Holding (China) Limited, which in turn established a wholly owned subsidiary in the PRC, Dissector (Beijing) Technology Co., Ltd.  Additionally, the Company established Gridsum Holding (Beijing) Co., Ltd. ("Gridsum PRC Holding") in China, which in turn acquired ownership of Beijing Gridsum, Beijing Moment, and Guoxinjunhe.

39.     To operate in and under the laws of the PRC, Gridsum conducts its operations principally through Gridsum PRC Holding and its subsidiaries through a series of contractual arrangements, treating Gridsum PRC Holding as a variable interest entity.  Gridsum PRC Holding is beneficially owned by Qi, Yu, and other employees.  Through these contractual arrangements,

Gridsum exerts control over Gridsum PRC Holding and its subsidiaries, and consolidates their operating results in Gridsum's financial statements under U.S. Generally Accepted Accounting Principles ("GAAP").



**B.    Gridsum's Products And Operations**

40.     Gridsum designs and develops data analysis software, providing cloud-based analytics and AI solutions for commercial and governmental entities.  The Company's proprietary distributed data architecture allows its customers to efficiently collect and analyze large amounts of information.  Gridsum's initial products have concentrated on digital marketing analytics and

automation solutions.  The Company claims to be among the first companies to offer web analytics

solutions based on data warehouse technology, and the only China-based company to provide

solutions to enterprise customers that cover web, video, and mobile analytics.

41.     Gridsum's core technology is the Gridsum Big Data Platform, which uses machine

learning capabilities to perform multi-dimensional correlation analysis and to analyze complex

real-time events, allowing customers to use data visualization and data-mining technologies to

identify complex relationships within their data.  The Company's software solutions analyze data

from 68 million internet and mobile sessions per day from users operating on over 272 million

mobile and desktop devices.

42.     Gridsum customers use the Company's products and solutions to, among other

things, analyze Internet user behavior and optimize user experiences, assess web design, manage

search engine marketing campaigns, and integrate data from sources online and offline.  The

Company offers a series of solutions based on the Gridsum Big Data Platform, including, but not

limited to, the following:  SEM Dissector, SEO Dissector, Mobile Dissector, Ad Dissector,

Audience Dissector, Contribution Dissector, Streaming Dissector, Video Dissector, Government

Web Dissector, Media Dissector, and Law Dissector, as well as ADSUITE, a fully integrated

package of marketing automation solutions.

43.     The Company's commercial marketing and advertising customers have included

the Haier Group, a consumer electronics and home appliances company, Coca-Cola, Chrysler

(China), and Nike.  The Company has also worked with China Network Television, Peking

University Law School, a large full-service law firm in China, and various Chinese government

entities.  In January 2016, the Company entered into a strategic cooperation agreement with the

PRC's People's Court Press providing for the development of a platform to enable access to judicial decisions and other legal information.

44.     Gridsum's competitors include diversified technology companies such as Google and IBM, bid management companies such as adSage and Adobe Media Optimizer, and web analytics companies such as Adobe Omniture and WebTrends.

45.     As of December 31, 2016, the Company had 929 employees, with 418 in the research and development department, 393 in sales and marketing, and 118 in general and administrative.  All of the Company's employees are based in China.  The Company has offices and/or data centers in Beijing, Shanghai, Guangzhou, Shenzhen, and Chengdu.

46.     Gridsum grew quickly from 2013 to 2016.  Its customers increased from 141 in 2013 to 395 in 2016, net revenues grew from RMB62.5 million in 2013 to RMB400.3 million in 2016, and net losses grew from RMB30.7 million in 2013 to RMB67.7 million in 2016.

47.     Enterprise customers purchasing marketing and automation solutions account for the majority of Gridsum's net revenues, at 89% and 87% for 2015 and 2016, respectively.  The Company has no long-term contracts with customers, with most contracts renewed on an annual basis.  For 2015 and 2016, its top 20 customers accounted for 56% and 51% of its total revenues, respectively.

48.     The Company accounts for revenues "on a net basis, based on the fees our customers pay" and "charge the majority of our customers based on percentage of their spending on our system in the bid management application or the volume of data being processed (*e.g.*, page views or viewer views)."  For data analytics solutions with bid management functionality, the customer is charged based on a percentage of ad spending with the search engine providers.  If a

customer purchases a data analytic solution without spending money on advertisements, Gridsum generally charges a negotiated variable amount based on the monthly volume of data processed.

49.     An annual data volume estimate is provided at the beginning of an engagement and a fee charged for the predetermined base number of page or viewer views.  When data volume exceeds the predetermined base, Gridsum charges progressively for additional usage.  Some customers request a fee cap which is negotiated and subject to annual review, and others negotiate fixed-fee contracts.  For 2016, 38% of Gridsum's revenues were based on capped or fixed-fee arrangements.  For marketing automation solutions, the Company earns and records service fee revenues over the life of the contract, in proportion to ad spending or the completion of contractual milestones.  The Company also receives revenues from the incentive programs of search engine providers, such as Baidu.

**C.      Gridsum's Initial Public Offering**

50.     On September 21, 2016, the Company filed with the SEC a Form F-1/A Registration Statement offering 6,521,740 American Depositary Shares of Gridsum (together with all exhibits and amendments, the "Registration Statement").  The Registration Statement was declared effective by the SEC on September 22, 2016.  The prospectus was subsequently filed with the SEC on Form 424B4 on September 23, 2016 (collectively with the Registration Statement, the "Offering Materials") and offered 6,700,000 ADSs at a price of $13.00 per share.  The Offering Materials stated that the intended use of the IPO proceeds was for working capital and other general corporate purposes, including technology and infrastructure investments, product development, and expansion of sales and marketing.

51.     On September 30, 2016, Gridsum announced that the Underwriter Defendants had chosen to exercise in full their over-allotments, purchasing an additional 1,005,000 shares.  In total, Gridsum issued and sold 7,705,000 ADSs, reaping net proceeds of approximately $87.1 million.

**D.      Gridsum Is Subject To SEC And U.S. GAAP Reporting Requirements**

52.      GAAP are a set of principles recognized by the accounting profession as the

standards, rules, and procedures necessary to define accepted accounting practices at a particular

time.

53.      SEC rules and regulations require that publicly-traded companies include financial

statements that comply with GAAP in their annual filings with the SEC.  *See* Section 13 of the

Exchange Act (15 U.S.C. § 78m); Rule 10-01(d) of Regulation S-X (17 C.F.R. § 210.10-01(d)).

Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC

that are not prepared in accordance with GAAP are presumed to be misleading.

**E.      Defendants Used Material Misstatements And Omissions In The Offering
         Materials To Sell Gridsum ADSs To The Investing Public**

54.      The Registration Statement provided Gridsum shareholders with summary

consolidated statements of operations data for the six months ended June 30, 2015 and 2016, and

summary consolidated balance sheet data as of June 30, 2016, which was derived from the

Company's unaudited interim consolidated financial statements.   The unaudited interim

consolidated financial statements were prepared on the same basis as the Company's audited

consolidated financial statements and included all adjustments, consisting of normal and recurring

adjustments, that the Company considered necessary for a fair statement of its financial position

and operating results for the periods presented.

55.      The Registration Statement provided in relevant part:

> You should read this Summary Consolidated Financial Data section together with
> our consolidated financial statements and the related notes and "Management's
> Discussion and Analysis of Financial Condition and Results of Operations"
> included elsewhere in this prospectus.  ***Our consolidated financial statements are
> prepared in accordance with U.S. GAAP.***  Our historical results are not necessarily
> indicative of results expected for future periods.

14

| | For the Year Ended December 31, | | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | | 2015 | 2016 | |
| | RMB | RMB | RMB | US$ | RMB | RMB | US$ |
| | (in thousands, except for share, per share and per ADS data) | | | | | | |
| **Consolidated Statements of Operations Data:** | | | | | | | |
| Revenues: | | | | | | | |
| Enterprise | 57,025 | 104,891 | 208,157 | 31,321 | 75,483 | 133,918 | 20,150 |
| e-Government and other | 6,414 | 21,340 | 29,467 | 4,434 | 10,029 | 16,648 | 2,505 |
| Less: Business tax and surcharges | (892) | (1,711) | (2,785) | (419) | (878) | (2,499) | (376) |
| Net revenues | 62,547 | 124,520 | 234,839 | 35,336 | 84,634 | 148,067 | 22,279 |
| Cost of revenues[1] | (13,810) | (21,143) | (35,237) | (5,302) | (11,500) | (20,023) | (3,013) |
| Gross profit | 48,737 | 103,377 | 199,602 | 30,034 | 73,134 | 128,044 | 19,266 |
| Operating expenses: | | | | | | | |
| Sales and marketing expenses[1] | (29,012) | (46,880) | (84,548) | (12,722) | (33,351) | (52,214) | (7,857) |
| Research and development expenses[1] | (20,385) | (38,137) | (100,186) | (15,075) | (40,178) | (66,956) | (10,075) |
| General and administrative expenses[1] | (30,276) | (54,931) | (60,540) | (9,109) | (27,861) | (37,466) | (5,637) |
| Total operating expenses | (79,673) | (139,948) | (245,274) | (36,906) | (101,390) | (156,636) | (23,569) |
| Loss from operations | (30,936) | (36,571) | (45,672) | (6,872) | (28,256) | (28,592) | (4,303) |
| Other income/(expense): | | | | | | | |
| Foreign currency exchange gain/(loss) | 296 | (766) | 1,339 | 201 | 672 | (889) | (134) |
| Interest income, net | 87 | 180 | 80 | 12 | 26 | 189 | 28 |
| Other income, net | 9 | 373 | 111 | 17 | — | (417) | (63) |
| Loss before income tax | (30,544) | (36,784) | (44,142) | (6,642) | (27,558) | (29,709) | (4,472) |
| Income tax expense | (130) | (476) | (4,693) | (706) | — | — | — |
| Net loss | (30,674) | (37,260) | (48,835) | (7,348) | (27,558) | (29,709) | (4,472) |
| | — | — | (16) | (2) | — | (27) | (4) |

56.    The Registration Statement provided audited consolidated financial statements for the years-ended December 31, 2013, 2014, and 2015.  For 2015, the audited consolidated financial statements provided, among other things, the following information:  net revenues of $35.3 million; gross profit of $30 million; total operating expenses of $36.9 million; and a net loss of $7.3 million.  The notes to the consolidated financial statements stated, "***The Company's consolidated financial statements have been prepared in accordance with U.S. GAAP.***"

57.     The audited consolidated financial statements notes also included the following

regarding Gridsum's revenues:

**(k) Revenue Recognition**

Revenues are generated from sales of the Company's marketing automation
solutions and e-Government and other solutions.  The targeted customers for
marketing automation solutions are enterprise customers and the targeted
customers for e-Government and other solutions are governmental agencies and
state-owned entities.

Revenues are recognized when:

- persuasive evidence of an arrangement exists;
- the Group's platform is made available and services have been delivered to
  the customer;
- the fee is fixed or determinable; and
- collection is reasonably assured.

Revenues received from the incentive programs of search engine providers are
based on factors determined by these providers, such as yearly growth in the
amount of advertising on the provider's search engine platform that the Company's
customers purchase through its solutions, and other factors selected at the discretion
of these providers.  Revenues are recorded net of value-added taxes and surcharges.

In accordance with ASC 605-45, Revenue Recognition: Principal Agent
Considerations, the Company considers several factors in determining whether it
acts as the principal or as an agent in the arrangement of merchandise sales and
provision of various related services and thus whether it is appropriate to record the
revenues and the related cost of sales on a gross basis or record the net amount
earned as service fees.

Where customers purchase multiple solutions in a single contract, the Company
allocates the total consideration to the various elements based on the relative selling
price method and recognizes revenues as services are rendered.  In accordance with
ASC 605-25, Revenue Recognition-Multiple-Element Arrangements, the
following hierarchy are followed when determining the appropriate selling price
for each element:  (1) vendor specific objective evidence ("VSOE"), (2) third party
evidence ("TPE") and (3) best estimate of selling price ("BESP").  The Company
recognizes revenues on the elements delivered and defers the recognition of
revenues for the fair value of the undelivered elements until the remaining
obligations have been satisfied.  Where all of the elements within an arrangement
are delivered uniformly over the agreement period, revenues are recognized on a
straight line basis over the contract period.

Enterprise

The Company generates enterprise revenue primarily by providing marketing automation solutions including bid management and data analysis solutions to enterprise customers.  The Company earns and records service fee revenues over the contractual period, in proportion to ad spending or the completion of milestones that are stipulated in the contracts.  In addition, the Company receives revenues from the incentive programs of search engine providers based on factors determined by these providers, such as yearly growth in the amount of advertising on the provider's search engine platform that the Company's customers purchase through its solutions, and other factors selected at the discretion of these providers. Revenues from these programs are received on both a quarterly and an annual basis and are calculated in accordance with the Company's customers' usage of the search engine providers.

With respect to the bid management services, the Group considered that: (i) the search engines are responsible for providing the advertisements service to the customers; (ii) the Group lacks the latitude to determine the prices charged by the search engine providers and earns only the fixed service fee from the customers; (iii) the hosting and maintenance of the advertisements are the responsibilities of the search engine providers; (iv) the customers have the discretion in choosing the search engines selection; (v) we receive revenues from incentive programs based on the search engine providers' policies.  The Group's responsibility is to manage the customer's advertising campaign on the search engines, according to the terms of the customer contracts so the Group views itself as an agent, and records revenues related to these services on a net basis.

e-Government and Other

The Company generates revenues by entering into service contracts with governmental agencies for its e-government solutions, including Law Dissector solutions for the court systems and other law communities beginning in 2015.  The Company also generates revenues by entering into contracts with state-owned television stations for its new media solutions, including TV Dissector, Streaming Dissector and Video Dissector.

**(l) Advances from Customers and Deferred Revenues**

Upon the entering of contracts, customers pay the contractual balance as prepayments.   The Company allocates the prepayments into advances from customers and deferred revenues.  Advances from customers are the balance of the advertising campaign spending that would be recognized as cost payable to search engine providers when advertisements are placed.  Deferred revenues are the revenues to be earned by the Group for services and is recognized as the revenues according to the prescribed revenue recognition criteria and policies described above.

58.     The Registration Statement also stated the following regarding Gridsum's revenues:

> Net revenues consist of revenues recognized from customers who used our software solutions during the period, including revenues that we receive from the incentive programs of search engine providers, less business tax and surcharge. Historically, we have increased net revenues through our ability to increase the number of customers, retain high quality customers and increase the average customer contribution by upselling and cross selling new solutions. We believe this trend will continue as more customers adopt our solutions and demand more business intelligence to improve their operational efficiency, and as we continue to bring more innovative solutions to market and serve our customers.

59.     The Registration Statement attributed differences between net revenues from 2014 to 2015 as follows:

> Net revenues increased by RMB110.3 million, or 89%, from 2014 to 2015, with 98% and 38% growth rates in enterprise revenues and e-Government and other revenues, respectively. This growth was attributable to increased demand for our solutions from new and existing customers. Total customers increased 45% to 307 customers in 2015 from 211 customers in 2014. Enterprise revenues increased RMB103.3 million due to a 48% increase in the number of customers from 163 to 242 and a 34% increase in average customer contribution from RMB643,503 to RMB860,153 (US$129,426). E-Government and other revenues increased RMB8.1 million due to an increase in the number of customers from 48 to 65 and a slight increase in average customer contribution from RMB444,583 to RMB453,338 (US$68,213).

60.     The Registration Statement also explained the changes in net revenues for the six months-ended June 30, 2015 and six months-ended June 30, 2016:

> Net revenues increased by RMB63.4 million, or 75%, from the six months ended June 30, 2015 to the six months-ended June 30, 2016, with 77% and 66% growth rates in enterprise revenues and e-Government and other revenues, respectively. This growth was attributable to increased demand for our solutions from both new and existing customers.

61.     The Registration Statement stated the following regarding Gridsum's expenses:

> Sales and marketing, research and development, and general and administrative expenses generally increased sequentially over the periods as we increased our headcount to support continued investment in our products. The increase in personnel costs was related to increases in headcount, along with higher share-based compensation expense. However, research and development expenses were

slightly lower in the first quarter of 2016 than in the fourth quarter of 2015, primarily due to high expenses related to technical and sales conferences in the fourth quarter of 2015.  General and administrative expenses were lower in the second quarter of 2016 than in the first quarter of 2016, primarily due to high travel and meeting expenses for business planning in the first quarter of 2016.

62.     The Registration Statement stated the following with respect to Gridsum's internal

controls:

Prior to this offering, we have been a private company with limited accounting personnel and other resources with which to address our internal control over financial reporting.  Our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting.  However, in the course of auditing our consolidated financial statements as of and for the years ended December 31, 2013, 2014 and 2015, we and our independent registered public accounting firm **identified one material weakness and certain other deficiencies in our internal control over financial reporting**, each as defined in the standards established by the Public Company Accounting Oversight Board of the United States.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

The material weakness relates to our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements to properly address complex accounting issues and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and SEC financial reporting requirements.

***We have taken initiatives to improve our internal control over financial reporting to address the material weakness that has been identified, including:  hiring an additional senior financial reporting manager, an internal control manager, and three financial analysts with experience in U.S. GAAP accounting and SEC reporting to lead accounting and financial reporting matters; designating more resources to improve the period-end closing procedures for financial statements and relevant disclosures preparation; and taking steps to establish an audit committee prior to completion of this offering, with members who have an appropriate level of financial expertise to oversee our accounting and financial reporting processes as well as our external and internal audits.***

***We have also taken other steps to strengthen our internal control over financial reporting, including preparing a contracts tracking database, formalizing a set of comprehensive U.S. GAAP accounting manuals, establishing an internal audit function, continuing to hire qualified professionals with sufficient U.S. GAAP accounting and SEC reporting experience, providing relevant training to our accounting personnel and upgrading our financial reporting system to***

19

*streamline monthly and year-end closings and integrate financial and operating reporting systems.*

63.    The statements in ¶¶ 55-62 were materially false and misleading when made because as more fully detailed immediately below:  (i) Gridsum's material weaknesses over internal controls extended beyond the "lack of sufficient financial reporting and accounting personnel;" (ii) Gridsum was not addressing issues with its financial reporting raised by its auditor; (iii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading financial reports; (iv) as admitted by the Company in its April 23, 2018 press release, PricewaterhouseCoopers Zhong Tian LLP ("PwC") had previously raised with the Company issues relating to revenue recognition, cash flow, cost, expense items, and their underlying documentation, and as later stated, the Audit Committee's investigation includes the 2015 financial statements; (v) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (vi) as a result of the foregoing, Gridsum's public statements were materially false and misleading at all relevant times.

F.    **The Truth Is Revealed**

64.    On April 23, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Reports Suspension of Audit Report on Financial Statements," announcing that its "audit report for the Company's financial statements for the year ended December 31, 2016 should no longer be relied upon."  The press release further stated, in relevant part:

BEIJING, April 23, 2018 — Gridsum Holding Inc. ("Gridsum" or "Company") (NASDAQ: GSUM), a leading provider of cloud-based big-data analytics and artificial intelligence ("AI") *solutions in China, today reported that on April 20, 2018, PricewaterhouseCoopers Zhong Tian LLP ("PwC"), the Company's independent registered public accounting firm, notified the Company's Board of Directors and Audit Committee that PwC's audit report for the Company's*

20

*financial statements for the year ended December 31, 2016 should no longer be relied upon.  Therefore, investors should not rely on that audit opinion.*

*In its letter, dated April 16, 2018 ("PwC Letter"), PwC informed the Company of certain issues it had identified in conducting its audit of the Company's financial results for the year ended December 31, 2017.  Those issues relate to certain revenue recognition, cash flow, cost, expense items, and their underlying documentation which PwC had previously raised with the Company.  Of the items specifically identified in the PwC Letter, the Company estimates a 2016 revenue impact of approximately RMB 2 million and a 2016 expense impact of approximately RMB 6 million.*  There can be no assurance that the Company or PwC will not identify more items as the Company finalizes the review.  The Audit Committee Chairman and the Company's Co-Chief Financial Officer have discussed the topics covered by the PwC Letter with representatives of PwC.  *The Company's Audit Committee is fully investigating these issues with assistance from external legal and accounting advisors and is working diligently toward an expeditious conclusion of the investigation.*  The Company undertakes no obligation to update its disclosures on this topic until the Audit Committee investigation is complete.  Because PwC will not be in a position to issue reports on the Company's financial statements until the Audit Committee completes its review and PwC is satisfied that any outstanding issues have been satisfactorily addressed, *the Company's 20-F filing will be delayed until such audit is completed*.

Mr. Guosheng Qi, Chief Executive Officer of Gridsum, commented, "For many years, starting well before our IPO, we have been committed to transparency and good corporate governance and remain so.  When we became aware of certain accounting issues, we immediately took measures to address this situation.  Our Audit Committee started an investigation and appointed a respected global law firm to conduct that review with the assistance of 'big four' forensic accounting specialists.  This work is still ongoing.  I have full confidence in the integrity and professionalism of all parties involved and we hope to report our results as soon as practicable after that work concludes.  Meanwhile, we continue to make good progress in our efforts to grow the Company and expand our product range and client base.  Our fundamentals and business prospects remain robust, and we look forward to continuing to work toward increasing shareholder value."

65.     On this news, Gridsum ADSs declined $1.17 per share, or 16.04%, to close at $6.12 on April 23, 2018 on unusually heavy trading volume of over 7.4 million shares.  Intra-day trading on April 23, 2018 reached a share price low of $3.68, a 49% decrease from the share price low on April 20, 2018.  Gridsum's ADSs continued to decline over the next few days as a result of the disclosure, dropping another 10% on April 24, 2018, and $2.27, or 31.14% from its closing price

per share on April 20, 2018 to its closing price per share on April 26, 2018.  The Company's share

price has not returned to its April 20, 2018 closing price since.

## G.      Post-Class Period Events

66.      On April 30, 2018, the Company filed a Form 12b-25 with the SEC, signed by

Zhang, stating that Gridsum's annual report on Form 20-F for the year-ended December 31, 2017

could not be filed in a timely manner "due to delays associated with certain issues identified in the

course of the audit of the registrant's annual financial statements for the year ended December 31,

2017 and the investigation of such issues by the registrant's audit committee."

67.      On the same day, Gridsum issued a press release, attached as Exhibit 99.1 to a Form

6-K filed with the SEC, signed by Zhang, titled "Gridsum Receives NASDAQ Notice Relating to

Late Filing of Annual Report on Form 20-F," stating in relevant part:

> BEIJING, April 30, 2018 — Gridsum Holding Inc. ("Gridsum" or "Company")
> (NASDAQ: GSUM), a leading provider of cloud-based big-data analytics and
> artificial intelligence ("AI") solutions in China, today reported that *it has received
> a letter from the Listing Qualifications Department of The Nasdaq Stock Market
> ("Nasdaq"), dated April 27, 2018 ("Nasdaq Letter"), notifying the Company that
> it is not in compliance with the requirements for continued listing under Nasdaq
> Listing Rule 5250(c)(1), because it is unable to timely file its annual report on
> Form 20-F for the year ended December 31, 2017 ("2017 Annual Report").*
>
> *Under Nasdaq Listing Rules, the Company has 60 calendar days from the date
> of the Nasdaq Letter to submit a plan as to how it plans to regain compliance with
> Nasdaq's continued listing requirements ("Compliance Plan").*  If Nasdaq
> accepts the Company's Compliance Plan, Nasdaq may grant the Company an
> exception of up to 180 calendar days from the due date of the 2017 Annual Report,
> or until October 29, 2018, to regain compliance.  If Nasdaq does not accept the
> Compliance Plan, the Company will have the opportunity to appeal that decision to
> a Nasdaq Hearings Panel.  The Company intends to file submit its Compliance Plan
> within the prescribed 60-day period, and, if Nasdaq grants the exception, to file its
> 2017 Annual Report within the permitted period.

68.      The next day, May 1, 2018, the Company issued a press release, attached as Exhibit

99.1 to a Form 6-K filed with the SEC, titled "Gridsum Announces Proposed Investment from

FutureX Capital," announcing that the Company had entered into a convertible note purchase

agreement (the "Note") with FutureX Innovation SPC, an affiliate of FutureX Capital Limited. Pursuant to the Note, FutureX would purchase a convertible note with a principal value of $40 million, convertible into Class B ordinary shares at a conversion price of $6.50 per share, a 21.5% premium to Gridsum's closing price on April 27, 2018.  The Note term was 18 months bearing interest at 2.80% per annum.  It was announced on May 7, 2018 that the investment was complete.

69.     On May 8, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, titled "Gridsum Announces Receipt of Preliminary Non-Binding Proposal," announcing receipt of a preliminary proposal letter from FutureX Capital Limited proposing to acquire all outstanding shares of the Company for $8.70 per ADS in a going private transaction.  In a press release issued by the Company on May 11, 2018, Gridsum informed investors that the Company's Board had formed a special committee comprised of Defendants Schloss, Gao, and Melcher to evaluate the proposal.  To date, the Company has not provided any further information to investors regarding the proposal.

70.     On June 28, 2018, the Company filed a Form 6-K with the SEC announcing the dismissal of PwC as the independent registered public accounting firm for Gridsum, as recommended by the Audit Committee and approved by the Board.

71.     On August 29, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Granted Extension by Nasdaq to Regain Compliance," announcing Nasdaq's extension of time to regain compliance "provided that the Company files its annual report on Form 20-F for the year ended December 31, 2017 ("2017 Annual Report") by October 29, 2018, and provides the Nasdaq staff with an update on the Audit Committee's internal investigation on or before September 28, 2018."  Gridsum affirmatively stated, "***The Company expects to satisfy***" these requirements.

72.     Gridsum did not satisfy Nasdaq's requirements and filed nothing on October 29,

2018.  On October 31, 2018, the Company issued a press release, attached as Exhibit 99.1 to a

Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Announces Receipt of Nasdaq

Staff Determination Letter and Intent to Request Hearing," announcing that it had received a letter

from Nasdaq stating that the Company's ADSs are subject to delisting, stating in relevant part:

> BEIJING, October 31, 2018 — Gridsum Holding Inc. ("Gridsum" or "Company")
> (Nasdaq: GSUM), announced that it received a letter from the Staff of the Listing
> Qualifications Department of the Nasdaq Stock Market ("Nasdaq") notifying the
> Company that since it remains delinquent in filing its Annual Report on Form 20-
> F for the fiscal year ended December 31, 2017 (the "2017 Annual Report"), it has
> not regained compliance with Nasdaq Listing Rule 5250(c)(1) (the "Rule"), which
> requires  timely  filing  of  periodic  reports  with  the  Securities  and  Exchange
> Commission ("SEC").  Previously, Nasdaq granted the Company an extension until
> October 29, 2018 to file all delinquent periodic reports.  *As described in the letter,*
> *as a result of the continued delinquency, the Company's American depositary*
> *shares are subject to delisting unless the Company timely requests a hearing*
> *before a Nasdaq Hearings Panel ("Panel").*
>
> The Company intends to timely request a hearing before the Panel to present its
> plan for regaining compliance with the Rule and request continued listing pending
> its return to compliance.  The hearing request automatically stays the delisting for
> a period of 15 calendar days from the date of the deadline to request a hearing.  The
> Company will present information to the Panel, which will make a decision based
> on the plan for regaining compliance and the Company's presentation, whether to
> grant the Company an extension of time within which to regain compliance with
> the Rule for a period of up to 360 days from the original due date of the Company's
> first late filing.
>
> *The Company recently concluded its audit committee investigation, announced*
> *on April 23, 2018.  The Company has made significant progress in implementing,*
> *and continues to action, a number of remedial steps to bolster substantially its*
> *financial controls and contract management processes as recommended by the*
> *audit committee.   The Company continues to make significant progress in*
> *working with its independent auditors to finalize its audited financial statements*
> *as of and for the years ended December 31, 2015, 2016 and 2017.*

73.     On November 13, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to

a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Announces Nasdaq Hearing

Date," announcing the scheduling of the Company's hearing before the Panel for December 13,

2018 when the Company plans to request the continued listing of the Company's securities on Nasdaq.  According to the press release, Nasdaq "has indicated that the Panel will issue its determination regarding the Company's listing status likely within 30 days of the hearing."  The Company stated that it "expects to receive a separate determination from the Panel regarding the Company's request for a further extension of the stay - at least pending the ultimate conclusion of the hearing process - prior to November 21, 2018."  The Company stated again that it "*continues to make significant progress in working with its independent auditors to finalize its audited financial statements as of and for the years ended December 31, 2015, 2016 and 2017.*"

74.    On November 23, 2018, Gridsum issued yet another press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Announces Nasdaq Stay Request Granted," announcing the "stay of any suspension action by Nasdaq pending the issuance of the Panel's determination regarding the Company's listing status following the hearing [on December 13, 2018]."  And again, for the third time, the Company stated that it "*continues to make significant progress in working with its independent auditors to finalize its audited financial statements as of and for the years ended December 31, 2015, 2016 and 2017*."

75.    Although the Audit Committee has completed its internal investigation as of October 31, 2018, if not before, as of the date of the Amended Complaint, almost *one month later*, the Gridsum Defendants have failed to inform investors of those results and have put the Company at risk of delisting from Nasdaq.

## V.    ADDITIONAL ALLEGATIONS APPLICABLE ONLY TO THE EXCHANGE ACT CLAIMS

76.    The additional allegations contained in ¶¶ 77-114 below are made with respect to Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act only.  Plaintiffs disclaim

any reliance upon these allegations or incorporation of these allegations in the Securities Act claims.

77.    Gridsum and the Individual Defendants, with the exception of Sarathy, are makers of the statements contained in the Registration Statement because Gridsum is the issuer of the statements and each of the Individual Defendants signed his name to those statements, indicating that he was a maker thereof.

### A.    Additional Materially False And Misleading Misrepresentations And Omissions

78.    On November 21, 2016, Gridsum issued a press release announcing its third quarter 2016 financial results, stating in relevant part:

***Third Quarter 2016 Financial Highlights***

- Net revenues increased by 69.8% to RMB98.7 million (US$14.8 million) from RMB58.1 million in the comparable period in 2015, driven by 63.1% growth in enterprise revenues and 129.0% increase in e-Government and other revenues.
- Gross margin expanded by 389 bps to 88.2% from the previous year.
- Operating loss declined to RMB15.4 million (US$2.3 million) from the previous year.

"We are very excited to report solid revenue and business growth for our first time as a NASDAQ listed company," stated Mr. Guosheng Qi, Chief Executive Officer of Gridsum.  "Our revenues grew a solid 69.8% year over year as we witnessed rapidly growing demand for our business solutions across the board.  Increasingly, we see customers in China recognizing the benefits of making data-driven decisions, which is driving strong demand for our software from both new and existing customers.  We are encouraged by the steady development of our business, based on our proprietary cloud-based SaaS platform, the *Gridsum Big Data Platform*, and we are excited about the opportunities ahead of us.  We are also proud to announce significant progress in our strategic longer term initiatives.  Leveraging on our proprietary platform as well as capitalizing on the market void for world-class localized solutions tailored for China businesses, we have moved to live client beta testing for our new cloud-based SaaS CRM solution which we aim to roll out in late 2017.  Given the dramatic growth in demand for such scalable big data analytic solutions, coupled with a successful IPO on NASDAQ, we believe that Gridsum is well positioned to seize these dynamic secular trends and generate significant shareholder value going forward."

26

Mr. Michael Zhang, Chief Financial Officer of the Company, commented, "Driven by strong top-line growth during the third quarter, we expanded our margin performance and improved bottom line year over year.  Thanks to a favorable sales mix, gross margin expanded by 389 bps to 88.2% and operating loss declined significantly to RMB15.4 million from one year ago.  By continuing to focus on leveraging our brand, scale and industry leadership in China, we anticipate improved top line growth and operating leverage as our proprietary cloud platform continues to attract new customers and drive revenue growth going forward."

\*       \*       \*

**COST OF REVENUES:**  Cost of revenues increased by RMB2.5 million to RMB11.7 million (US$1.8 million), or 27.8%, from the comparable period in 2015. The increase was a result of a RMB1.4 million increase in cost of customer service consultants, and a RMB1.1 million increase in bandwidth costs and overhead allocation.

\*       \*       \*

**OPERATING EXPENSES:**  Total operating expenses for the third quarter of 2016 increased by 47.4% to RMB102.5 million (US$15.4 million), from RMB69.5 million in the comparable period in 2015.  As a percentage of net revenues, operating expenses were 103.8%, compared with 119.6% in the comparable period in 2015, thanks to improving operating leverage as revenue grew steadily.

\*       \*       \*

**NET LOSS:**  Net loss attributable to Gridsum's ordinary shareholders for the third quarter of 2016 was RMB24.6 million (US$3.7 million), which decreased from RMB29.0 million in the comparable period in 2015.

\*       \*       \*

**NET LOSS PER ADS:**  Net loss per ADS for the third quarter of 2016 was RMB2.36 (US$0.35).

79.      The statements in ¶ 78 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Gridsum Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Gridsum lacked effective internal control over financial reporting; (ii) Gridsum was not addressing issues with its financial reporting

raised by its auditor; (iii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading financial reports;  (iv) as admitted by the Company in its April 23, 2018 press release, PwC had previously raised with the Company issues relating to revenue recognition, cash flow, cost, expense items, and their underlying documentation and estimates a 2016 revenue impact of approximately RMB 2 million and a 2016 expense impact of approximately RMB 6 million; (v) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (vi) as a result of the foregoing, Gridsum's public statements were materially false and misleading at all relevant times.

80.     On March 15, 2017, the Company issued a press release titled "Gridsum Reports Unaudited Fourth Quarter and Full Year 2016 Financial Results," stating in relevant part:

### Fourth Quarter 2016 Financial Highlights

- Net revenues increased by 66.7% to RMB153.5 million (US$22.1 million) from RMB92.1 million in the comparable period in 2015, driven by 62.7% growth in Enterprise revenues and 116.4% increase in e-Government and other revenues.
- Gross profit increased by 70.0% to RMB131.7 million (US$19.0 million) from RMB77.5 million in the comparable period in 2015.
- Income from operations increased by 133.2% to RMB7.3 million (US$1.0 million) from RMB3.1 million in the comparable period in 2015.

### Full Year 2016 Financial Highlights

- Net revenues increased by 70.4% to RMB400.3 million (US$57.6 million) from RMB234.8 million in the prior year, driven by 68.1% growth in Enterprise revenues and 101.6% increase in e-Government and other revenues.
- Gross profit increased by 73.7% to RMB346.8 million (US$49.9 million) from RMB199.6 million in the prior year.
- Loss from operations narrowed by 19.5% to RMB36.8 million (US$5.3 million) from RMB45.7 million in the prior year.

"We are delighted to report another quarter of solid growth in both our financial and operating performance," stated Mr. Guosheng Qi, Chief Executive Officer of Gridsum.  "Our topline continued to witness significant momentum in the quarter

with revenues exceeding our expectations.  This strong performance was driven by both new customer wins as well as an increase in average revenue per customer.  In 2016, we had 395 total customers, representing a 28.7% year-over-year increase. Additionally, average revenue per customer increased by 35.5% year over year to RMB1.0 million.  These solid metrics demonstrate that our innovative DNA is a core component of our success, and our commitment to strengthen our R&D capabilities remains robust.

*        *        *

Mr. Michael Zhang, Chief Financial Officer of the Company, commented, "Driven by a 62.7% increase in Enterprise revenues and a 116.4% increase in e-Government and other revenues, our net revenues experienced solid growth of 66.7% year over year in the fourth quarter.  Meanwhile, our 2016 full year revenues increased by 70.4% year over year.  As our business grows, we will continue to invest to further strengthen our portfolio of products and the robustness of those products, as well as to broaden Gridsum's market visibility with targeted investment into sales and marketing to fuel our continued growth.  We will also continue to expand into new markets that possess significant growth potential and believe we are well positioned, with the right strategy, to capitalize on this dynamic growth momentum and further fortify our position as China's leading cloud-based data analytics and enterprise SaaS provider."

***Fourth Quarter 2016 Financial Results***

*        *        *

***COST OF REVENUES:***  Cost of revenues were RMB21.8 million (US$3.1 million), as compared with RMB14.6 million in the comparable period in 2015, mainly due to a RMB12.0 million increase in cost of software optimization services.  The increase primarily reflects the increase in total revenues and the Company's incremental investment in data security as a result of an increasing number of customers in the juridical system which have very high standards for the security of sensitive data.

*        *        *

***OPERATING EXPENSES:***  Total operating expenses for the fourth quarter of 2016 were RMB124.4 million (US$17.9 million), as compared with RMB74.3 million in the comparable period in 2015.  As a percentage of net revenues, operating expenses were 81.1%, as compared with 80.8% in the comparable period in 2015, primarily due to the increased sales and marketing expenses and research and development expenses.

*        *        *

***NET   LOSS   ATTRIBUTABLE   TO   GRIDSUM'S   ORDINARY SHAREHOLDERS:***  Net loss attributable to Gridsum's ordinary shareholders for

the fourth quarter of 2016 was RMB 23.4 million (US$3.4 million), as compared with RMB11.3 million in the comparable period in 2015.  The increase was primarily due to a RMB23.7 million increase in income tax expenses and partially offset by the increase of income from operations.

*        *        *

**NET LOSS PER ADS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:**  Net loss per ADS attributable to Gridsum's ordinary shareholders for the fourth quarter of 2016 narrowed by 30.1% to RMB0.79 (US$0.11), as compared with RMB1.13 in the comparable period in 2015.

*        *        *

***Full Year 2016 Financial Results***

*        *        *

**COST OF REVENUES:**  Cost of revenues were RMB53.5 million (US$7.7 million) in the full year of 2016, as compared with RMB35.2 million in the prior year.  The increase was a result of a RMB14.7 million increase in the cost of software optimization services, a RMB3.6 million increase in cost of customer service consultants, and increased overhead allocation.  The increase primarily reflects the Company's incremental investment to enhance its data security capability.

*        *        *

**OPERATING EXPENSES:**  Total operating expenses for the full year of 2016 were RMB383.5 million (US$55.2 million), as compared with RMB245.3 million in the prior year.  As a percentage of net revenues, operating expenses declined to 95.8% from 104.4% in the prior year.

*        *        *

**NET LOSS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:**  Net loss attributable to Gridsum's ordinary shareholders for the full year of 2016 was RMB97.4 million (US$14.0 million), as compared with RMB85.2 million in the prior year.

*        *        *

**NET LOSS PER ADS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:**  Net loss per ADS attributable to Gridsum's ordinary shareholders for the full year of 2016 narrowed by 24.1% to RMB6.47 (US$0.93), as compared with RMB8.52 in the prior year.

81.     On April 27, 2017, Gridsum filed its 2016 Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year-ended December 31, 2016.  For fiscal year 2016, Gridsum reported a net loss attributable to Gridsum shareholders of $14 million, or $0.93 per diluted share, on net revenue of $57.65 million, compared to a net loss attributable to Gridsum shareholders of $12.82 million, or $1.28 per diluted share, on net revenue of $35.34 million for fiscal year 2015.  The Company also reported fiscal year 2016 gross profit of $49.9 million and operating expenses of $55.2 million.

82.     In the 2016 Form 20-F, the Company stated in relevant part:

***Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with U.S. GAAP***, appearing elsewhere in this annual report.  The preparation of these consolidated financial statements requires us to make estimates, judgments and assumptions that affect the reported amounts of assets, liabilities, revenues, expenses and related disclosure of contingent assets and liabilities.  We evaluate these estimates, judgments and assumptions on an ongoing basis for taxes.

Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances.  These estimates form the basis for our judgments about the carrying values of assets and liabilities that are not readily apparent from other sources.  Actual results may differ materially from such estimates under different assumptions or conditions.

83.     Gridsum also explained the following in the 2016 Form 20-F regarding revenues:

***Net Revenues***

Net revenues consist of revenues recognized from customers who used our software solutions during the period, including revenues that we receive from the incentive programs of search engine providers, less business tax and surcharge.  Historically, we have increased net revenues through our ability to increase the number of customers, retain high quality customers and increase the average customer contribution by upselling and cross selling new solutions.  We believe this trend will continue as more customers adopt our solutions and demand more business intelligence to improve their operational efficiency, and as we continue to bring more innovative solutions to market and serve our customers.

\*       \*       \*

**(l) Revenue Recognition**

Revenues are generated from sales of the Company's marketing automation solutions and e-Government and other solutions.  The targeted customers for marketing automation solutions are enterprise customers and the targeted customers for e-Government and other solutions are governmental agencies and state-owned entities.

Revenues are recognized when:

- persuasive evidence of an arrangement exists;
- the Group's platform is made available and services have been delivered to the customer;
- the fee is fixed or determinable; and
- collection is reasonably assured.

Revenues received from the incentive programs of search engine providers are based on factors determined by these providers, such as yearly growth in the amount of advertising on the provider's search engine platform that the Company's customers purchase through its solutions, and other factors selected at the discretion of these providers.  Revenues are recorded net of value-added taxes and surcharges.

In accordance with ASC 605-45, Revenue Recognition: Principal Agent Considerations, the Company considers several factors in determining whether it acts as the principal or as an agent in the arrangement of merchandise sales and provision of various related services and thus whether it is appropriate to record the revenues and the related cost of sales on a gross basis or record the net amount earned as service fees.

Where customers purchase multiple solutions in a single contract, the Company allocates the total consideration to the various elements based on the relative selling price method and recognizes revenues as services are rendered.  In accordance with ASC 605-25, Revenue Recognition-Multiple-Element Arrangements, the following hierarchy are followed when determining the appropriate selling price for each element:  (1) vendor specific objective evidence ("VSOE"), (2) third party evidence ("TPE") and (3) best estimate of selling price ("BESP").  The Company recognizes revenues on the elements delivered and defers the recognition of revenues for the fair value of the undelivered elements until the remaining obligations have been satisfied.  Where all of the elements within an arrangement are delivered uniformly over the agreement period, revenues are recognized on a straight line basis over the contract period.

Enterprise

The Company generates enterprise revenue primarily by providing marketing automation solutions including bid management and data analysis solutions to enterprise customers.  The Company earns and records service fee revenues over

the contractual period, in proportion to ad spending or the completion of milestones that are stipulated in the contracts.  In addition, the Company receives revenues from the incentive programs of search engine providers based on factors determined by these providers, such as yearly growth in the amount of advertising on the provider's search engine platform that the Company's customers purchase through its solutions, and other factors selected at the discretion of these providers. Revenues from these programs are received on both a quarterly and an annual basis and are calculated in accordance with the Company's customers' usage of the search engine providers.

With respect to the bid management services, the Group considered that:  (i) the search engines are responsible for providing the advertisements service to the customers; (ii) the Group lacks the latitude to determine the prices charged by the search engine providers and earns only the fixed service fee from the customers; (iii) the hosting and maintenance of the advertisements are the responsibilities of the search engine providers; (iv) the customers have the discretion in choosing the search engines selection; (v) we receive revenues from incentive programs based on the search engine providers' policies.  The Group's responsibility is to manage the customer's advertising campaign on the search engines, according to the terms of the customer contracts so the Group views itself as an agent, and records revenues related to these services on a net basis.

e-Government and Other

The Company generates revenues by entering into service contracts with governmental agencies for its e-government solutions, including Law Dissector solutions for the court systems and other law communities beginning in 2015.  The Company also generates revenues by entering into contracts with state-owned television stations for its new media solutions, including TV Dissector, Streaming Dissector and Video Dissector.

**(m) Advances from Customers and Deferred Revenues**

Upon the entering of contracts, customers pay the contractual balance as prepayments.  The Company allocates the prepayments into advances from customers and deferred revenues.  Advances from customers are the balance of the advertising campaign spending that would be recognized as the cost payable to search engine providers when advertisements are placed.  Deferred revenues are the revenues to be earned by the Group for services and is recognized as revenue according to the prescribed revenue recognition criteria and policies described above.

**(n) Cost of Revenues**

Cost of revenues primarily consists of costs related to hosting the Company's cloud-based platform, providing implementation and ongoing customer support, data communications expenses, salaries and benefits of operations and support

personnel, costs associated with website development activities, allocated overhead and property and equipment depreciation.

84.   With regards to the Company's internal controls, the 2016 Form 20-F stated in relevant part:

**Internal Control over Financial Reporting**

Prior to our initial public offering in September 2016, we were a private company with limited accounting personnel and other resources with which to address our internal controls.  Our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting.  In the course of auditing our consolidated financial statements, we and our independent registered public accounting firm identified ***two material weaknesses*** and certain other control deficiencies in our internal controls, each as defined in the standards established by U.S. Public Company Accounting Oversight Board, in our internal control over financial reporting as of December 31, 2016.  A material weakness is a deficiency, or combination of deficiencies, in internal controls, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

The two material weaknesses relate to:  (1) our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and the SEC reporting requirements to properly address complex accounting issues and to prepare and review our financial statements and related disclosures in accordance with U.S. GAAP and SEC financial reporting requirements; and (2) the lack of sufficient written policies and procedures for capturing certain services received before contracts were signed to timely record the related expenses in the financial statements.

***We have taken initiatives to improve our internal control over financial reporting to address the material weaknesses and certain other control deficiencies that have been identified, including:  hiring a Co-Chief Financial Officer, a financial analyst with experience in U.S. GAAP accounting and SEC reporting; hiring two internal control supervisors to enhance the internal audit function; established an audit committee after our initial public offering, with members who have an appropriate level of financial expertise to oversee our accounting and financial reporting processes as well as our external and internal audits; and we engaged an external consulting firm to assist us to assess Sarbanes-Oxley compliance readiness and improve overall internal controls.***

***We have also taken other steps to strengthen our internal control over financial reporting, including preparing a contracts tracking database, continuing to hire qualified professionals with sufficient U.S. GAAP accounting and SEC reporting experience, providing relevant training to our accounting personnel and***

*upgrading our financial reporting system to streamline monthly and year-end closings and integrate financial and operating reporting systems.*

\*        \*        \*

**Changes in Internal Control over Financial Reporting**

*Except for the matters described above to improve our internal control over financial reporting, there were no changes in our internal control over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

85.    The 2016 Form 20-F contained signed certifications pursuant to SOX by Qi, Zhang, and Sarathy, stating, in relevant part, that the information contained in the 2016 Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

86.    The statements in ¶¶ 80-85 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial results, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the Gridsum Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Gridsum's material weaknesses over internal controls extended beyond the "lack of sufficient financial reporting and accounting personnel" and "lack of sufficient written policies;" (ii) Gridsum was not addressing issues with its financial reporting raised by its auditor; (iii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading financial reports; (iv) as admitted by the Company in its April 23, 2018 press release, PwC had previously raised with the Company issues relating to revenue recognition, cash flow, cost, expense items, and their underlying documentation and estimates a 2016 revenue impact of approximately RMB 2 million and a 2016 expense impact of approximately RMB 6 million; (v) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial

condition and results of operations of the Company; and (vi) as a result of the foregoing, Gridsum's public statements were materially false and misleading at all relevant times.

87.     On May 25, 2017, Gridsum issued a press release, filed as Exhibit 99.1 to a Form 6-K with the SEC on May 26, 2017, signed by Zhang, titled "Gridsum Reports Unaudited First Quarter 2017 Financial Results."  The press release stated in relevant part:

### First Quarter 2017 Financial Highlights

- Net revenues increased by 57.3% to RMB100.6 million (US$14.6 million) from RMB64.0 million in the comparable period in 2016, driven by 51.5% growth in Enterprise revenues and a 112.4% increase in e-Government and other revenues.
- Gross profit increased by 64.6% to RMB90.0 million (US$13.1 million) from RMB54.7 million in the comparable period in 2016.

"The first quarter of 2017 was another solid quarter with robust financial and operating results," stated Mr. Guosheng Qi, Chief Executive Officer of Gridsum. "We are pleased to see our topline continue its strong growth momentum, primarily driven by solid customer base expansion, which we target to grow by 30-40% in 2017, and a steady increase in Average Revenue Per User ("ARPU").

*        *        *

Mr. Michael Zhang, Chief Financial Officer of the Company, commented, "In the first quarter of 2017, our net revenues increased by 57.3% year over year to RMB100.6 million, driven by a solid 51.5% increase in our Enterprise revenues and 112.4% increase in e-Government and other revenues.  The significant growth of our e-Government and other business was primarily driven by the better-than expected performance in all the three revenue streams of e-Government, new media and legal services with legal services, in particular, exhibiting exceptional growth. To fuel further topline growth, we will leverage our superior sales efficiency and continue our targeted investment in sales and marketing to broaden our market visibility.  R&D will remain another key area of focused investment to strengthen our technology leadership and drive expansion into new products and services."

### First Quarter 2017 Financial Results

*        *        *

**COST OF REVENUES:**  Cost of revenues were RMB10.6 million (US$1.5 million), as compared with RMB9.3 million in the comparable period in 2016.  The increase was primarily due to the RMB2.6 million increased cost of technical service fee, which was in line with total revenues growth.

*     *     *

*OPERATING EXPENSES:*  Total operating expenses for the first quarter of 2017 were RMB139.0 million (US$20.2 million), as compared with RMB76.3 million in the comparable period in 2016.   As a percentage of net revenues, operating expenses were 138.2%, as compared with 119.3% in the comparable period in 2016, primarily due to the increased sales and marketing expenses and research and development expenses.

*     *     *

*LOSS FROM OPERATIONS:*  Loss from operations for the first quarter of 2017 was RMB49.0 million (US$7.1 million), as compared with RMB21.6 million in the comparable period in 2016.

*NET LOSS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:*  Net loss attributable to Gridsum's ordinary shareholders for the first quarter of 2017 was RMB57.2 million (US$8.3 million), as compared with RMB31.1 million in the comparable period in 2016.  The increase was primarily due to the increased operating expenses, including the incremental expenses as a result of being a publicly listed company.

*     *     *

**NET LOSS PER ADS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:**  Net loss per ADS attributable to Gridsum's ordinary shareholders for the first quarter of 2017 narrowed by 38.3% to RMB1.92 (US$0.28), as compared with RMB3.11 in the comparable period in 2016.

88.     On May 25, 2017, Gridsum also held an earnings conference call to discuss the Company's first quarter 2017 financial results.  On this call, certain Individual Defendants were questioned on revenue recognition as follows:

**Unidentified Participant**

Hi, gentlemen.  Congratulations on the results.  I know we just met recently.  But my question pertains to how you book your revenues.  I'm just trying to get a little bit more clarity on why there is such seasonality?  How does your customer – from my understanding, correct me if I'm wrong, do they give you a marketing budget and as and when they have bigger solutions for you, you book the revenues or how does it work?  Can you try to explain a little bit on why first Q is weaker than four Q traditionally or is it just promotional driven when they have a new product launch for example, then they engage you for more services and it usually happens during fourth quarter or how does it really work?

37

**Michael Zhang, Chief Financial Officer**

Well, thank you.  This was not as simple, we book revenue based on the consumption.  The consumption meaning the data volume we processed for our clients or for the marketing automation – in the marketing automation space, based on the total marketing spend as a percentage we took as the revenue.

So it's a pure SaaS and consumption based, however as you know, we work with a lot of Fortune 500 and China 500 Corporations, large customers.  Each customer, they have different marketing budget and schedules as the example you mentioned, for certain events for car company slightly in the third quarter, they will launch new cars.

Around that time, they will increase the spending and for our e-commerce customers, for example, JD.com, they have June 16th as a shopping festival and they have also participated the (inaudible) November 11th shopping festival.  Those events will also have certain impact on our revenues.  So overall, there is a seasonality from Q1 to Q4.  But the event driven, it's just a part of that.  For Q1 the reason it is the weakest because the Chinese New Year, (inaudible) festival is always in the first quarter and basically there is about 20 days to 30 days, people do not do business, and activities are very low in the first quarter.

**Guosheng Qi, Chairman of the Board, Chief Executive Officer**

Ming –

**Unidentified Participant**

Right, okay.  And my last question, sorry go ahead.

**Ravi Sarathy, Co-Chief Financial Officer**

Ming, it's a very good question.  So we have very good visibility on annual offers.  So the beginning of the year, we have more than 75% revenue visibility for clients.  But we have less quarterly visibility because the way they spend the annual budget between quarters can vary, but that is a heavy seasonal overlay.

89.     On August 24, 2017, Gridsum issued a press release, filed as Exhibit 99.1 to a Form

6-K filed with the SEC on August 25, 2017, signed by Zhang, titled "Gridsum Reports Unaudited

Second Quarter 2017 Financial Results."  The press release stated in relevant part:

*Second Quarter 2017 Financial Highlights*

- Net revenues increased by 43.8% to RMB120.9 million (US$17.8 million) from RMB84.1 million in the comparable period in 2016, driven by a 34.6%

growth in Enterprise revenues and a 123.9% increase in e-Government and other revenues.

- Gross profit increased by 37.4% to RMB100.8 million (US$14.9 million) from RMB73.4 million in the comparable period in 2016.

"We delivered strong financial and operating results once again in the second quarter of 2017," stated Mr. Guosheng Qi, Chief Executive Officer of Gridsum. "Our topline maintained its robust growth trajectory, primarily driven by solid customer base expansion and increased Average Revenue Per User ('ARPU'). We remain on target to grow our customer count by 30% to 40% in 2017. In particular, we were very effective in cross-selling and upselling our products and services to existing clients.

*       *       *

Mr. Michael Zhang, co-Chief Financial Officer of the Company, commented, "In the second quarter of 2017, our net revenues increased by 43.8% year over year to RMB120.9 million, driven by a 34.6% increase in our Enterprise revenues and a 123.9% increase in e-Government and other revenues. Although our gross margin declined from 87.2% to 83.3% year over year, it is within our budgeted range and expectations as we increased our investment in optimizing and enhancing the performance and security of our system and database. During the quarter, we also increased our spending in sales and marketing as well as research and development, consistent with our strategy of augmenting our brand recognition and solidifying our technology leadership. At the same time, we are carefully monitoring the ROI of our investments and making sure that our cost structure is optimized for efficiency. Going forward, we will continue to prudently invest in our future growth."

***Second Quarter 2017 Financial Results***

*       *       *

***COST OF REVENUES:*** Cost of revenues were RMB20.2 million (US$3.0 million) as compared to RMB10.8 million in the comparable period of 2016. The increase was primarily due to the RMB10.1 million increased cost of technical service fee and was partially offset by a RMB1.1 million decrease in personnel cost.

*       *       *

***OPERATING EXPENSES:*** Total operating expenses for the second quarter of 2017 were RMB128.2 million (US$18.9 million) as compared to RMB80.3 million in the comparable period of 2016. As a percentage of net revenues, operating expenses were 106.0% as compared to 95.5% in the comparable period of 2016, primarily due to the increased sales and marketing expenses and research and development expenses.

*       *       *

***LOSS FROM OPERATIONS:***  Loss from operations for the second quarter of 2017 was RMB27.4 million (US$4.0 million) as compared to a loss of RMB7.0 million in the comparable period of 2016.

***NET LOSS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:***  Net loss attributable to Gridsum's ordinary shareholders for the second quarter of 2017 was RMB32.3 million (US$4.8 million) as compared to RMB18.3 million in the comparable period of 2016.  The increase was primarily due to the increase in operating expenses, including incremental expenses as a result of being a publicly listed company, by a larger percentage as compared to the increase of gross profits.

*      *      *

***NET LOSS PER ADS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:***  Net loss per ADS attributable to Gridsum's ordinary shareholders for the second quarter of 2017 was RMB1.09 (US$0.16) as compared to RMB1.83 in the comparable period of 2016.

90.      On November 28, 2017, Gridsum issued a press release, filed as Exhibit 99.1 to a Form 6-K filed with the SEC on November 29, 2017, signed by Zhang, titled "Gridsum Reports Unaudited Third Quarter 2017 Financial Results."  The press release stated in relevant part:

***Third Quarter 2017 Financial Highlights***

- Net revenues increased by 53.4% to RMB151.4 million (US$22.8 million) from RMB98.7 million in the comparable period of 2016, driven by a 47.8% rise in Enterprise revenues and a 98.0% increase in e-Government and other revenues.
- Gross profit increased by 43.8% to RMB125.2 million (US$18.8 million) from RMB87.0 million in the comparable period of 2016.

Mr. Guosheng Qi, Chief Executive Officer of Gridsum, commented, "We delivered another strong quarter of growth driven by our continued effectiveness at attracting new clients, including companies such as Dyson, Domino's, Stanley Black and Decker, Union Life, Viking Cruise, and others, to our core marketing automation business, and cross selling and upselling additional products and features which drove growth of average revenue per customer ('ARPU') within our expanding portfolio of clients.  We have also made considerable progress in our strategy to develop solutions for new verticals, such as an intelligent customer relationship management system (CRM) which is anticipated to be launched next month and the industrial internet of things (IIoT).  In August, Mr. Xijian Liu joined us as our chief strategy officer.  He also heads our newly established IIoT division.  Mr. Liu's more than three decades of IT and strategic management experience at one of the largest state-owned petrochemical companies in China lays a solid foundation for

40

our rapid development in the IIoT space.  Moving forward, we will continue to consolidate long-term relationships with our clients and delve deeper into their businesses by offering solutions to multiple parts of their organizations to help them with their digital transformations.  We continue to target having around half of our growth being driven by new client additions, and around half from ARPU expansion."

\*       \*       \*

Mr. Michael Zhang, co-Chief Financial Officer of Gridsum, concluded, "During the quarter, enterprise revenues increased by 47.8% while e-Government and other revenues increased by an even faster 98.0%, albeit from a smaller base.  We continue to invest for the future while carefully balancing growth opportunities with a path to profitability.  We believe that with rapid top line growth our operating leverage will become more significant.  We have already started to see solid leverage from our sales and marketing ('S&M') spending, and we expect to see greater stability in our research and development ('R&D') and general and administrative ('G&A') spending, which should put us on a stronger path to profitability.  R&D remains a critical element of our business to ensure that we maintain our leading position in the enterprise SaaS space over the short, medium and long term.  As such, we expect that R&D spending, in absolute terms, to continue growing at a sustainable level in the coming quarters."

***Third Quarter 2017 Financial Results***

\*       \*       \*

**COST OF REVENUES:**  Cost of revenues was RMB26.2 million (US$3.9 million), compared with RMB11.7 million in the comparable period of 2016.  The rise was primarily due to a RMB14.4 million increase in technical service fees.

\*       \*       \*

**OPERATING EXPENSES:**  Total operating expenses were RMB155.7 million (US$23.4 million), compared with RMB102.5 million in the comparable period of 2016.  As a percentage of net revenues, operating expenses were 102.8%, compared with 103.8% in the comparable period of 2016.

\*       \*       \*

**LOSS FROM OPERATIONS:**  Loss from operations was RMB30.5 million (US$4.6 million), compared with a loss of RMB15.4 million in the comparable period of 2016.

***NET LOSS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:***  Net loss attributable to Gridsum's ordinary shareholders was RMB34.1 million (US$5.1 million), compared with RMB24.6 million in the comparable period of 2016.  The increase was primarily due to an increase in

operating expenses, especially R&D as the Company aims to position itself for its anticipated seasonally strong fourth quarter.

*     *     *

***NET LOSS PER ADS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:*** Net loss per ADS attributable to Gridsum's ordinary shareholders was RMB1.15 (US$0.17), compared with RMB2.36 in the comparable period of 2016.

91.     The statements in ¶¶ 87-90 were materially false and misleading because the Individual Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, the defendants made false and/or misleading statements and/or failed to disclose that: (i) Gridsum lacked effective internal control over financial reporting; (ii) Gridsum was not addressing issues with its financial reporting raised by its auditor; (iii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading financial reports; (iv) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (v) as a result of the foregoing, Gridsum's public statements were materially false and misleading at all relevant times.

### B.     Scienter

92.     As alleged herein, each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information. Throughout the Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class. Such actions caused the price of Gridsum shares to be artificially inflated.

42

93.     In their respective roles as officers and/or directors of Gridsum, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period.  As a result, each had the opportunity to falsify the information provided to the public regarding Gridsum's business and performance.

### 1.     Gridsum's $87 Million IPO

94.     The Individual Defendants' fraudulent scheme and materially false and misleading statements and omissions ensured the success of the Company's entry into the United States public equity markets.  While the Individual Defendants disclosed in the Registration Statement that the Company lacked sufficient financial reporting and accounting personnel with appropriate knowledge, they omitted to inform investors that the reported financial information was inaccurate. In fact, the Registration Statement explicitly stated that the audited consolidated financial statements for the years-ending December 31, 2013, 2014 and 2015 were "prepared in accordance with U.S. GAAP," and gave explicit details on relevant accounting policies such as revenue recognition (*see, e.g.*, ¶ 57).

95.     The Individual Defendants' materially false and misleading statements allowed Gridsum to sell 7.7 million ADSs at $13.00 per share during its IPO, garnering proceeds of more than $87 million, more than doubling its cash on hand, cash it needed to continue to operate.  *See, e.g.*, Bishop, S., "Is Gridsum Holding Inc.'s (GSUM) Balance Sheet a Threat to Its Future?" Simply Wall St., Aug. 31, 2017, https://simplywall.st/news/is-gridsum-holding-incs-gsum-balance-sheet-a-threat-to-its-future/; *see also* ¶ 68 ($40 million convertible note with FutureX Capital).

## 2.    Admitted Knowledge

96.    Gridsum is a small company with only 929 employees as of December 31, 2016, and only 118 in the general and administrative department.  Just a few years prior, in 2013, the Company only had 268 employees.  Qi founded the company in 2005 and most of the directors have been with the Company since 2013 or before.  Gridsum's Registration Statement and 2016 Form 20-F both state:

> Our success and future growth depend largely upon the continued services of our executive officers. . . .   The loss of one or more of our executive officers, particularly our chief executive officer and chairman, Guosheng Qi, or the failure of our executive team to work with our employees and lead our company effectively, could adversely affect our business.

97.    Additionally, the Registration Statement and 2016 Form 20-F state that the Company's "chief operating decision maker has been identified as the chief executive officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of [Gridsum]."

98.    Qi, Zhang, and Sarathy repeatedly admitted to having knowledge of Gridsum's financial condition through their public statements.  For example:

- Mr. Michael Zhang, Chief Financial Officer of the Company, commented, "Driven by strong top-line growth during the third quarter, we expanded our margin performance and improved bottom line year over year.  Thanks to a favorable sales mix, gross margin expanded by 389 bps to 88.2% and operating loss declined significantly to RMB15.4 million from one year ago.  By continuing to focus on leveraging our brand, scale and industry leadership in China, we anticipate improved top line growth and operating leverage as our proprietary cloud platform continues to attract new customers and drive revenue growth going forward." *Zhang, November 21, 2016 Press Release.*

- Ming, it's a very good question.  So we have very good visibility on annual offers.  So the beginning of the year, we have more than 75% revenue visibility for clients.  But we have less quarterly visibility because the way they spend the annual budget between quarters can vary, but that is a heavy seasonal overlay. *Sarathy, May 25, 2017 Earnings Conference Call.*

- "We delivered strong financial and operating results once again in the second quarter of 2017," stated Mr. Guosheng Qi, Chief Executive Officer of Gridsum. "Our topline maintained its robust growth trajectory, primarily driven by solid customer base expansion and increased Average Revenue Per User ('ARPU'). We remain on target to grow our customer count by 30% to 40% in 2017. In particular, we were very effective in cross-selling and upselling our products and services to existing clients. *Qi, August 24, 2017 Press Release.*

99. Further, each of them signed the SOX certifications for the 2016 Form 20-F attesting that the information contained in the 2016 Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

100. Significantly, as admitted by the Company on April 23, 2018, PwC had "***previously raised with the Company***" the issues that caused the financial statements for the year-ended December 31, 2016 to no longer be reliable.

101. By virtue of their executive and/or directorship positions within a small Company, where the accuracy of the financial statements was or should have been a key focus given the admitted weaknesses, and the admitted knowledge above, it can be presumed that the Individual Defendants knew non-public material facts concerning the financial statements.

### 3.    Audit Committee

102. Gao, Melcher, and Schloss were members of Gridsum's Audit Committee at all relevant times. As reported by the Company, Schloss, the Audit Committee Chair, "meets the criteria of an audit committee financial expert as set forth under the applicable rules of the SEC."

103. According to Gridsum's SEC filings, the Audit Committee performs the following functions:

The Audit Committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. It is responsible for, among other things:

- appointing the independent auditor and pre-approving all auditing and non-auditing services permitted to be performed by the independent auditor;

- reviewing with the independent auditor any audit problems or difficulties and management's response;
- reviewing and approving all proposed related party transactions;
- reviewing and discussing audited annual financial statements with management and the independent auditor;
- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;
- annually reviewing and reassessing the adequacy of our Audit Committee charter;
- meeting separately and periodically with management and the independent auditor; and
- reporting regularly to the Board of Directors.

104.    As members of the Audit Committee, specifically tasked with overseeing the Company's accounting, financial reporting processes, and audits of the financial statements, it can be presumed that Gao, Melcher, and Schloss knew non-public material information regarding the financial statements.

### 4.    Qi's Personal Guarantee Of Company Loans

105.    According to the Registration Statement, in June 2016, Beijing Gridsum entered into a $3.8 million short-term guaranteed revolving credit facility, for which Qi provided a personal guarantee.  As of June 30, 2016, the Company had borrowed $1.5 million under the credit facility.

106.    The 2016 Form 20-F stated that "several short-term guaranteed loan agreements" were entered into during 2016 and that the "guarantees on these loans were provided by Guosheng Qi . . . or Beijing Haidain Sci-tech Enterprises Financing Guarantee Co., Ltd., a third-party guarantor."  As of December 31, 2016, Gridsum's short-term loans amounted to $9.4 million.

107.    Qi was motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements to protect his personal assets as a guarantor on Company bank loans.

C.     **Loss Causation**

108.    During the Class Period, as detailed herein, the Individual Defendants engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Gridsum securities and operated as a fraud or deceit on Class Period purchasers of Gridsum ADSs.

109.    The Individual Defendants' materially false and/or misleading statements and omissions concealed Gridsum's true financial condition.  As detailed above, when the truth about Gridsum's misleading financial statements was revealed, the price of Gridsum securities declined significantly as the prior artificial inflation was removed from the Company's stock price.

110.    As a result of their purchases of Gridsum during the Class Period, at artificially inflated prices, Plaintiffs and the Class suffered damages under the federal securities laws.

111.    The artificial inflation created by the Individual Defendants' misrepresentations and omissions was removed when the Company announced on April 23, 2018 that its financial statements for the year-ended December 31, 2016 should no longer be relied upon and that the Company's Audit Committee was investigating issues identified by PwC relating to certain revenue recognition, cash flow, cost, and expense items.  *See* ¶ 64.

112.    Following this disclosure, Gridsum's share price declined by $1.17 per share, or 16.04%, on heavier than usual trading volume of over 7.4 million shares, to close on April 23, 2018 at $6.12 per share.  Intra-day trading on April 23, 2018 reached a share price low of $3.68, a 49% decrease from the share price low on April 20, 2018.  Gridsum's ADSs continued to decline over the next few days as a result of the disclosure, dropping another 10% on April 24, 2018, and $2.27, or 31.14% from its closing price per share on April 20, 2018 to its closing price per share on April 26, 2018.  The Company's share price has not returned to its April 20, 2018 closing price since.

113. The timing and magnitude of the price decline in Gridsum's stock on the date of the disclosures above negates any inference that the losses suffered by Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to the Individual Defendants' fraudulent conduct.

114. The damages suffered by Plaintiffs and the Class were the direct and proximate result of the Individual Defendants' materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning the Individual Defendants' prior misrepresentations and fraudulent conduct were revealed.

## VI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

115. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who (1) purchased or otherwise acquired Gridsum securities during the Class Period, and/or (2) purchased or otherwise acquired Gridsum securities pursuant to and/or traceable to Gridsum's Offering Materials in connection with its IPO, and were damaged upon the revelation of the alleged corrective disclosures.  Excluded are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

116. Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gridsum securities were actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other Class members may be identified from records

maintained by Gridsum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

117.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

118.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

119.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the Offering Materials contained any material misrepresentations or omissions;

b.    whether Defendants have a viable good faith defense to the strict liability imposed by Section 11 of the Securities Act;

c.    whether Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Section 11 of the Securities Act;

d.    whether the Individual Defendants were control persons of Gridsum for the purposes of Section 15 of the Securities Act and Section 20(a) of the Exchange Act;

e.    whether the additional statements made by the Gridsum Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Gridsum, or omitted facts necessary to make the statements not misleading;

f.    whether Individual Defendants caused Gridsum to issue false and misleading financial statements during the Class Period;

g.    whether the Individual Defendants acted knowingly or recklessly in issuing false and misleading misrepresentations or omissions;

h.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

i.    whether the prices of Gridsum securities during the Class Period were artificially inflated because of the Gridsum Defendants' conduct complained of herein; and

j.    whether the members of the Class have sustained damages with respect to their Exchange Act claims and, if so, what is the proper measure of damages.

120.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

121.    With respect to the Exchange Act claims, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    the Gridsum Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    the omissions and misrepresentations were material;

c.    Gridsum's securities are traded in an efficient market;

d.    the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.    the Company's ADSs traded on the Nasdaq and Gridsum was covered by multiple analysts;

f.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.    Plaintiffs and the Class purchased, acquired, and/or sold Gridsum securities between the time the Gridsum Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

122.   Based upon the foregoing, Plaintiffs and the Class are entitled to a presumption of reliance upon the integrity of the market.

123.   Alternatively, Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Gridsum Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VII.   NO SAFE HARBOR

124.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein. The statements alleged herein all relate to then-existing facts and conditions.

125.   To the extent that statements alleged to be false and/or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and the Gridsum Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## COUNT I

### For Violations of Section 11 of the Securities Act
### (Against All Defendants Except For Sarathy)

126.   Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-75 and 115-125 as if fully set forth herein.  This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statement.

127.    This Count does not sound in fraud.   Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege for this Count that Defendants had scienter or fraudulent intent, which are not elements of this claim.

128.    This Count is brought pursuant to Section 11 of the Securities Act on behalf of all persons who purchased Gridsum securities pursuant to and/or traceable to the Company's IPO, in which shares registered under the Registration Statement were sold.

129.    As discussed herein, the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements not misleading, and omitted to state material facts required to be stated therein.

130.    As issuer of the shares, Gridsum is strictly liable to Plaintiffs and the Class for any misstatements and omissions in the Registration Statement, as identified in ¶¶ 54-63.

131.    The Individual Defendants are strictly liable for the contents of the Registration Statement based upon their status as officers and/or directors of the Company or because they signed or authorized the signing of the Registration Statement on their behalf pursuant to Section 11(a)(1)-(3) of the Securities Act.

132.    The Underwriter Defendants are strictly liable for the contents of the Registration Statement as named underwriters pursuant to Section 11(a)(5) of the Securities Act.

133.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and identified at ¶¶ 54-63 were true and without omissions of any material facts and were not misleading.

134.    By reason of the conduct alleged herein, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

135.    Plaintiffs acquired Gridsum ADSs pursuant and/or traceable to the Registration Statement for the IPO.

136.    Plaintiffs and the Class have sustained damages.  The value of Gridsum's ADSs has declined substantially subsequent to and due to Defendants' violations.

137.    At the time of their purchases of Gridsum securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time of the filing of the initial complaint in this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

138.    By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provision of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

**For Violations of Section 15 of the Securities Act**
**(Against the Individual Defendants Except For Sarathy)**

139.    Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-75 and 115-138 as if fully set forth herein.

140.    This Count does not sound in fraud.  Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do

not allege for this Count that Defendants had scienter or fraudulent intent, which are not elements of this claim.

141.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

142.    Each of the Individual Defendants acted as a controlling person of Gridsum within the meaning of Section 15 of the Securities Act by virtue of his or her position as a director and/or senior officer of Gridsum.  By reason of their senior management positions and/or directorships at the Company, as alleged above, the Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Gridsum to engage in the conduct complained of herein.  Further, the Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

143.    Each of the Individual Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the IPO Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

144.    None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and identified at ¶¶ 54-63 were true and without omissions of any material facts and were not misleading.

145.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered as a result of the primary Securities Act violations of Gridsum.

## COUNT III

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against Gridsum and the Individual Defendants)

146.     Plaintiffs repeat and re-allege each and every allegation contained in ¶¶ 1-125 above as if fully set forth herein.

147.     This Count is asserted against Gridsum and each of the Individual Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

148.     At the time the Registration Statement was filed and during the Class Period, these Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gridsum securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Gridsum securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Gridsum Defendants, and each of them, took the actions set forth herein.

149.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, the Gridsum Defendants participated directly or indirectly in the preparation and/or issuance of the Registration Statement.   Each of the Individual Defendants, except for Sarathy, signed as a maker of the representations contained therein, which were materially false and misleading, as particularized in ¶¶ 54-63.

150.     Pursuant to the above plan, scheme, conspiracy and course of conduct, the Gridsum Defendants participated directly or indirectly in the preparation and/or issuance of the annual report, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Gridsum securities.   Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Gridsum's finances and business prospects, as particularized in ¶¶ 1-125.   The primary violations alleged under this Count related to misrepresentations and omissions in Gridsum's annual report, press releases, and earnings conference calls in ¶¶ 78-91 are brought only against Gridsum, Qi, Zhang, and Sarathy.

151.     By virtue of their positions at Gridsum, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Gridsum and the Individual Defendants.   Said acts and omissions of the Individual Defendants were committed willfully or

with reckless disregard for the truth.  In addition, the Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

152.    Information showing that the Gridsum Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Gridsum Defendants' knowledge and control.  As the senior managers and/or directors of Gridsum, the Individual Defendants had knowledge of the details of Gridsum's internal affairs.

153.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Gridsum.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Gridsum's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Gridsum securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Gridsum's business and financial condition which were concealed by the Gridsum Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Gridsum securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Gridsum Defendants and were damaged thereby.

154.    During the Class Period, Gridsum securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Gridsum Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired

shares of Gridsum securities at prices artificially inflated by the Gridsum Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Gridsum securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Gridsum securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

155.    By reason of the conduct alleged herein, Gridsum and the Individual Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

156.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.  Gridsum and the Individual Defendants are liable for damages in connection with those losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

157.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs 1-125 and 146-156, as if fully set forth herein.

158.    During the Class Period, the Individual Defendants participated in the operation and management of Gridsum, and conducted and participated, directly and indirectly, in the

conduct of Gridsum's business affairs.  Because of their senior positions and/or directorships, they knew the adverse non-public information about Gridsum's misstatements of income and expenses and false financial statements.

159.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Gridsum's financial condition and results of operations, and to correct promptly any public statements issued by Gridsum which had become materially false or misleading.

160.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to and did control the contents of the various reports, press releases and public filings which Gridsum disseminated in the marketplace during the Class Period concerning Gridsum's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Gridsum to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Gridsum within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Gridsum securities.

161.    Each of the Individual Defendants, therefore, acted as a controlling person of Gridsum.  By reason of their senior management positions and/or being directors of Gridsum, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Gridsum to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Gridsum and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

162.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Gridsum.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  November 30, 2018                    Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Lawrence P. Eagel*
Lawrence P. Eagel
Marion C. Passmore
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 308-5858
Email: eagel@bespc.com
          passmore@bespc.com
          fortunato@bespc.com

*Attorneys for Lead Plaintiff William Barth*

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
        tjmckenna@gme-law.com

*Attorneys for Named Plaintiff Xuechen Li*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of November, 2018, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS was served by CM/ECF to all parties registered to the Court's CM/ECF system.

*/s/ Lawrence P. Eagel*
Lawrence P. Eagel
