UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEIFA XU, *Individually and On Behalf of All Others Similarly Situated*,

        Plaintiff,

    *– against –*

GRIDSUM HOLDING INC., GUOSHENG QI, MICHAEL PENG ZHANG, RAVI SARATHY, GUOFA YU, PERRY LIN CHUI, XIANG FAN, YANCHUN BAI, XUDONG GAO, THOMAS ADAM MELCHER, PETER ANDREW SCHLOSS, PRICEWATERHOUSECOOPERS ZHONG TIAN LLP, GOLDMAN SACHS (ASIA) L.L.C., CITIGROUP GLOBAL MARKETS INC., *and* STIFEL, NICOLAUS & COMPANY INCORPORATED,

        Defendants.

**OPINION & ORDER**

18 Civ. 3655 (ER)

R<small>AMOS</small>, D.J.:

A putative class of shareholders of an overseas company brings this action against that company, Gridsum Holding Inc., a set of individuals who are current and former officers and directors, Gridsum's former accounting firm, and the underwriters of a 2016 securities offering. They bring this action under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o, and under Section 10(b) and 20(a) of the Securities Exchange Act of 1944 (the "Exchange Act"), 15 U.S.C. §§ 78j, 78t. The plaintiffs seek to hold the defendants liable for a series of alleged misstatements and omissions in a 2015 registration statement, a 2016 annual report, and other, related, documents.

This Opinion and Order resolves the underwriters' motion to dismiss the Securities Act claims against it for failure to state a claim, the accountant's motion to dismiss the Securities Act and Exchange Act claims for lack of personal jurisdiction and

failure to state a claim, and a motion to dismiss all claims by Gridsum and one of the individual defendants.  In addition, the plaintiffs move the Court to order alternative service on several of the individual defendants and the accounting firm, all of whom are located in China or Hong Kong and have yet to be served.

For the below reasons, the motions to dismiss the Securities Act claims are GRANTED, the motions to dismiss the Exchange Act claims are DENIED, the accountant's motion to dismiss for lack of personal jurisdiction is GRANTED, and the motion for alternative service is DENIED.

## I.      THE ALLEGATIONS

### A.  The Defendants

Gridsum is a Cayman Islands holding company that, through a series of intermediate entities and contractual arrangements, operates a portfolio of Chinese software development and data analytics firms.  Second Amended Complaint ("SAC") ¶¶ 43, 44, Doc. 104.  Its products include the Gridsum Big Data Platform, which allows customers to analyze large amounts of data, Gridsum Prophet, which enhances the capabilities of the Big Data Platform, and a suite of solutions that assist customers in utilizing its products to analyze data related to marketing, advertising, social media, the law, and government operations.  SAC ¶¶ 44–48.

Gridsum grew from approximately 730 employees in 2015 to 1150 employees in 2018 — all located in China.  SAC ¶ 51.  About 50 percent of the employees work in research and development, almost 40 percent work in sales and marketing, and about 10 percent work in general and administrative roles — equivalent to 122 in 2017.  In 2017, Gridsum lost ¥197.9 billion[1] or $3.5 billion before interest, taxes, depreciation, and amortization on net revenues of ¥469.5 billion or $72.2 billion.  Decl. of Willam J. Foley

---

[1] The symbol "¥" in this context refers to the Chinese yuan.

("Foley Decl.") Ex 7 ("2017 20-F") at 4–5, Doc. 146.[2] American Depository Shares ("ADS") for Gridsum are listed on NASDAQ under the ticker symbol "GSUM." SAC ¶ 21.

The individual defendants are each a current or former officer or director at Gridsum and include:

- Co-founder, chief executive officer, and chairman **Guosheng Qi**. In 2016 and 2017, Qi personally guaranteed a number of credit lines used by Gridsum. SAC ¶ 207–09. By the end of 2017, Gridsum held $40.9 million in short-term loans. SAC ¶ 209.

- Co-founder and director **Guofa Yu**.

- Co-chief financial officer **Michael Peng Zhang**.

- Co-chief financial officer and former chief of strategy **Ravi Sarathy.**

- Current directors **Yanchun Bai**, **Xudong Gao**, and **Thomas Adam Melcher**.

- Former directors **Perry Lin Chui**, **Xiang Fan**, and **Peter Andrew Schloss**.

SAC ¶¶ 22–31; Letter of July 10, 2019, Doc. 158 (claiming that Schloss is no longer affiliated with Gridsum). Gridsum and all individual defendants except for Fan and Sarathy are represented by the firm Orrick, Herrington & Sutcliffe. Fan and Sarathy have not appeared at all in this action, and both reside in Hong Kong. Decl. of Lawrence P. Eagel ("Eagel Decl.") Ex. 5, Doc. 189; Foley Decl. ¶ 3.

PricewaterhouseCoopers Zhong Tian LLP ("PwC") served as Gridsum's auditor from 2015 to June 2018 and is based in Shanghai. It is represented by Davis Polk & Wardwell LLP. Goldman Sachs (Asia) L.L.C., Citigroup Global Markets Inc., and Stifel, Nicolaus & Co. each served as Gridsum's underwriters in its 2016 initial public offering ("IPO"). SAC ¶¶ 32–35. The underwriters are represented by Latham & Watkins LLP.

---

[2] The Court takes judicial notice of the existence of this and other documents extensively cited and quoted from in the Second Amended Complaint, but not of the truth of the matters asserted therein. *See, e.g.*, *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

## B. The Registration Statement

The company submitted a draft registration statement to the Securities and Exchange Commission ahead of an IPO in July 2015. SAC ¶ 66. The company filed its final registration statement with the SEC on Form F-1 on September 21, 2016, and the SEC declared it effective the day after. SAC ¶ 67. On September 23, Gridsum filed a prospectus with the SEC offering ADS at a price of $13.00 per share. SAC ¶ 68. The underwriters exercised their option to purchase additional shares the next week, ultimately resulting in an offering of 7.7 million ADS that raised $87.1 million. SAC ¶ 69.

The registration statement included audited financial statements for 2013, 2014, and 2015 that, as the statement indicated, were "prepared in accordance with U.S. GAAP [*i.e.*, Generally Accepted Accounting Principles]." SAC ¶¶ 70, 71. The Court has reproduced the relevant financial data in the Appendix to this Opinion.

The registration statement defined how Gridsum recognized revenue for the purposes of the filing, namely when:

- persuasive evidence of an arrangement exists;
- [Gridsum's] platform is made available and services have been delivered to the customer;
- the fee is fixed or determinable; and
- collection is reasonably assured.

SAC ¶ 77. The statement also indicated that when a customer prepays at the beginning of a contract, Gridsum split the monies into "Advances," which were costs to be paid to third-party vendors, and "Deferred Revenues," which were fees to be retained by Gridsum. SAC ¶ 77.

Also included were March and August 2016 reports from PwC. SAC ¶ 80. The reports opined that Gridsum's financial statements fairly presented the company's position and were in conformity with U.S. GAAP. SAC ¶ 80.

Finally, the statement described a "material weakness" with Gridsum's internal financial controls discovered by PwC and Gridsum, namely that Gridsum lacked "sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements." SAC ¶ 81. Gridsum indicated that it was taking several steps to hire the appropriate personnel, increase the resources devoted to preparing financial statements, and establish an audit committee on the board of directors. SAC ¶ 81. The company identified a number of recently completed steps, including the establishment of software systems, procedures, and departments to improve the financial and accounting functions. SAC ¶ 81.

### C. The 2016 Form 20-F

In March 2017, Gridsum issued a press release with its 2016 financial results. It reported the same to the SEC on a Form 20-F in April. SAC ¶ 157. The Court has reproduced relevant financial data in the Appendix to this Opinion. Gridsum indicated that the statements were prepared in accordance with U.S. GAAP. SAC ¶ 160. The Form 20-F included an identical discussion of revenue recognition authority as the 2016 registration statement. SAC ¶ 161. It also included a similar report from PwC, affirming that the financial statements are a fair presentation of Gridsum's financial results and were prepared in accordance with U.S. GAAP. SAC ¶ 164.

The 2016 Form 20-F included a discussion of material weaknesses in Gridsum's internal controls over financial reporting. Like the 2016 registration statement, the form identified a lack of qualified accounting personnel as an ongoing weakness. SAC ¶ 165. It also identified as a weakness a "lack of sufficient written policies and procedures for capturing certain services received before contracts were signed to timely record the related expenses in the financial statements." SAC ¶ 165. Gridsum indicated it had taken a number of steps since the IPO to improve its controls, including hiring additional personnel, establishing an audit committee on the board of directors, and engaging a consulting firm to examine Gridsum's level of compliance with U.S. legislation. SAC

¶ 165.  The company indicated that there were no other material changes to its internal controls in 2016.  SAC ¶ 165.

### D.  The 2018 Audit

On April 23, 2018, Gridsum announced in a press release that the audit report accompanying the 2016 20-F should not be relied upon anymore, based on guidance from PwC.  SAC ¶ 83.  Gridsum's announcement indicated that PwC had sent a letter to Gridsum the previous week indicating that the accounting firm had identified issues relating to "revenue recognition, cash flow, cost, expense items," and underlying documentation, "which PwC had previously raised with the Company."  SAC ¶ 83.  The press release indicated that 2016 revenue could be impacted by ¥2 million and 2016 expenses could be impacted by ¥6 million.[3]  SAC ¶ 83.  Gridsum announced that the board's audit committee would investigate the issues and accordingly delay the company's 2017 20-F until after the completion of the audit.  SAC ¶ 83.  Gridsum's ADS listed on NASDAQ dropped over 16 percent that day and continued to drop thereafter.  SAC ¶ 84.  It filed a notice with the SEC that its Form 20-F for 2017 would be delayed on April 30, 2018.  SAC ¶ 85.

One week after the announcement, on May 1, Gridsum announced a proposed investment from Future X Capital via a convertible promissory note worth $40 million.  SAC ¶ 87.  On May 8, Gridsum announced that Future X had issued a proposal to purchase all outstanding share and bring the company private.  SAC ¶ 88.  Although Gridsum announced the formation of a committee to evaluate the proposal, the company has not made any announcement related to the proposal in the time since.  SAC ¶ 88.

For the rest of the year, Gridsum dealt with the fallout of the April announcement.  It dismissed PwC as its auditor in June 2018.  SAC ¶ 89.  Because it had indicated its Form 20-F for 2017 would be late, NASDAQ began delisting procedures.  SAC ¶ 86.

---

[3] Gridsum had reported ¥400 million in net revenues for 2016 and ¥384 million in expenses for 2016 in its Form F-4.  App'x, *infra*.

The company made announcements in April and August regarding NASDAQ's delisting procedures, in which the company indicated it was making progress in the audit of its statements and financial procedures. SAC ¶¶ 86, 90. It announced it had completed its audit in October 2018, was working to finalize audited financials for 2015 to 2017, and would implement remedial measures. SAC ¶ 91. Gridsum released additional updates on its negotiations with NASDAQ in November and indicated that remedial measures and work on the audited financials were ongoing. SAC ¶¶ 92, 93. In December, the company announced that "the Audit Committee was unable to reach conclusions with respect to issues relating to certain expense items due to documentation issues," and that the audited financials would be released before the end of January 2019. SAC ¶¶ 94, 95.

### E. The January 2019 Form 20-F

Gridsum filed its 2017 Form 20-F with the SEC on January 7, 2019.[4] The report included 2017 financial information, as well as restatements of Gridsum's 2015 and 2016 statements of operations. SAC ¶ 97. The Court has reproduced relevant figures in the Appendix to this Opinion. The restated financials for 2015 saw a tripling of income tax expenses, driving a 26 percent increase in net loss. The financials also saw a 41 percent decrease in deferred revenue — that is, funds from customer prepayments earmarked to pay for future Gridsum services. The restated financials for 2016 included a 46 percent increase in net loss driven by a 9 percent drop of net revenue, a 14 percent drop in accounts receivable, a four-fold increase in accounts payable, and a 58 percent drop in deferred revenue.

The Form 20-F included some explanation for the changes. It suggested that the 2015 changes were due to "adjustments relating to cost accruals, expense cutoff procedures and classification changes." SAC ¶ 100. As for the 2016 changes only, Gridsum explained that the drop in net revenue and the balance sheet changes were

---

[4] Melcher is not alleged to have signed this document.

caused, at least in part, by a change in revenue recognition methodology.[5]  SAC ¶ 100.

The company had previously recognized revenue for a social media analytics tool at time

of sale to a sub-distributor.[6]  SAC ¶ 100.  Because collection on accounts receivable grew

less slowly than rapidly growing revenues, Gridsum changed its methodology to only

recognize revenue when it collected cash from the sub-distributor.  SAC ¶ 100.  Gridsum

attributed the change in accounts payable to a need to "reconcile its accounting" with that

of one of its partners in purchasing digital advertising space for customers.  SAC ¶ 100.

The annual report also described the circumstances surrounding PwC's dismissal.

According to the report, PwC was unable to determine what additional audit work it

would need to plan and complete to re-audit Gridsum's 2016 results and prepare the 2017

results for the first time.  SAC ¶ 101.  In a paragraph discussing the April 2018

announcement of PwC's guidance to no longer rely on the 2015 and 2016 financials,

Gridsum wrote, "PwC China also advised that the issues identified raised questions

related to its ability to rely upon the representations of management."  SAC ¶ 179.

Gridsum had not included the information in previous press releases or filings with the

SEC.  SAC ¶ 186.  Gridsum indicated that PwC had informed it of these concerns

sometime before the accounting firm's dismissal in June 2018.  2017 20-F at 99.

In response to the filing of the January 2019 20-F, Gridsum's shares fell 5.6

percent the next day.  SAC ¶ 187.

## II.    EFFORTS TO SERVE THE DEFENDANTS LOCATED IN CHINA

The Complaint in this case was first filed in April 2018.  Doc. 1.  The Court

consolidated this case with a related case, No. 18 Civ. 5649, in September 2018 and

appointed William R. Barth lead plaintiff.  Doc. 30.  The plaintiffs filed an Amended

---

[5] The plaintiffs allege that the decrease in revenue and accounts receivable in the 2015 financials creates a "strong inference" that the change in revenue recognition methodology was applied to 2015, as well.

[6] The plaintiffs allege that these sub-distributors were never sold anything; rather, they were "sales agents who took possession of and then sold" Gridsum's social media analytics product under a consignment agreement.  SAC ¶ 112.  They also allege that sales in 2015 were nevertheless impacted by the 2016 change, and allege that Gridsum engaged in "fictitious 2015 sales."  SAC ¶ 114.

Complaint in December 2018. Doc. 50. Summonses were issued for the individual defendants other than Melcher on December 14, Docs. 74–82, while Gridsum, the underwriters, and Melcher waived service on December 28, Docs. 83, 84. The plaintiffs engaged a vendor to translate the Amended Complaint into Chinese and coordinate with the appropriate authorities to effectuate service. Eagel Decl. ¶ 3.

In reaction to Gridsum's 2019 restatement, the plaintiffs filed the Second Amended Complaint on March 1, 2019. Doc. 104. This complaint added PwC as a party, and a summons issued on March 4. Doc. 106. On March 11, the plaintiffs filed an affidavit of service for PwC, indicating it had been served through C.T. Corporation System in New York. On March 26, the plaintiffs filed a notice indicating C.T. Corporation System had not been able to forward the service documents to PwC because PwC was not "listed on their records," even though the company was listed as PwC's U.S. agent in PwC's Public Company Accounting Oversight Board Annual Report. Doc. 108.

On April 4, the plaintiffs asked for leave to file a motion for alternative service on all non-served individual defendants and PwC. Doc. 109. The Court granted the plaintiffs leave to file the motion on May 1 at a pre-motion conference, although they did not file that motion until the following year, in January 2020. Doc. 186. Nevertheless, summonses were issued for the unserved individual defendants and PwC on May 16. Docs. 132–41. The plaintiffs' vendor delivered service documents to the Hong Kong authorities for Fan on July 3 and to the Chinese authorities for the others on July 18. Eagel Decl. Exs. 2, 3. The vendor sent letters to the Hong Kong authorities inquiring into the status of service on Fan in October, November, and December 2019, receiving a response in November indicating that the request was being processed. Eagel Decl. Ex. 4. The vendor also sent letters to the Chinese authorities in Beijing asking about service on Schloss in October, November, and December 2019, but it has received no response. Eagel Decl. Ex. 5.

Certificates of service filed in January 2020 indicated that Bai, Gao, Qi, Schloss, and Zhang, were served with the First Amended Complaint on June 19, 2019 via Gridsum's Beijing office. Docs. 179–83. Service for Sarathy, also listed as in the care of Gridsum's Beijing office, was refused. Doc. 185. There are no certificates of service of the First Amended Complaint on the docket for Fan.

Also in January 2020, the plaintiffs filed notices that service of the Second Amended Complaint had been refused for Qi, Zhang, Sarathy, Bai, Gao, and Yu sometime in 2019 when the documents had been delivered to Gridsum's Bejing office. Doc. 185. Chui was served with the Second Amended Complaint via personal service in Shanghai in October 2019. Doc. 176.[7] There are no certificates of service of the Second Amended Complaint for Schloss or Fan.

## III.   STANDARD

### A.  Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557). However, this "flexible 'plausibility standard' " is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

---

[7] Chui has asked for leave to file his own motion to dismiss, pending the outcome of Gridsum's similar motion. Doc. 191.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable...."). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

**B. Rule 9(b)**

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)). These requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether fraudulent intent is an element of a claim. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("By its terms, Rule 9(b) applies to 'all averments of fraud.'")

Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012). Conditions of a person's mind — such as malice, intent, or knowledge — may be alleged generally. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)). Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura*, 544 U.S. at 345 (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

These heightened pleading standards, when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014) (citing ECA, Local 134, 553 F.3d at 196), *aff'd* 604 F. App'x 62 (2d Cir. 2015).

## IV. SECURITIES ACT CLAIMS

To state a claim under Section 11 of the Securities Act, a plaintiff must allege that a defendant issued or signed a securities registration statement that "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k. Such claims can impose strict liability on issuers, their officers and directors, and underwriters for statements contained within registration statements. *See Rombach v. Chang*, 355 F.3d 165, 168 n.2 (2d Cir. 2004).

Before the Court analyzes whether the Second Amended Complaint states a claim under Section 11, however, it must first determine whether the stricter pleading standard of Rule 9(b) and the PSLRA apply. *See id.* at 171. When determining whether a Section 11 claim sounds in fraud for the purposes of Rule 9(b) and the PSLRA, courts look to whether "the wording and imputations of the complaint are classically associated with fraud." *Id.* at 172. In essence, they look for "fraud-based buzzwords" that indicate the gravamen of the behavior alleged is, in fact, fraud. *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 214 (S.D.N.Y. 2004) (citing *Rombach*).

The defendants argue that the Section 11 claims sound in fraud and focus on paragraph 114 of the Second Amended Complaint. In that paragraph, the plaintiffs allege that the decrease in 2015's revenue and accounts receivable creates an inference that the reduction was due to the reversal of "fictitious" 2015 sales. Allegations of these "sham transactions," the defendants suggest, bring the count under the heightened fraud-based pleading standards. *See Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 38 (2d Cir. 2013).[8]

But these transactions only implicate changes in net revenues (a decrease of ¥2.6 million) and accounts receivable (a decrease of ¥6.0 million). Nothing in the Second Amended Complaint alleges that these transactions affected the greater changes in income taxes paid (an increase of ¥10.7 million), taxes payable (an increase of ¥9.6 million), deferred revenue (a decrease of ¥12.9 million), or customer advances (an increase of ¥8.2 million). As for these larger changes, the Second Amended Complant generally alleges only that neither Gridsum nor the underwriters "made a reasonable investigation or possessed reasonable grounds for the belief" that the 2015 financials were not false or misleading. SAC ¶ 141. Without more, and especially when set off from the fraud claims under Section 10, the Section 11 claims of the Second Amended

---

[8] The underwriters argue that they are implicated in the fraud, as well, because they are alleged to have had "virtually unlimited access to internal corporate documents." SAC ¶ 65.

Complaint do not sound in fraud and the fraud-based pleading standards therefore do not apply. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (finding careful division of Section 11 and Section 10 claims and allegations only of failing to conduct a reasonable investigation and failing to possess reasonable belief prevents Rule 9(b) and PSLRA requirements from applying).

* * *

Having decided the applicable pleading standards, the Court next turns to whether the plaintiffs have alleged material misstatements. In their briefing, they focus on two sets of alleged misstatements: statements concerning the adequacy of Gridsum's internal controls and the 2015 financial statements contained in the registration statement. The Court finds that neither set can lay a foundation for a Section 11 claim: the former because it was not alleged to be a misstatement and the latter because any misstatements are not material.

### A. The 2015 Financials

The plaintiffs principally argue that the 2015 financials contained material misstatements because the January 2019 restatement provided corrected figures after the discovery of "adjustments relating to cost accruals, expense cutoff procedures and classification changes." SAC ¶ 100. Although the defendants do not argue that the financials were correct in 2015 — except to the extent that revenue recognition policies are implicated, *see infra* part V.B — they do argue that disclaimers of a material weakness in Gridsum's financial controls make the misstatements immaterial as a matter of law.

But these disclaimers were disclaimers of potential *future* errors in financials, not that the so-stated 2015 financials may have been incorrect. As the registration statement described it, a "material weakness" is one that creates "a reasonable possibility that a material misstatement of our annual or interim financial statements *will not be* prevented or detected on a timely basis." SAC ¶ 81 (emphasis added). The defendants may not use

these words warning of future mistakes to seek refuge from errors that had already occurred and existed alongside the cautionary language. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.")

The defendants next argue that the small magnitude and character of the restated financials make them immaterial as a matter of law. In making this determination, the Court looks to the extent to which the misstatement was quantitatively and qualitatively material. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011). According to SEC Staff Accounting Bulletin No. 99 ("SAB 99"), 64 Fed. Reg. 45,150 (Aug. 12, 1999) — referred to often by courts of this Circuit — a five percent change can provide a "'basis for a preliminary assumption' of materiality." *Hutchison*, 647 F.3d at 485. (quoting 64 Fed. Reg. at 45,151). Qualitatively, the Court looks to "(1) whether there was a concealment of an unlawful transaction; (2) the significance of the misstatement in relation to the company's operations; and (3) management's expectation that the misstatement will result in a significant market reaction." *In re Lone Pine Resources, Inc.*, No. 12 Civ. 4839 (GBD), 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014) (citing 64 Fed. Reg. at 45,150–52).

In arguing the materiality of the restated figures, the plaintiffs point out that some of the figures swing quite dramatically between the original statement and the 2019 restatement. For example, in the statement of operations, income tax paid more than tripled. And in the balance sheet, taxes payable increased 58.4 percent while deferred revenue decreased 41.3 percent. Customer advances increased 7.8 percent and accrued expenses decreased 5.1 percent.

The defendants argue that, when placed into the context of Gridsum's operations, the magnitude of these changes greatly diminishes. Through that lens, the change in income tax paid amounts to 4.5 percent of net revenues. Deferred revenue only dropped

by 3.6 percent of liabilities, and the other balance sheet changes were even smaller. The defendants have the better of the argument.

Plaintiffs place too strict a focus on quantitative materiality in their proffered analysis. Yes, the unit of analysis in SAB 99's five percent quantitative materiality is the "particular item on the registrant's financial statements." 46 Fed. Reg. at 45,151. And therefore, each of the particular items cited by the plaintiffs would seem to pass the materiality threshold. But courts do not hold themselves to a bright line rule in this regard. *See Hutchison*, 647 F.3d at 485.

For example, a 2013 panel of the Second Circuit refused to limit its analysis to a single region's revenue when determining materiality. *See Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 27 (2d Cir. 2013). Rather, it looked at the change in the context of the company's "total operations," and explicitly rejected the plaintiffs' attempts to create a presumption that investors would find such a change material based on the change in the line item alone. *Id.* In that case, the plaintiffs "failed to plead any reason why a reasonable investor would consider revenue from this one region standing alone material when making an investment decision." *Id.*

So, too, here. The plaintiffs have not provided the Court with any reason why these changed line items "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Hutchison v. Deutsche Bank Secs. Inc.,* 647 F.3d 479, 485 (2d Cir. 2011) (citations omitted). What is the implication of a shift in the mix of how customer prepayments are allocated between deferred revenue and customer advances? To what extent is a large change in income tax, even when a small part of the overall picture, indicative of this company's success to investors? The plaintiffs have not hinted at the answer to any of these or similar questions for other line items in the corrected 2015 financials. Accordingly, even when drawing all inferences in the plaintiffs' favor, the Court cannot find that the 2015 financial misstatements are material.

### B. Deficient Accounting Controls

The plaintiffs next point out that the registration statement disclosed only one material weakness in Gridsum's internal controls: a "lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements." SAC ¶ 81. This statement was false or misleading, they argue, because there was, in fact, more than one weakness. The plaintiffs do not allege, however, what the other material weaknesses were or could have been.

Although the pleading standards of Rule 9(b) and the PSLRA do not apply to these claims, the plaintiffs must still plead enough facts to make plausible their claim that there were accounting deficiencies *other* than the ones disclosed in 2015. As it stands, the plaintiffs have pointed to no statements in the 2019 restatement or otherwise that suggest there were accounting weaknesses other than a lack of personnel who understand GAAP. To the extent they argue that the disclosure of material weaknesses was deficient, they are in reality arguing against using those disclosures to protect against finding the financial figures material, as discussed above.

* * *

Because the plaintiffs have failed to plead any material misstatements in the 2015 registration statement, the defendants' motion to dismiss the claim under Section 11 of the Securities Act is granted. The plaintiffs are granted leave to replead their claims.

Melcher, separately, seeks to dismiss the Section 15 claim of control person liability against him. To properly allege a claim of control person liability under Section 15, a plaintiff must properly plead a primary violation. *See ATSCI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). As discussed, the plaintiffs here have not done so. Therefore, the Section 15 count against Melcher is dismissed, as well.

## V. EXCHANGE ACT CLAIMS

To state a claim under Section 10 of the Exchange Act a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

The plaintiffs allege that Gridsum made material misstatements in its registration statement, its 2016 20-F, and the April 2018 press release indicating that the 2016 financials could no longer be relied upon. Gridsum contends that these were not actually misstatements, and, in any event, that plaintiffs have not properly alleged scienter. The Court finds that any misstatements in the 2015 registration were not material for the reasons explained in *supra* part IV.A. But the Court finds that the Second Amended Complaint otherwise properly pleads scienter and the materiality of the latter two sets of misstatements. On this basis, the Court denies Gridsum's and Melcher's motions to dismiss.

## A. Scienter

Plaintiffs bringing private securities actions properly plead scienter when they "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In the Second Circuit, "the scienter requirement is met where the complaint alleges facts showing either: (1) a motive and opportunity to commit the fraud; or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Emps. Ret. Sys. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). The inference of scienter need not be the *most* plausible inference; rather, it need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

The plaintiffs' allegations of motive do not meet this standard because the properly alleged misstatements and omissions do not temporally match with the alleged motive. Because the only pre-IPO statement — the registration statement — does not

contain material misstatements, the motive of artificially increasing the revenues in preparation for a more successful IPO cannot apply to the 2016 financials and the 2018 press release. The other motive proffered by the plaintiffs — that the fraud was executed to prepare for a $40 million convertible note with Future X — is more promising. *See In re Complete Mgt. Inc. Securities Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) ("[T]he artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement" (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir. 1993))). But the first mention of the note in the Second Amended Complaint only comes about in May 2018 — *after* PwC announced that the financials could no longer be relied upon. Without more facts that show the Future X deal was actively contemplated prior to the announcement of the unreliable financials, this inference of motive is neither cogent nor as compelling as more innocent inferences.

The plaintiffs do, however, properly plead scienter through their allegations of conscious misbehavior or recklessness. A plaintiff can plead scienter in this manner by alleging that defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (internal quotation omitted). The plaintiffs proffer three reasons why the defendants' behavior shows scienter. The latter two convince the Court that the plaintiffs have plead that the defendants "knew facts or had access to information suggesting that their public statements were not accurate."

*First*, the plaintiffs make a number of allegations relating to the "core operations" doctrine and the knowledge the individual defendants must necessarily have had. Under the "core operations" doctrine, a plaintiff can plead scienter by showing that a defendant made false or misleading statements when "contradictory facts of critical importance" were or should have been apparent. *See In re Rockwell Medical, Inc. Sec. Litig.*, No. 16

Civ. 1691, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018). "The doctrine typically applies only where the operation in question constitutes nearly all of a company's business." *See also Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (internal quotation and alteration omitted). Here, the plaintiffs have not alleged that the affected operations truly constituted *all* of the company's business. Nor can the plaintiffs' allegations of the company being "small" at over 1000 employees or the executives having knowledge of the misstatements by virtue of their management and board positions support the inference of scienter. *See Cohen v. Kitov Pharms. Holdings, Inc.,* No. 17 Civ. 917, 2018 WL 1406619, at *8 (S.D.N.Y. Mar. 20, 2018) (The "size of the company does not give rise to a 'strong inference' that [defendant] acted with a guilty of state of mind" even where there were "at most ten employees and consultants"). Accordingly, the Court does not find these allegations to be probative of scienter.

*Second*, the plaintiffs argue that the magnitude of the restated financials is indicative of fraudulent intent. The magnitude of a misstatement, while not dispositive, can be a factor in properly alleging scienter. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (finding that $24 million error "undermines . . . argument that defendants were unaware"); *Rothamn v.* Gregor, 220 F.3d 81, 92 (2d Cir. 2000) (same for $74 million write-off). Here, that factor cuts in the plaintiffs' favor because the magnitude of the restated financials was substantial at the line-item and company-wide level. For example, restated net revenues were 9 percent lower than the original 2015 figures — a drop of ¥36.4 million or $5.6 million. Accounts receivable decreased by 14 percent, or 4.6 percent of assets. Accounts payable increased four-fold — a 9 percent increase in liabilities.

It is true that when courts find the magnitude of a restatement probative of scienter, the percent and absolute change in the financials is often higher. *E.g., Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l., Inc.,* 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) (inventory drawdown of between $50 million and $70 million); *Rothman*, 220 F.3d

at 92 (write-off of $74 million or 84 percent of total).  But, given that this is a motion to dismiss where all facts and inferences are to be considered in the plaintiffs' favor, the allegations here are sufficient to weigh in favor of a finding of scienter.  *See, e.g.*, *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Intern. N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) (finding changes of 17, 22, and 1600 percent probative of scienter).

*Third*, the plaintiffs argue that the nature of the accounting errors alleged contribute to an inference of scienter.  Violations of GAAP and other accounting policies, along with allegations of "corresponding fraudulent intent," can show scienter.  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  When the policies at issue are alleged to be relatively simple, such as "revenue cannot be recognized for unexecuted contracts," some courts find that the violation of those policies further buttresses the inference of scienter.  *See, e.g.*, *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 637 (E.D. Va. 2000).

The plaintiffs allege that Gridsum clearly violated its own revenue recognition polices when it recognized consignment sales as revenue.  The Court agrees with the plaintiffs' characterization of the restatement.  Gridsum's own revenue recognition policies indicate that revenue is to be recognized when "the Group's platform is made available to the customer."  SAC ¶ 77.  As the plaintiffs allege, Gridsum recognized consignment transactions as revenue.  A consignment sale, by definition, does not involve a sale to a final customer.  *See* U.C.C. § 9-102(a)(20), (defining a consignment sale as "a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale").

The plaintiffs properly allege that these recognizing these transactions as revenue was a violation of U.S. GAAP, as well.  U.S. GAAP does not provide for the recognition of revenue when a product is given to a reseller in a consignment sale.  *See* SAC ¶ 115 (citing SAB 101); SAC ¶ 116 (citing SEC Accounting and Audition Enforcement Release No. 817).  As with the internal policies, the plaintiffs allege that recognizing the consignment sales and sham transactions clearly violated this simple rule.  Furthermore,

PwC indicated to the company that it could no longer rely upon the representations of management and therefore could not complete its audit of the 2016 financials. The Court finds that this allegation, in concert with the size and nature of the restatement, makes for a properly plead allegation of scienter.

### B. Falsity of the Statements

With scienter having been established, the defendants argue finally that the plaintiffs have failed to establish that there were any falsehoods in the 2016 financials or the April 2018 press release. The Court, however, disagrees.

The defendants argue that the changes from the 2016 financials to the 2019 restatement are due to a disclosed change in revenue-recognition methodology, and therefore the plaintiffs have failed to plead that the 2016 financials were untrue at the time the statement was made. But the plaintiffs plead more than a change in revenue recognition methodology. As discussed above, they plead that the 2016 financials included revenue and other figures inconsistent with U.S. GAAP and Gridsum's internal policies — both of which Gridsum said in the 2016 report that it followed. As discussed above, Gridsum is alleged to have violated both sets of guidelines and, therefore, its representations to the contrary are false.

Plaintiffs argue that the April 2018 press release was false because it failed to disclose that PwC had told Gridsum that it could no longer "rely upon the representations of management." SAC ¶ 179. The defendants respond that the Court may take judicial notice of language in the 2019 restatement that Gridsum had been advised of PwC's concerns "prior to" June 28, 2018.

When viewing the facts in the light most favorable to the plaintiffs and drawing all inferences in their favor, the Court finds that the plaintiffs have properly plead an omission. Although the allegations leave room for the reality that PwC informed Gridsum of its concerns after the April 2018 press release, they leave the same amount of

room for a reality in which Gridsum was informed prior to the April 2018 press release, still prior to PwC's dismissal in June 2018.

Accordingly, Gridsum's motion to dismiss is DENIED as to the Exchange Act counts. The motion to dismiss the control person liability claims against Melcher under Section 20 is likewise DENIED. The plaintiffs have properly provided both "[a] short, plain statement that gives [Melcher] fair notice of the claim that [Melcher] was a control person and the ground on which it rests its assertion that [Melcher] was a control person." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 3d 392, 415–16 (S.D.N.Y. 2003). The Section 10 count against Melcher, however, is dismissed; the plaintiffs never alleged that Melcher signed or otherwise "made" either the 2016 financial statements or the April 2018 press release. *See Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 141 (2011).

## VI. PRICEWATERHOUSECOOPER'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

PwC moves to dismiss the case against it for lack of personal jurisdiction under Rule 12(b)(1). Simply put, this Court cannot exercise personal jurisdiction over any non-consenting party until that party is properly served. *See Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). The plaintiffs do not argue that PwC has been properly served in this action and provide no opposition to this ground for the accounting firm's motion to dismiss. Accordingly, the Court GRANTS PwC's motion.

Rather than dismiss the case without prejudice against PwC, however, the Court will QUASH the service of March 6, 2019, Doc. 107. *See* 5B Wright & Miller, *Federal Practice & Procedure* § 1354 ("The federal courts have broad discretion to dismiss the action or to retain the case but quash the service that has been made on the defendant."). PwC has not argued that this Court is incapable of exercising personal jurisdiction over it, even if it is properly served, and dismissal would needlessly increase costs and complications for the parties. *Cf. Stormhale, Inc. v. Baidu.com, Inc.* 675 F. Supp. 2d 373,

376 (S.D.N.Y. 2009) (dismissing case after finding that, regardless of service, court did not have personal jurisdiction).

## VII.   MOTIONS FOR ALTERNATIVE SERVICE OF PROCESS

Citing their attempts to serve the defendants located in China, the plaintiffs ask the Court for leave to serve the Second Amended Complaint on the individual defendants located in China and Hong Kong, as well as PwC.  The following table summarizes service thus far, as detailed in *supra* part II, the parties' relationships to Gridsum, and their locations:

| INDIVIDUAL | ASSOCIATION WITH GRIDSUM | LOCATION | SERVICE STATUS |
| --- | --- | --- | --- |
| Bai, Gao, Qi, Yu, Zhang | Current Gridsum Directors or Officers | China | Service of First and Second Amended Complaints attempted via delivery to Gridsum's Beijing office. |
| Sarathy | Current Gridsum Officer | Hong Kong | Service of First Amended Complaint attempted via delivery to Gridsum's Beijing office. |
| Fan | Former Gridsum Director | Hong Kong | Service not yet attempted. |
| Schloss | Former Gridsum Director | China | Service of First Amended Complaint attempted via delivery to Gridsum's Beijing office. Service of Second Amended Complaint not yet attempted. |
| Chui | Former Gridsum Director | China | Service of Second Amended Complaint completed. |
| Melcher | Current Gridsum Director | United States | Waived service. |
| Gridsum Holding Inc. | Company | Cayman Islands | Waived service. |

Individuals and entities located outside the United States may be served, *inter alia*, "by any internationally agreed means of service that is reasonably calculated to give notice" — including the Hague Convention[9] — or "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(1), (3), (h)(2). Any service ordered by this Court "must comply with constitutional notions of due process and constitute 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 398 (S.D.N.Y. 2014) (ultimately quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

There is no strict requirement that a plaintiff pursue service through an international agreement before asking a court's assistance in ordering alternative service, and the decision of whether to allow that service is committed to the sound discretion of the district court. *See Wash. State Inv. Bd. v. Odebrecht S.A.*, No. 17 Civ. 8118 (PGG), 2017 WL 6253877, at *3–4 (S.D.N.Y. Sept. 21, 2018). But district courts in this Circuit routinely examine two threshold questions before authorizing alternative service: (1) Did the plaintiff reasonably attempt to effectuate service? And, (2) has the plaintiff made a showing that the court's intervention is necessary? *See China Ne. Petroleum*, 27 F. Supp. 3d at 398. "These requirements are imposed in order to prevent parties from whimsically seeking an alternate means of service." *Id.* (internal citation and quotation marks omitted).

The plaintiffs ask for leave to serve Qi, Zhang, Yu, Bai, Gao, and Schloss through their counsel of record, Orrick, and PwC through its counsel, Davis Polk. They additionally seek leave to serve Fan and Sarathy, neither of which have appeared through

---

[9] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, https://www.hcch.net/en/instruments/conventions/full-text/.

any counsel, through Orrick. The plaintiffs have presented no evidence that Fan or Sarathy are in communication with Orrick.

The Court does not find that an order for alternative service is necessary at this time. "When courts have allowed for alternative service, they have done so when plaintiffs have been unable, despite diligent efforts, to serve the defendant in the foreign country according to the Hague Convention procedures." *Id.* at 398 (internal alterations and quotations omitted). The plaintiffs here have not been diligent in their efforts.

*First*, regarding the individual defendants served in Beijing, the method of service — dropping the summonses off with Gridsum — does not comply with Chinese law requiring service to be made on individuals or with an adult at their home. *See* Declaration of Gary J. Gao ("Gao Decl.") ¶ 5 (discussing Chinese laws of serving defendants), Doc. 196. Indeed, that method would not comply with *U.S.* law if attempted here. *See* Fed. R. Civ. P. 4(e) (allowing service via personal delivery or via delivery to an adult at the person's home).

*Second*, for Sarathy, service was not even attempted in the correct jurisdiction. For purposes of the Hague Convention, China and Hong Kong are two different regions. *See* Foley Decl. Ex. B (Hague convention website designating China's Ministry of Justice and Hong Kong's Chief Secretary for Administration as service Central Authority). Sarathy lives in Hong Kong, but service on him was attempted in Beijing, China. The plaintiffs must at least attempt service in the proper jurisdiction before asking the Court to provide an alternative to the Hague Convention. Furthermore, proper service has not been attempted at all for PwC or Fan at this time.

*Third*, the record of service attempts have shown that the Chinese and Hong Kong authorities have not been obstructive in their work such that the Court's intervention is necessary. The delivery of the First Amended Complaint to Gridsum's office in June 2019 occurred within four months of when this Court issued summonses in February 2019. Chui, in Shanghai, was successfully served with the Second Amended Complaint

in October 2019, five months after a summons was issued in May 2019. And the Hong Kong authorities indicated in November 2019 that service was pending on the Hong Kong-based defendants.

Furthermore, although service on counsel for Qi, Zhang, Bai, Gao, Schloss, Sarathy and PwC may comport with due process and likely does not violate any international agreement,[10] the Court finds that the plaintiffs have failed to show that service on Fan in this manner would be appropriate, even if the Court were to find alternative service necessary. "[A] party seeking leave to serve an individual by counsel must show adequate communication between the individual and the attorney." *In re GLG Life Tech*, 287 F.R.D. at 267. "This communication requirement remains essential when a party looks to serve an individual through his corporate rather than his personal attorney." *China Ne. Petroleum*, 27. F. Supp. 3d at 399. The plaintiffs have offered no evidence that Fan is in touch with Gridsum or Orrick at all, and without such evidence the Court cannot be assured that such service will properly notify him.

For these reasons, the plaintiffs' motion to order alternative service is denied in its entirety. They may renew their motion at such time as they are able to provide proof of their diligence.

## VIII.  CONCLUSION

For the foregoing reasons, the motions of the underwriters, Gridsum, and Melcher to dismiss the claims under Sections 11 and 15 of the Securities Act are GRANTED. Gridsum's and Melcher's motions to dismiss the claims under Sections 10 and 20 of the Exchange Act are DENIED. The motion to dismiss all counts against PwC is

---

[10] *See China Ne. Petroleum*, 27 F. Supp. 3d at 299 (noting that courts have allowed service via counsel); *In GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 267 (S.D.N.Y. 2012) (finding that service on U.S. counsel does not violate the Hague Convention and that service on corporate officer through corporate attorney is proper) (citing *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 703 (1988)).

GRANTED and the Clerk of Court is directed to QUASH the service noted at Doc. 107. The plaintiffs' motion for alternative service is DENIED.

If the plaintiffs seek to file a Third Amended Complaint realleging the Securities Act claims, they are directed to move to do so by May 1, 2020 or otherwise inform the Court that they will proceed under the Second Amended Complaint. Objections or answers to the operative complaint are due by June 1, 2020. All parties are directed to appear via teleconference on April 2, 2020 at 10:15 a.m. at the number listed in Doc. 200. The Clerk of Court is respectfully directed to terminate the motions, Docs. 144, 151, 154, and 186.

It is SO ORDERED.

Dated:    March 30, 2020
         New York, New York

_____
EDGARDO RAMOS, U.S.D.J.

# APPENDIX

| Gridsum 2015 Consolidated Statement of Operations | | | |
|---|---|---|---|
| ¥ '000s | 2015 Registration Statement* | 2019 Restatement** | Correction |
| Net Revenues | 234,839 | 232,197 | (2,642) |
| Cost of Revenues | (35,237) | (33,392) | 1,845 |
| **Gross Profit** | 199,602 | 198,805 | (797) |
| | | | |
| **Total Operating Expenses** | (245,274) | (246,737) | (1,463) |
| *Loss from Operations* | (45,672) | (47,932) | (2,260) |
| *Other Income/(Expense)* | 1,530 | 1,530 | - |
| *Income Tax* | (4,693) | (15,371) | (10,678) |
| **NET LOSS** | (48,835) | (61,773) | (12,938) |

| Gridsum 2015 Consolidated Balance Sheet | | | |
|---|---|---|---|
| ¥ '000s | 2015 Registration Statement | 2019 Restatement | Correction |
| Cash & Cash Equivalents | 198,523 | 198,523 | - |
| Net Accounts Receivable | 279,537 | 273,536 | (6,001) |
| Prepayment & Other Current Assets | 107,046 | 105,387 | (1,659) |
| **Total Current Assets** | 585,106 | 577,446 | (7,660) |
| **Total Non-Current Assets** | 40,801 | 40,800 | (1) |
| *Total Assets* | 625,907 | 618,246 | (7,661) |
| | | | |
| Short Term Bank Loans | - | - | - |
| Accounts Payable | 103,289 | 99,559 | (3,730) |
| Salary & Welfare Payables | 33,539 | 33,539 | - |
| Taxes Payable | 16,484 | 26,112 | 9,628 |
| Deferred Revenue | 31,308 | 18,368 | (12,940) |
| Advance from Customers | 104,605 | 112,782 | 8,177 |
| Accrued Expenses & Other Current Liabilities | 70,908 | 67,292 | (3,616) |
| **Total Current Liabilities** | 360,133 | 357,652 | (2,481) |
| *Total Liabilities* | 360,133 | 357,652 | (2,481) |
| **Mezzanine Equity** | 476,018 | 476,018 | - |
| **Shareholders' Equity** | (210,244) | (215,424) | (5,180) |
| *Total Equity* | 265,774 | 260,594 | (5,180) |

---

* Foley Decl. Ex. 1 at F-2 to F-4.

** Foley Decl. Ex. 7 at F-3 to F-5.

| **Gridsum 2016 Consolidated Statement of Operations** | | | |
|---|---|---|---|
| ¥ '000s | **2016 F-20**[†] | **2019 Restatement**[**] | **Correction** |
| Net Revenues | 400,259 | 363,823 | (36,436) |
| Cost of Revenues | (53,487) | (55,707) | (2,220) |
| **Gross Profit** | 346,772 | 308,116 | (38,656) |
| **Total Operating Expenses** | (383,522) | (388,276) | (4,754) |
| *Loss from Operations* | (36,750) | (80,160) | (43,410) |
| *Other Income/(Expense)* | (2,609) | (3,666) | (1,057) |
| *Income Tax* | (28,387) | (14,801) | 13,586 |
| **NET LOSS** | (67,746) | (98,627) | (30,881) |

| **Gridsum 2016 Consolidated Balance Sheet** | | | |
|---|---|---|---|
| ¥ '000s | **2016 F-20** | **2019 Restatement** | **Correction** |
| Cash & Cash Equivalents | 524,454 | 520,452 | (4,002) |
| Net Accounts Receivable | 412,301 | 355,880 | (56,421) |
| Prepayment & Other Current Assets | 229,517 | 263,172 | 33,655 |
| **Total Current Assets** | 1,166,272 | 1,139,504 | (26,768) |
| **Total Non-Current Assets** | 60,054 | 68,996 | 8,942 |
| *Total Assets* | 1,226,326 | 1,208,500 | (17,826) |
| Bank Loans | 65,093 | 65,000 | (93) |
| Accounts Payable | 12,150 | 49,564 | 37,414 |
| Salary & Welfare Payables | 54,779 | 42,820 | (11,959) |
| Taxes Payable | 66,589 | 66,851 | 262 |
| Deferred Revenue | 50,110 | 21,057 | (29,053) |
| Advance from Customers | 106,570 | 109,381 | 2,811 |
| Accrued Expenses & Other Current Liabilities | 58,473 | 76,578 | 18,105 |
| **Total Current Liabilities** | 413,764 | 431,251 | 17,487 |
| *Total Liabilities* | 413,764 | 431,251 | 17,487 |
| *Mezzanine Equity* | - | - | - |
| *Shareholders' Equity* | 812,562 | 777,249 | (35,313) |
| *Total Equity* | 812,562 | 777,249 | (35,313) |

---

[†] Foley Decl. Ex. 5 at F-2 to F-4.

[**] Foley Decl. Ex. 7 at F-3 to F-5.