## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PEIFA XU, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>GRIDSUM HOLDING INC., GUOSHENG QI, MICHAEL PENG ZHANG, RAVI SARATHY, GUOFA YU, PERRY LIN CHUI, XIANG FAN, YANCHUN BAI, XUDONG GAO, THOMAS ADAM MELCHER, PETER ANDREW SCHLOSS, PRICEWATERHOUSECOOPERS ZHONG TIAN LLP, GOLDMAN SACHS (ASIA) L.L.C., CITIGROUP GLOBAL MARKETS INC., and STIFEL, NICOLAUS & COMPANY INCORPORATED,<br><br>        Defendants. | **Civil Action: 1:18-cv-03655 (ER)**<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## THIRD AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    JURISDICTION AND VENUE ......................................................................... 7

III.   PARTIES ............................................................................................................ 8

       A.     Plaintiffs ................................................................................................... 8

       B.     Defendants ................................................................................................ 8

IV.    COMPANY BACKGROUND ......................................................................... 11

V.     VIOLATIONS OF SECTIONS 11 AND 15 OF THE SECURITIES ACT ..... 17

       A.     Gridsum's Initial Public Offering ........................................................... 19

       B.     Defendants Used Material Misstatements and Omissions in the Offering
              Materials to Sell Gridsum ADSs to the Investing Public ......................... 20

       C.     Gridsum's 2016 Income Tax Expense ..................................................... 31

       D.     The Full Truth is Slowly Revealed .......................................................... 33

              1.     The Initial Revelation ..................................................................... 33

              2.     Nasdaq Warnings as the Audit Committee Investigates .................. 35

              3.     The January 7, 2019 Restatement ................................................... 40

       E.     Defendants are Subject to SEC, GAAP, and Certain Auditing Requirements
              and Violated Those Requirements ........................................................... 48

       F.     Causes of Action Under Sections 11 and 15 of the Securities Act ............ 63

              COUNT I For Violations of Section 11 of the Securities Act (Against All
              Securities Act Defendants) ...................................................................... 63

              COUNT II For Violations of Section 15 of the Securities Act (Against Defendants
              Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss) .............................. 66

VI.    VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT ........... 67

       A.     Additional Materially False and Misleading Misrepresentations and
              Omissions Actionable Under the Exchange Act ....................................... 68

False and Misleading Statements Relating to Gridsum's 2016 Financial
Statements ................................................................................. 68

The April 2018 False Statement ................................................. 83

B.    Loss Causation ............................................................................ 83

C.    Additional Allegations of Scienter............................................. 85

1.    Gridsum's $87 Million IPO ............................................. 86

2.    Admitted Knowledge and Core Operations...................... 87

3.    The Magnitude and Extent of the Restatement................ 88

4.    Accounting Violations ...................................................... 89

5.    The Audit Committee Defendants .................................... 90

6.    Qi's Personal Guarantee of Company Loans.................... 91

7.    Additional PwC Scienter Allegations .............................. 91

D.    No Safe Harbor ........................................................................... 96

E.    Causes of Action Under Sections 10(b) and 20(a) of the Exchange Act................... 97

COUNT III For Violations of Section 10(b) of the Exchange Act and SEC Rule
10b-5 (Against All Exchange Act Defendants) .................................. 97

COUNT IV For Violations of Section 20(a) of the Exchange Act (Against the
Individual Defendants)........................................................................ 101

VII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS.................................... 102

VIII.  PRAYER FOR RELIEF ................................................................ 105

IX.    DEMAND FOR TRIAL BY JURY .............................................. 106

Court-appointed Lead Plaintiff William Barth ("Barth") and plaintiff Xuechen Li ("Li") (collectively, "Plaintiffs") bring this action on behalf of themselves and all other persons or entities who purchased or otherwise acquired the securities of Defendant Gridsum Holding Inc. ("Gridsum" or the "Company") during the period from September 22, 2016 through January 7, 2019 (the "Class Period").

Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.  Plaintiffs' information and belief is based upon, *inter alia*, the investigation conducted by and through their counsel, which included, among other things, a review and analysis of:  (i) regulatory filings made by Gridsum with the United States Securities and Exchange Commission ("SEC"); (ii) Gridsum's other public statements, including press releases; (iii) analysts' reports and advisories about the Company; and (iv) news articles, and other commentary and analysis concerning Gridsum and the industry in which it operates.  Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants (defined below).  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.   **INTRODUCTION**

1.      This is a federal securities class action asserting claims against the Company, certain of its officers and directors, its auditor, PricewaterhouseCoopers Zhong Tian LLP ("PwC"), and the Underwriter Defendants (defined below) under (i) Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), and (ii) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Gridsum states it is a web analytics holding company that designs and develops sophisticated data analysis software for online marketing and digital intelligence applications for multinational and domestic enterprises and government agencies in China.  The Company offers software that allows customers to collect and analyze information that is collected, indexed, and stored in an organized manner.  The Company was founded in 2005 by defendants Guosheng Qi ("Qi") and Guofa Yu ("Yu") and is headquartered in Beijing, China.

3.     Gridsum filed its initial draft registration statement with the SEC on July 10, 2015. Over one year later, after numerous draft registration statements in response to SEC correspondence, on August 26, 2016, the Company filed a registration statement on Form F-1 relating to a proposed initial public offering of American Depositary Shares ("ADSs").

4.     The August 26, 2016 Form F-1 registration statement was followed by an amendment on September 9, 2016, and a final amendment on September 21, 2016, which became effective on September 22, 2016 (together with all exhibits and amendments, the "Registration Statement").

5.     On September 23, 2016, Gridsum filed with the SEC a Prospectus pursuant to Rule 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Materials"), commencing the public offering of 6.7 million ADSs at a price of $13.00 per share (the "IPO").

6.     Gridsum's IPO was successful, and with the Underwriter Defendants' exercise in full of their over-allotments, the Company issued and sold 7,705,000 ADSs for net proceeds of approximately $87.1 million.  The Company's closing share price on September 23, 2016 was $15.75, exceeding the offering price by over 21%.  Unbeknownst to investors, the Offering Materials contained materially false and misleading statements and omitted material information.

7.     The Offering Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements not misleading, and omitted to state material facts required to be stated therein, including: (i) the existence of a "sub-optimal" offshore capital structure; (ii) Gridsum's plans to bring the sub-optimal offshore capital structure to the Company's anchor entities after the IPO; (iii) the materially adverse tax consequences of bringing the sub-optimal offshore capital structure to the Company's anchor entities; (iv) the material understatement of the tax expense reported in Gridsum's Statement of Operations for the six months ended June 30, 2016; (v) Gridsum's plan to launch a new sentiment tracking services product within weeks, if not days, of the IPO, and that Gridsum planned to recognize revenue thereon when the services were transferred to sub-distributors (sales agents) on a consignment basis, which method of revenue recognition was improper; (vi) that PwC was, at a minimum, negligent in performing its audit of the 2015 financial statements and additional audit procedures through August 19, 2016; (vii) Gridsum's material weaknesses over internal controls extended beyond the "lack of sufficient financial reporting and accounting personnel;" (viii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading statements; (ix) Gridsum and certain Individual Defendants (defined below) were not appropriately addressing issues with the Company's financial reporting raised by its auditor; (x) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (xi) as a result of the foregoing, Gridsum's Offering Materials were materially false and misleading at all relevant times.

8.     More specifically, in violation of U.S. Generally Accepted Accounting Principles ("GAAP"), Gridsum's statement of operations for the six months ended June 30, 2016 reported *no*

*income tax expense*.[1]  When the Company originally issued its full year 2016 financial reports, a RMB28,387,000[2] tax expense was included in the statement of operations.  Gridsum planned to record a substantial year-end tax expense, but, although required to do so by GAAP, it failed to include or accrue any amount for the six months ending June 30, 2016.  At a minimum, Gridsum should have accrued and reported income tax expense of at least one-half of the annual tax expense reported as of December 31, 2016, or RMB14,193,500.   In its restatement of the financial statements for the year ended December 31, 2016, Gridsum reduced the income tax expense for the year ended December 31, 2016 from RMB28,387,000 to RMB14,801,00 with no explanation for the reduction.

9.      By failing to correctly account for the tax expense in the Offering Materials and stating it was zero and then just six months later stating it was RMB28,387,000 for the year ended December 31, 2016, *Gridsum's net loss as of June 30, 2016 was materially understated by 47.78%*.  Even using the restated amount of Gridsum's net loss as of December 31, 2016 of RMB14,801,000, and using one-half of that amount as the necessary accrual, Gridsum's net loss as of June 31, 2016 was materially understated by 24.9% percent.  Furthermore, the notes to financial statements for the year ended December 31, 2015 omitted material facts relating to the Company's imminently planned launch of its social listening solution and related improper recognition of revenue on consignment sales through the social listening solution.

---

[1]  Unless otherwise stated, all emphasis is added.

[2]  Gridsum uses Renminbi ("RMB") as its reporting currency in its financial statements and thus Company financial metrics herein will refer to RMB and not USD.  For reference only, as stated by Gridsum in its Form 20-F filed with the SEC on January 7, 2019, on December 28, 2018, the RMB to USD exchange rate was RMB6.8755 to USD1.00 and the average exchange rates during the relevant periods were as follows: (1) for 2015, RMB6.2869 to USD1.00; (2) for 2016, RMB6.6549 to USD1.00; and (3) for 2017, RMB6.7350 to USD1.00.

10.     The Company continued issuing materially false and misleading statements and omissions after the IPO, including, but not limited to, in its Form 20-F for the year ended December 31, 2016 filed with the SEC on April 27, 2017 (the "2016 Form 20-F").  Gridsum's 2016 Form 20-F reported the Company's financial and operating results for the year ended December 31, 2016, misleadingly touting a 2016 full year revenue increase of 70.4% year over year.

11.     Then, on April 23, 2018, Gridsum issued a press release announcing that its "***audit report for the Company's financial statements for the year ended December 31, 2016 should no longer be relied upon***" and that the "Company's Audit Committee is fully investigating these issues with assistance from external legal and accounting advisors and is ***working diligently toward an expeditious conclusion of the investigation***."  According to the press release, Gridsum's auditor identified certain issues in conducting its audit of Gridsum's financial results for the year-ended December 31, 2017.  Those issues related to "***certain revenue recognition, cash flow, cost, expense items, and their underlying documentation which [the auditor] had previously raised***" with Gridsum.

12.     On this news, Gridsum ADSs declined $1.17 per share, or 16.04%, to close at $6.12 on April 23, 2018 on unusually heavy trading volume of over 7.4 million shares.  Gridsum's ADSs continued to decline over the next few days as a result of the disclosure, dropping another 10% on April 24, 2018, and $2.27, or 31.14% from its closing price per share on April 20, 2018 to its closing price per share on April 26, 2018.

13.     Defendants failed to file the Company's Form 20-F for the year ended December 31, 2017 in a timely manner due to the internal investigation, subjecting Gridsum to possible Nasdaq Global Select Market ("Nasdaq") delisting from April 30, 2018 through the end of the Class Period.

14.     Then, on January 7, 2019, almost nine months after first admitting that the Company's financials could no longer be relied upon, Gridsum filed with the SEC on Form 20-F its annual report for the year ended December 31, 2017 (the "2017 Form 20-F").  The 2017 Form 20-F included a broad restatement of the Company's financial statements for the years ended December 31, 2015 and 2016, showing material overstatements of revenues and assets and understatements of certain expenses, losses from operations, and net losses.  Gridsum's ADSs decreased 5.6% on the release of the restatement, from a closing price of $1.60 per share on January 7, 2019 to $1.51 per share on January 8, 2019, ***an overall decrease of 88%*** from the $13.00 IPO price.

15.     As fully disclosed almost two and one-half years after the Company's IPO, during the Class Period the Company booked millions of RMBs of revenue on "sales" to sub-distributors. These "sales" were not true sales, but consignment transactions wherein Gridsum did not actually receive payment until the sub-distributors sold the services product to a third-party buyer.  As a result of the improper recognition of revenue, Gridsum's 2016 revenues were materially overstated by as much as 9.2%.

16.     Furthermore, the Company's financial statements for 2015 and 2016 materially misstated accounts payable, other certain costs and expenses, and contained classification errors. As a result of the misstatements, errors, and improper revenue recognition, Gridsum's ***net losses were understated by 26.5% and 45.6%*** for 2015 and 2016, respectively.

17.     In the Company's Offering Materials and throughout the Class Period, Defendants made materially false and misleading statements and omissions regarding the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose:  (i) that Gridsum was recognizing sales revenue on

consignment transactions that were not sales; (ii) that Gridsum failed to record accounts payable; (iii) that Gridsum failed to accrue certain expenses; (iv) that Gridsum failed to record certain costs; (v) that Gridsum misclassified certain financial statement items; (vi) the extent and magnitude of Gridsum's lack of effective internal control over financial reporting; (vii) that Gridsum and certain Individual Defendants were not appropriately addressing issues with the Company's financial reporting raised by its auditor; (viii) that the audit was not appropriately performed by the auditor in accordance certain auditing standards; (ix) that consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (x) that as a result of the foregoing, Gridsum's public statements were materially false and misleading at all relevant times.

## II.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to (i) Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and (ii) Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

20.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b). Gridsum's ADSs trade on the Nasdaq, located within this District.

21.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

7

including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.   PARTIES

### A.   Plaintiffs

22.   Lead Plaintiff William Barth, as set forth in his previously-filed certification (ECF No. 22-2), purchased Gridsum securities at artificially inflated prices during the Class Period and was damaged as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.   Named plaintiff Xuechen Li, as set forth in his certification filed in Case No. 1:18-cv-05749 in the United States District Court for the Southern District of New York (ECF No. 1), purchased Gridsum securities pursuant to and/or traceable to the Company's IPO at artificially inflated prices during the Class Period and was damaged as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

### B.   Defendants

24.   Gridsum is a corporation organized and existing under the laws of the Cayman Islands with its principal place of business located in the People's Republic of China ("PRC") at South Wing, High Technology Building, No. 229 North 4th Ring Road, Haidian District, Beijing, China 100083.  Gridsum's ADSs trade on the Nasdaq under the ticker symbol "GSUM."

25.   Qi co-founded Gridsum and has served at all relevant times as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board").  Qi serves as a member of the Board's Compensation and Nominating and Corporate Governance Committees. According to the 2017 Form 20-F, as of December 31, 2018, Qi beneficially owned 29.9% of the total ordinary shares of the Company.  Qi beneficially owns all of the Class A shares, giving him nearly 70% of the voting power as the Class A shares are entitled to ten votes per share.  Qi founded

Beijing Gridsum Technology Co. Ltd. ("Beijing Gridsum") in 2005. Qi signed the Company's Registration Statement, Gridsum's 2016 Form 20-F, and the certifications attached to the 2016 Form 20-F pursuant to SEC Rule 13(a) and Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX").

26.     Michael Peng Zhang ("Zhang") currently serves as Gridsum's Vice President of Corporate Development. He served as Co-Chief Financial Officer ("CFO) from April 2017 until September 30, 2019, and served as the Company's sole CFO from February 2014 to April 2017. Zhang signed the Company's Registration Statement and the certifications attached to the 2016 Form 20-F pursuant to SEC Rule 13(a) and Section 906 of SOX.

27.     Ravi Sarathy ("Sarathy") is currently the sole CFO of Gridsum. He served as Gridsum's Co-CFO from April 2017 until September 30, 2019, and as Chief Strategy Officer from October 2016 to April 2017. Sarathy signed the certifications attached to the 2016 Form 20-F pursuant to SEC Rule 13(a) and Section 906 of SOX.

28.     Yu co-founded Gridsum and has served as the Company's Chief Operating Officer and a director since 2005. According to the 2017 Form 20-F, as of December 31, 2018, Yu beneficially owned 4.5% of the total ordinary shares of the Company. Yu signed the Company's Registration Statement.

29.     Perry Lin Chui ("Chui") served as a director of Gridsum from 2010 until sometime before April 27, 2017. Chui was not listed as a director of the Company in the Company's 2016 Form 20-F filed with the SEC on April 27, 2017. Chui signed the Company's Registration Statement.

30.     Xiang Fan ("Fan") served as a director of Gridsum from 2015 until February 1, 2019. Fan is a managing director of Goldman Sachs. According to the 2017 Form 20-F, as of

December 31, 2018, Fan beneficially owned 7.2% of the total ordinary shares of the Company. Fan signed the Company's Registration Statement.

31.    Yanchun Bai ("Bai") has served as a director of Gridsum since 2012.  Bai signed the Company's Registration Statement.

32.    Xudong Gao ("Gao") has served as a director of Gridsum since 2006.  Gao is a member of the Board's Audit and Nominating and Corporate Governance Committees.  He is the Chair of the Compensation Committee.  Gao signed the Company's Registration Statement.

33.    Thomas Adam Melcher ("Melcher") served as a director of Gridsum from 2008 until March 30, 2019.  Melcher was a member of the Board's Audit Committee and served on the Compensation Committee during the Class Period.  He was Chair of the Nominating and Corporate Governance Committee.  Melcher signed the Company's Registration Statement.

34.    Peter Andrew Schloss ("Schloss") served as a director of Gridsum from 2016 until April 1, 2019.  During the Class Period, he was Chair of the Board's Audit Committee and a member of the Compensation Committee.  Schloss signed the Company's Registration Statement.

35.    PwC served as Gridsum's auditor from at least 2015 until June 28, 2018.  PwC consented to the use of its report and opinion of independent registered public accounting firm dated March 9, 2016 in the Registration Statement.  PwC consented to the use of its report and opinion of independent registered public accounting firm dated April 27, 2017 in the 2016 Form 20-F.

36.    Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") served as an underwriter in connection with Gridsum's IPO.  According to the Schedule 13-G/A filed with the SEC on February 11, 2019, Goldman Sachs and its related entities beneficially own approximately 7.4% of the ordinary shares of the Company.

10

37.     Citigroup Global Markets Inc. ("Citigroup") served as an underwriter in connection with Gridsum's IPO.

38.     Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter in connection with Gridsum's IPO.

39.     Qi, Zhang, Sarathy, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss are sometimes referred to herein as the "Individual Defendants."

40.     Goldman Sachs, Citigroup, and Stifel are sometimes referred to herein as the "Underwriter Defendants."

41.     Gridsum, Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, Schloss, PwC, and the Underwriter Defendants are sometimes referred to herein as the "Securities Act Defendants."

42.     Gridsum, Qi, Zhang, Sarathy, Yu, Chui, Fan, Bai, Gao, Melcher, Schloss, and PwC, are sometimes referred to herein as the "Exchange Act Defendants."

43.     Gridsum, the Individual Defendants, PwC, and the Underwriter Defendants are referred to collectively herein as "Defendants."

IV.     **COMPANY BACKGROUND**

44.     Gridsum was founded in 2005 with the establishment of Beijing Gridsum in China. Between 2011 and August of 2017, Beijing Gridsum established or acquired eight additional operating companies:  Beijing Moment Everlasting Ad Co., Ltd. ("Beijing Moment"), and its wholly owned subsidiary, Beijing Yunyang Ad Co., Ltd.; Guoxinjunhe (Beijing) Technology Co., Ltd. ("Guoxinjunhe"); Beijing Guoxinwangyan Technology Co., Ltd.; Beijing Gridsum Yizhun Technology Co., Ltd.; Beijing Zhixunyilong Software Co., Ltd.; Beijing Gridsum Wang'an Technology Co., Ltd.; and Beijing Hainatianchuang Technology Development Co., Ltd.

45.     In preparation for entrance into the United States securities markets, Gridsum undertook a reorganization from July to December of 2014.   Gridsum Holding Inc. was

incorporated under the laws of the Cayman Islands on July 21, 2014 as the parent holding company of Gridsum's related companies.  Gridsum established a wholly-owned subsidiary in Hong Kong, Gridsum Holding (China) Limited, which in turn established a wholly owned subsidiary in the PRC, Dissector (Beijing) Technology Co., Ltd.  Additionally, the Company established Gridsum Holding (Beijing) Co., Ltd. ("Gridsum PRC Holding") in China, which in turn acquired ownership of Beijing Gridsum, Beijing Moment, and Guoxinjunhe.

46.    To operate in and under the laws of the PRC, Gridsum conducts its operations principally through Gridsum PRC Holding and its subsidiaries through a series of contractual arrangements, treating Gridsum PRC Holding as a variable interest entity.  Gridsum PRC Holding is beneficially owned by Qi, Yu, and other employees.  Through these contractual arrangements, Gridsum exerts control over Gridsum PRC Holding and its subsidiaries, and consolidates their operating results in Gridsum's financial statements under GAAP.



Equity interest

- - - - - - - - - - - - - - -  Contractual arrangements including an Exclusive Business Cooperation
Agreement, Exclusive Option Agreements, Shareholders' Voting Rights Proxy
Agreements and Equity Pledge Agreements

(1)    Gridsum (Beijing) Management Consulting Co., Ltd. Is a holding company owned by Guosheng Qi and
other key employees, who own 57.34% and 42.66% of this entity, respectively

47.     Gridsum designs and develops data analysis software, providing cloud-based analytics and AI solutions for commercial and governmental entities.  The Company's proprietary distributed data architecture allows its customers to efficiently collect and analyze large amounts of information.   Gridsum's initial products concentrated on digital marketing analytics and automation solutions.  The Company claims to be among the first companies to offer web analytics solutions based "entirely on a distributed data warehouse architecture using the open-source Hadoop framework," and the only China-based company to provide solutions to enterprise customers that cover web, video, and mobile analytics.

48.     Gridsum's core technology is the Gridsum Big Data Platform, which uses machine learning capabilities to perform multi-dimensional correlation analysis and to analyze complex real-time events, allowing customers to use data visualization and data-mining technologies to identify complex relationships within their data.

49.     The Company launched Gridsum Prophet in May 2017.  Gridsum Prophet is an enterprise AI engine built on top of the Gridsum Big Data Platform which includes the following capabilities:  machine learning, predictive modeling, natural language processing, speech and image recognition, and knowledge graph.

50.     Gridsum customers use the Company's products and solutions to, among other things, analyze Internet user behavior and optimize user experiences, assess web design, manage search engine marketing campaigns, and integrate data from sources online and offline.  The Company offers "suites of solutions" based on the Gridsum Big Data Platform and Gridsum Prophet for marketing automation, e-Government, new media, information discovery, visualization, and Industrial Internet of Things.

51.     Gridsum's solutions include, but are not limited to, the following:  SEM Dissector (automates search engine marketing processes and provides comprehensive performance reports), SEO Dissector (search engine optimization tool analyzing quality and accessibility to search engines), Mobile Dissector (allows customer to understand mobile app user activity, gain insight in users' behaviors, and improve user experience), Ad Dissector (advertisement performance monitoring and optimization product), Government Web Dissector (solution for public sector websites, providing operators with real-time website operating data), Video Dissector (online content analytics tool providing viewer behavior and solutions), Social Listening (cloud-based solution enabling customers to monitor and analyze web and social media posts regarding brand, products, and customer service), Law Dissector (search and analysis tool for legal cases), and ADSUITE (fully integrated package of marketing automation solutions).

52.     The Company's commercial marketing and advertising customers have included the Haier Group, a consumer electronics and home appliances company, Coca-Cola, Chrysler (China), and Nike.  The Company has also worked with China Network Television, Peking University Law School, a large full-service law firm in China, and various Chinese government entities.  In January 2016, the Company entered into a strategic cooperation agreement with the PRC's People's Court Press providing for the development of a platform to enable access to judicial decisions and other legal information.  In November 2017, in cooperation with Tencent Holdings (a Chinese company focusing on Internet-related services and products) and the PRC People's Court Press, Gridsum launched the Faxin Wei Su Platform which provides integrated online litigation and remote trial handling services in China.

53.     Gridsum's competitors include diversified technology companies such as Google and IBM, bid management companies such as adSage and Adobe Media Optimizer, and web analytics companies such as Adobe Omniture and WebTrends.

54.     As of December 31, 2015, the Company had 733 employees, growing to 929 by the end of 2016, to 1,078 by the end of 2017, and to 1,148 by the end of 2018.  The majority of the Company's employees work in either sales and marketing (410 employees at the end of 2017) or research and development (546 employees at the end of 2017) with only 122 employees in "general and administrative" at the end of 2017.  All of the Company's employees are based in China.  The Company has offices and/or data centers in Beijing, Shanghai, Guangzhou, Shenzhen, Chengdu, and Xi'an.

55.     Gridsum grew quickly between 2013 and 2016.  According to the Company's Offering Materials and 2016 Form 20-F, the Company's customers increased from 141 in 2013 to 395 in 2016, net revenues grew from RMB62.5 million in 2013 to RMB400.3 million in 2016, and net losses grew from RMB30.7 million in 2013 to RMB67.7 million in 2016.

56.     As admitted in the restatement, however, the 2016 net revenues were actually RMB363.8 million and the 2016 net losses were actually RMB98.6 million.

57.     The Company has no long-term contracts with customers, with most contracts renewed on an annual basis.  For 2015, 2016, and 2017, its top 20 customers accounted for 55%, 55%, and 44% of its total revenues, respectively.

58.     The Company purportedly accounts for revenues "on a net basis, based on the fees our customers pay" and "charge the majority of our customers based on percentage of their spending on our system in the bid management application or the volume of data being processed (*e.g.*, page views or viewer views)."   For data analytics solutions with bid management

functionality, the customer is charged based on a percentage of ad spending with the search engine providers.   If a customer purchases a data analytic solution without spending money on advertisements, Gridsum typically charges a negotiated variable amount based on the monthly volume of data processed.

59.     An annual data volume estimate is provided at the beginning of an engagement and a fee charged for the predetermined base number of page or viewer views.   When data volume exceeds the predetermined base, Gridsum charges progressively for additional usage.   Some customers request a fee cap which is negotiated and subject to annual review, and others negotiate fixed-fee contracts.   For marketing automation solutions, the Company earns and records service fee revenues over the life of the contract, in proportion to ad spending or the completion of contractual milestones.   The Company also receives revenues from the incentive programs of search engine providers, such as Baidu.

## V.      VIOLATIONS OF SECTIONS 11 AND 15 OF THE SECURITIES ACT

60.     For all claims stated within this Section V., Plaintiffs expressly disclaim any allegations that could be construed as alleging fraud or intentional or reckless misconduct.

61.     The Securities Act claims are brought against the following defendants:  Gridsum, Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, Schloss, PwC, and the Underwriter Defendants, *i.e.*, the Securities Act Defendants.

62.     Defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss each participated in the preparation of and signed (or authorized the signing of) the Registration Statement and/or an amendment thereto, and the issuance of the Offering Materials.

63.     Defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss are strictly liable for the material omissions of fact and materially untrue and misleading statements incorporated into the Registration Statement.  By virtue of their positions with the Company, they

possessed the power and authority to control the contents of Gridsum's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and market investors.

64.     Defendant PwC is strictly liable for the material omissions of fact and materially untrue and misleading statements incorporated into the Registration Statement relating to Gridsum's unaudited statement of operations for the six months ended June 30, 2016.

65.     Defendant PwC is strictly liable for the material omissions of fact and materially untrue and misleading statements incorporated into the Registration Statement relating to its audit of the Company's financial statements for the year ended December 31, 2015.

66.     PwC consented to the inclusion of its audit report and opinion stating that Gridsum's consolidated financial statements for the year ended December 31, 2015 conformed with GAAP and that its audit was performed in accordance with U.S. Generally Accepted Auditing Standards ("GAAS").   In forming this opinion, PwC had access to confidential corporate information concerning Gridsum's operations and financial prospects, including, but not limited to, the "evidence supporting the amounts and disclosures in the financial statements."

67.     In connection with the services which PwC provided to the Company in connection with the IPO, PwC personnel were frequently present at the Company's corporate headquarters and they frequently spoke with Company personnel and had continual unrestricted access to and knowledge of the Company's confidential corporate financial, operating, and business information.  There was no restriction on the scope of PwC's audit.

68.     In the run-up to the IPO, the Underwriter Defendants:  (i) assisted in the preparation and presentation of any "road show" materials designed to induce investment in the Company; (ii) conducted due diligence on the Company, including, *inter alia*, access to confidential corporate

information concerning Gridsum's business operations unknown to the investing public; and (iii) consulted with Company management regarding the content of the Registration Statement.

69.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the materially untrue and misleading statements in the Offering Materials.   The Underwriter Defendants assisted Gridsum and certain Individual Defendants in planning the IPO and were required to conduct an adequate and reasonable investigation into the business and operations of Gridsum — a process known as a "due diligence" investigation.   The Underwriter Defendants were required to conduct a due diligence investigation to participate in the IPO.   During the course of their due diligence investigation, the Underwriter Defendants had continual access to confidential corporate information concerning Gridsum's operations and financial prospects.

70.     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Gridsum's lawyers, management, and top executives and made joint decisions regarding:   (i) the terms of the IPO, including the price at which Gridsum shares would be sold to the public; (ii) the strategy to best accomplish the IPO; (iii) the information to be included in the Offering Materials; and (iv) what responses would be made to the SEC in connection with its review of the Offering Materials.

## A.     Gridsum's Initial Public Offering

71.     Gridsum filed its initial draft registration statement with the SEC on July 10, 2015. Over one year later, after numerous draft registration statements in response to SEC correspondence, on August 26, 2016, the Company filed a registration statement on Form F-1 relating to a proposed initial public offering of ADSs.

72.     The August 26, 2016 Form F-1 registration statement was followed by an amendment on September 9, 2016, with the final amended Registration Statement filed with the

SEC on September 21, 2016.  The Registration Statement was declared effective by the SEC on September 22, 2016.

73.     On September 23, 2016, Gridsum filed with the SEC a Prospectus pursuant to Rule 424(b)(4), commencing its IPO of 6.7 million ADSs at a price of $13.00 per share.  The Offering Materials stated that the intended use of the IPO proceeds was for working capital and other general corporate purposes, including technology and infrastructure investments, product development, and expansion of sales and marketing.

74.     On September 30, 2016, Gridsum announced that the Underwriter Defendants had chosen to exercise in full their over-allotments, purchasing an additional 1,005,000 shares.  In total, Gridsum issued and sold 7,705,000 ADSs, reaping net proceeds of approximately $87.1 million.

**B.      Defendants Used Material Misstatements and Omissions in the Offering Materials to Sell Gridsum ADSs to the Investing Public**

75.     The Offering Materials contained the audited consolidated balance sheets and the related consolidated statements of operations and comprehensive loss, of shareholders' deficit, cash flows, and financial position of Gridsum and its subsidiaries at December 31, 2013, 2014, and 2015, and the results of operations and cash flows for each of the three years in the period ended December 31, 2015.   The Offering Materials also contained summary consolidated statements of operations and comprehensive loss, of shareholders' deficit, cash flows, and financial position of Gridsum and its subsidiaries for the six months ended June 30, 2015 and 2016, and the results of operations and cash flows for the six months ended June 30, 2016.

76.     The Registration Statement stated:

The following selected consolidated statements of operations data for the years ended December 31, 2013, 2014 and 2015, and selected consolidated balance sheet data as of December 31, 2013, 2014 and 2015, have been derived from our audited consolidated financial statements included elsewhere in this prospectus.

The following selected consolidated statements of operations data for the six months ended June 30, 2015 and 2016, and selected consolidated balance sheet data as of June 30, 2016, have been derived from our unaudited interim consolidated financial statements included elsewhere in this prospectus.  The unaudited interim consolidated financial statements have been prepared on the same basis as our audited consolidated financial statements and include all adjustments, consisting of normal and recurring adjustments, that we consider necessary for a fair statement of our financial position and operating results for the periods presented.  Results for the six months ended June 30, 2016 are not necessarily indicative of results that may be expected for the full year.

You should read this Selected Consolidated Financial Data section together with our consolidated financial statements and the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus.  Our consolidated financial statements are prepared in accordance with U.S. GAAP.  Our historical results are not necessarily indicative of results expected for future periods.

77.    The Registration Statement contained a Consolidated Statement of Operations that reflected the following financial data for 2015:

| 2015 Consolidated Statement of Operations Financial Data | | |
|---|---|---|
| | (RMB in Thousands) | |
| **Revenues:** | | |
| Enterprise | 208,157 | |
| e-Government and other | 29,467 | |
| **Total revenues** | | 237,624 |
| **Less: Business tax and surcharges** | | (2,785) |
| **Net Revenues** | | 234,839 |
| **Cost of Revenues** | | (35,237) |
| **Gross profit** | | 199,602 |
| **Operating expenses:** | | |
| Sales and marketing expenses | (84,548) | |
| Research and development expenses | (100,186) | |
| General and administrative expenses | (60,540) | |
| **Total operating expenses** | | (245,274) |
| **Loss from operations** | | (45,672) |
| **Other income/expense:** | | |
| Foreign currency exchange gain/loss | 1,339 | |
| Interest income, net | 80 | |
| Other income, net | 111 | |
| **Total other income/expense** | | 1,530 |
| **Loss before income tax** | | (44,142) |
| **Income tax expense** | | (4,693) |
| **Net loss** | | (48,835) |

78.    The 2015 Consolidated Statement of Operations was materially false and misleading as subsequently admitted upon the restatement which reflected that:

(i)    total revenues were actually RMB235,289,000 and not RMB237,624,000;

(ii)    business tax and surcharges were actually RMB3,092,000 and not RMB2,785,000;

(iii)    net revenues were actually RMB232,197,000 and not RMB234,839,000;

(iv)    cost of revenues was actually RMB33,392,000 and not RMB35,237,000;

22

(v)     total  operating  expenses  were  actually  RMB246,737,000  and  not
RMB245,274,000;

(vi)    loss  from  operations  was  actually  RMB47,932,000  and  not
RMB45,672,000; and

(vii)   net loss for the year was actually RMB61,773,000 and not RMB48,835,000.

79.     The  Registration  Statement  also  contained  a  Consolidated  Balance  Sheet  that
reflected the following financial data for 2015:

| 2015 Consolidated Balance Sheet Financial Data | | |
| --- | --- | --- |
| | (RMB in Thousands) | |
| **Cash and Cash equivalents** | | 198,523 |
| **Accounts receivable, net** | | 279,537 |
| **Prepayment and other current assets** | | 107,046 |
| **Total current assets** | | 585,106 |
| **Non-current assets:** | | |
| **Property, equipment, and software, net** | 36,243 | |
| **Other non-current assets** | 4,558 | |
| **Total non-current assets** | | 40,801 |
| **Total assets** | | 625,907 |
| **Accounts payable** | 103,289 | |
| **Taxes payable** | 16,484 | |
| **Deferred revenue** | 31,308 | |
| **Advance from customers** | 104,605 | |
| **Accrued expenses and other current liabilities** | 70,908 | |
| **Salary and welfare payables** | 33,539 | |
| **Total current liabilities** | 360,133 | |
| **Total liabilities** | | 360,133 |
| **Equity and shareholders' deficit** | | 265,774 |
| **Total liabilities, equity, and shareholders' deficit** | | 625,907 |

80. The 2015 Consolidated Balance Sheet was materially false and misleading as subsequently admitted upon the restatement which reflected that:

(i) accounts receivable, net was actually RMB273,536,000 and not RMB279,537,000;

(ii) prepayment and other current assets were actually RMB105,387,000 and not RMB107,046,000;

(iii) total current assets were actually RMB577,446,000 and not RMB585,106,000;

(iv) total assets were actually RMB618,246,000 and not RMB625,907,000;

(v) accounts payable was actually RMB99,559,000 and not RMB103,289,000;

(vi) deferred revenue was actually RMB18,368,000 and not RMB31,308,000;

(vii) advance from customers was actually RMB112,782,000 and not RMB104,605,000;

(viii) accrued expenses and other current liabilities were actually RMB67,292,000 and not RMB70,908,000; and

(ix) total current liabilities were actually RMB357,652,000 and not RMB360,133,000.

81. The Registration Statement contained Notes to the Consolidated Financial Statements (the "Notes") which again stated, "*The Company's consolidated financial statements have been prepared in accordance with U.S. GAAP.*"

82. The Notes also included the following regarding Gridsum's revenues:

**(k) Revenue Recognition**

Revenues are generated from sales of the Company's marketing automation solutions and e-Government and other solutions. The targeted customers for marketing automation solutions are enterprise customers and the targeted

customers for e-Government and other solutions are governmental agencies and state-owned entities.

Revenues are recognized when:

- persuasive evidence of an arrangement exists;
- the Group's platform is made available and services have been delivered to the customer;
- the fee is fixed or determinable; and
- collection is reasonably assured.

Revenues received from the incentive programs of search engine providers are based on factors determined by these providers, such as yearly growth in the amount of advertising on the provider's search engine platform that the Company's customers purchase through its solutions, and other factors selected at the discretion of these providers. Revenues are recorded net of value-added taxes and surcharges.

In accordance with ASC 605-45, Revenue Recognition: Principal Agent Considerations, the Company considers several factors in determining whether it acts as the principal or as an agent in the arrangement of merchandise sales and provision of various related services and thus whether it is appropriate to record the revenues and the related cost of sales on a gross basis or record the net amount earned as service fees.

Where customers purchase multiple solutions in a single contract, the Company allocates the total consideration to the various elements based on the relative selling price method and recognizes revenues as services are rendered. In accordance with ASC 605-25, Revenue Recognition-Multiple-Element Arrangements, the following hierarchy are followed when determining the appropriate selling price for each element: (1) vendor specific objective evidence ("VSOE"), (2) third party evidence ("TPE") and (3) best estimate of selling price ("BESP"). The Company recognizes revenues on the elements delivered and defers the recognition of revenues for the fair value of the undelivered elements until the remaining obligations have been satisfied. Where all of the elements within an arrangement are delivered uniformly over the agreement period, revenues are recognized on a straight line basis over the contract period.

Enterprise

The Company generates enterprise revenue primarily by providing marketing automation solutions including bid management and data analysis solutions to enterprise customers. The Company earns and records service fee revenues over the contractual period, in proportion to ad spending or the completion of milestones that are stipulated in the contracts. In addition, the Company receives revenues from the incentive programs of search engine providers based on factors determined by these providers, such as yearly growth in the amount of advertising on the provider's search engine platform that the Company's customers purchase through

its solutions, and other factors selected at the discretion of these providers.
Revenues from these programs are received on both a quarterly and an annual basis
and are calculated in accordance with the Company's customers' usage of the
search engine providers.

With respect to the bid management services, the Group considered that: (i) the
search engines are responsible for providing the advertisements service to the
customers; (ii) the Group lacks the latitude to determine the prices charged by the
search engine providers and earns only the fixed service fee from the customers;
(iii) the hosting and maintenance of the advertisements are the responsibilities of
the search engine providers; (iv) the customers have the discretion in choosing the
search engines selection; (v) we receive revenues from incentive programs based
on the search engine providers' policies.  The Group's responsibility is to manage
the customer's advertising campaign on the search engines, according to the terms
of the customer contracts so the Group views itself as an agent, and records
revenues related to these services on a net basis.

e-Government and Other

The Company generates revenues by entering into service contracts with
governmental agencies for its e-government solutions, including Law Dissector
solutions for the court systems and other law communities beginning in 2015.  The
Company also generates revenues by entering into contracts with state-owned
television stations for its new media solutions, including TV Dissector, Streaming
Dissector and Video Dissector.

**(l) Advances from Customers and Deferred Revenues**

Upon the entering of contracts, customers pay the contractual balance as
prepayments.   The Company allocates the prepayments into advances from
customers and deferred revenues.  Advances from customers are the balance of the
advertising campaign spending that would be recognized as cost payable to search
engine providers when advertisements are placed.  Deferred revenues are the
revenues to be earned by the Group for services and is recognized as the revenues
according to the prescribed revenue recognition criteria and policies described
above.

83.    The Registration Statement also included a section titled "Management's

Discussion And Analysis Of Financial Condition And Results of Operation" which stated the

following regarding Gridsum's revenues:

Net revenues consist of revenues recognized from customers who used our software
solutions during the period, including revenues that we receive from the incentive
programs of search engine providers, less business tax and surcharge.  Historically,
we have increased net revenues through our ability to increase the number of

customers, retain high quality customers and increase the average customer contribution by upselling and cross selling new solutions. We believe this trend will continue as more customers adopt our solutions and demand more business intelligence to improve their operational efficiency, and as we continue to bring more innovative solutions to market and serve our customers.

84.    The Registration Statement attributed differences between net revenues from 2014 to 2015 as follows:

Net revenues increased by RMB110.3 million, or 89%, from 2014 to 2015, with 98% and 38% growth rates in enterprise revenues and e-Government and other revenues, respectively. This growth was attributable to increased demand for our solutions from new and existing customers. Total customers increased 45% to 307 customers in 2015 from 211 customers in 2014. Enterprise revenues increased RMB103.3 million due to a 48% increase in the number of customers from 163 to 242 and a 34% increase in average customer contribution from RMB643,503 to RMB860,153 (US$129,426). E-Government and other revenues increased RMB8.1 million due to an increase in the number of customers from 48 to 65 and a slight increase in average customer contribution from RMB444,583 to RMB453,338 (US$68,213).

85.    The Registration Statement contained a Consolidated Statement of Operations which reflected the following financial data for the six months ended June 30, 2016:

| Consolidated Statement of Operations<br>Financial Data for the Six Months Ended June 30, 2016 | |
|---|---|
| | (RMB in Thousands) |
| **Loss before income tax** | (29,709) |
| **Income tax expense** | 0 |
| **Net loss** | (29,709) |

86.    As further explained below at ¶¶ 92-98, the Consolidated Statement of Operations for the six months ended June 30, 2016 was materially false and misleading. Just six months later, Gridsum reported the below financial data. It is inconceivable that the income tax expense could have been zero as of June 30, 2016 and RMB28,387,000 as of December 31, 2016. The reporting of the income tax expense as zero violated GAAP resulting in a material understatement of the Company's reported net losses by 47.78%. This astronomical change did not go unnoticed by analysts when it was reported (*see* ¶ 92).

27

| Consolidated Statement of Operations<br>Financial Data for the Year Ended December 31, 2016 | | |
|---|---|---|
| | (RMB in Thousands) | |
| **Loss before income tax** | | (39,359) |
| **Income tax expense** | | (28,387) |
| **Net loss** | | (67,746) |

87.    In 2019, Gridsum restated the income tax expense first reported in its December 31, 2016 financial statements from RMB28,387,00 to RMB14,801,000, as follows (with no explanation as to why it was reduced):

| [RESTATED] Consolidated Statement of Operations<br>Financial Data for the Year Ended December 31, 2016 | | |
|---|---|---|
| | (RMB in Thousands) | |
| | Originally Reported | Restated |
| **Loss before income tax** | (39,359 | (83,826) |
| **Income tax expense** | (28,387) | (14,801) |
| **Net loss** | (67,746) | (98,627) |

88.    For the same reasons as in ¶ 86 above, it is inconceivable that the income tax expense could have been zero as of June 30, 2016, even with the lower restated amount of RMB14,801,000 as of December 31, 2016.  The reporting of the income tax expense as zero violated GAAP, resulting in a material understatement of the Company's reported net losses as restated by 24.9%.

89.    The Registration Statement also contained the March 9, 2016 (except for note 2(a) and note (d), which was as of August 19, 2016) report and opinion of Gridsum's auditor, PwC, which stated:

To the Board of Directors and Shareholders of Gridsum Holding Inc.:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations and comprehensive loss, of shareholders' deficit and of cash flows present fairly, in all material respects, the financial position of Gridsum Holding Inc. and its subsidiaries at December 31, 2013, 2014 and 2015, and the results of their operations and their cash flows for each of the

three years in the period ended December 31, 2015 in conformity with accounting principles generally accepted in the United States of America.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.  We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

90.     Finally, the Registration Statement stated the following with respect to Gridsum's

internal controls:

Prior to this offering, we have been a private company with limited accounting personnel and other resources with which to address our internal control over financial reporting.  Our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting.  However, in the course of auditing our consolidated financial statements as of and for the years ended December 31, 2013, 2014 and 2015, we and our independent registered public accounting firm *identified one material weakness and certain other deficiencies in our internal control over financial reporting*, each as defined in the standards established by the Public Company Accounting Oversight Board of the United States.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

The *material weakness relates to our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements* to properly address complex accounting issues and to prepare and review our consolidated financial statements and related disclosures in accordance with U.S. GAAP and SEC financial reporting requirements.

*We have taken initiatives to improve our internal control over financial reporting to address the material weakness that has been identified, including:  hiring an additional senior financial reporting manager, an internal control manager, and three financial analysts with experience in U.S. GAAP accounting and SEC reporting to lead accounting and financial reporting matters; designating more resources to improve the period-end closing procedures for financial statements and relevant disclosures preparation; and taking steps to establish an audit committee prior to completion of this offering, with members who have an*

*appropriate level of financial expertise to oversee our accounting and financial reporting processes as well as our external and internal audits.*

*We have also taken other steps to strengthen our internal control over financial reporting, including preparing a contracts tracking database, formalizing a set of comprehensive U.S. GAAP accounting manuals, establishing an internal audit function, continuing to hire qualified professionals with sufficient U.S. GAAP accounting and SEC reporting experience, providing relevant training to our accounting personnel and upgrading our financial reporting system to streamline monthly and year-end closings and integrate financial and operating reporting systems.*

91.    The statements in ¶¶ 76-77, 79, 81-85, 89-90 were materially false and misleading when made because as more fully detailed above in ¶¶ 78, 80, 86-88 and below at Sections V.C., V.D.1., V.D.3., and V.E., the Offering Materials failed to disclose:  (i) the existence of a "sub-optimal" offshore capital structure; (ii) Gridsum's plans to bring the sub-optimal offshore capital structure to the Company's anchor entities after the IPO; (iii) the materially adverse tax consequences of bringing the sub-optimal offshore capital structure to the Company's anchor entities; (iv) the material understatement of the tax expense reported in Gridsum's Statement of Operations for the six months ended June 30, 2016; (v) Gridsum's plan to launch a new sentiment tracking services product within weeks, if not days, of the IPO, and that Gridsum planned to recognize revenue thereon when the services were transferred to sub-distributors (sales agents) on a consignment basis, which method of revenue recognition was improper; (vi) Gridsum was improperly recognizing revenue; (vii) Gridsum failed to record accounts payable; (viii) Gridsum failed to accrue certain expenses; (ix) Gridsum failed to record certain costs; (x) Gridsum misclassified certain financial statement items; (xi) PwC was, at a minimum, negligent in performing its audit of the 2015 financial statements and additional audit procedures through August 19, 2016; (xii) Gridsum's material weaknesses over internal controls extended beyond the "lack of sufficient financial reporting and accounting personnel;" (xiii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading statements;

(xiv) Gridsum and certain Individual Defendants were not appropriately addressing issues with the Company's financial reporting raised by its auditor; (xv) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (xvi) as a result of the foregoing, Gridsum's Offering Materials were materially false and misleading at all relevant times.

### C. Gridsum's 2016 Income Tax Expense

92.     On March 15, 2017, Gridsum issued a press release containing the Company's unaudited full year 2016 financial results which included an income tax expense of RMB28,387,000 for the year ended December 31, 2016.  That same day, during Gridsum's earnings conference call, a Citigroup analyst questioned the sharp increase in the income tax expense:

> <**Q - Alicia Yap**>:  Hi.  Thank you.  Good morning, Guosheng, Michael and [ph] Ravi (23:51).  Thanks for taking my questions and also congrats on the solid results and guidance.  I have a few questions.
>
> \*          \*          \*
>
> My second question is related to the income tax expense.  I thought that previously we were guided that we probably don't need to pay the income tax until couple of years later.  So, can you give us what's the change for this?  Thank you.
>
> <**A - Guosheng Qi**>:  We'll just try to answer the question, one second, guys.
>
> <**A - Michael Peng Zhang**>:  Thank you, Alicia.  This is Michael.  Let me take the first shot.  And for the full-year guidance visibility, as always, we have the better visibility for the full year as our customers, their budget is set for [ph] annual (26:03) that of a quarter.  So, the visibility is as good as we previously had.
>
> And your second question was – relate to the growth profile into different segments.  Given, the relatively smaller pace for our e-Government and other segment, we expect the stronger growth profile in this segment versus our Enterprise revenue.
>
> And relate to the tax, the tax comes ***from a sub-optimal structure we initially had in place to move the offshore capital to onshore entities post-IPO***.  We have since put in place a more efficient structure.  So, do not see this tax liability as a recurring

dynamic.  We can have a more detailed *offline discussion* about this if you want.
Thank you.

**<Q - Alicia Yap>**:  So, can I have a follow-up?  So, is that mean, this is a one-time
tax expense?  So, going forward, we shouldn't see any tax expense given we still
have accumulated loss previously?

**<A - Michael Peng Zhang>**:  Yeah.  That's our understanding.  Thank you.

**<Q - Alicia Yap>**:  Okay.  Thank you.

**Operator**

Ladies and gentlemen, that does conclude our conference for today.  Thank you for
all participating.  You may all disconnect.  Thank you and good-bye.

93.    During the above exchange, defendant Zhang admits that Gridsum planned to move

the offshore capital to Gridsum anchor entities after the IPO.  Defendant Zhang also admits that

Gridsum's planned move of the offshore capital to Gridsum anchor entities would trigger a tax

liability.  Defendant Zhang did not want to publicly elaborate on the details giving rise to the tax

liability and, therefore, offered to discuss it offline after which the earnings conference call was

terminated.

94.    Gridsum filed its 2016 Form 20-F with the SEC on April 27, 2017.  The 2016 Form

20-F contained the audited Consolidated Statement of Operations which reflected the same income

tax expense for the year ended December 31, 2016 of RMB28,387,000.[3]

95.    Pursuant to GAAP (ASC 740), in determining the tax expense to be recognized at

June 30, 2016, Gridsum was required to make its best estimate of the Company's annual tax for

the full year and to apply this estimate in determining the proportionate six month tax expense to

be recognized at June 30, 2016.

---

[3]  This tax expense was decreased upon restatement.  However, Gridsum did not provide any
justification for the decrease.

96.     Defendant Zhang admitted during the March 15, 2017 earnings conference call that the action triggering the 2016 full year tax expense of RMB28,387,000 was projected at the time of the IPO.  Based upon the full year tax expense reported at December 31, 2016 of RMB28,387,000, Gridsum's financial statements for the six months ended June 30, 2016 provided in the Registration Statement, should have included and accrued a tax expense of at least one half of that amount, or RMB14,193,500.  If the Securities Act Defendants had done so in accordance with GAAP (ASC 740), the Company would have reported *net losses 47.78% higher than what was reported*, for the six months ended June 30, 2016, making the Company far less appealing to investors.

97.     This material tax understatement was not disclosed in the notes to Gridsum's financial statements as of and for the six months ended June 30, 2016.

98.     As explained above, Gridsum later reduced the amount of income tax expense as part of its restatement, but even the lower amount of income tax expense demonstrated that the financial statements for June 30, 2016 included in the Registration Statement were materially false and misleading.

**D.     The Full Truth is Slowly Revealed**

**1.     The Initial Revelation**

99.     On April 23, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Reports Suspension of Audit Report on Financial Statements," announcing that its "audit report for the Company's financial statements for the year ended December 31, 2016 should no longer be relied upon."  The press release further stated, in relevant part:

> BEIJING, April 23, 2018 — Gridsum Holding Inc. ("Gridsum" or "Company") (NASDAQ: GSUM), a leading provider of cloud-based big-data analytics and artificial intelligence ("AI") solutions in China, today reported that *on April 20,*

*2018, PricewaterhouseCoopers Zhong Tian LLP ("PwC"), the Company's independent registered public accounting firm, notified the Company's Board of Directors and Audit Committee that PwC's audit report for the Company's financial statements for the year ended December 31, 2016 should no longer be relied upon.  Therefore, investors should not rely on that audit opinion.*

*In its letter, dated April 16, 2018 ("PwC Letter"), PwC informed the Company of certain issues it had identified in conducting its audit of the Company's financial results for the year ended December 31, 2017.  Those issues relate to certain revenue recognition, cash flow, cost, expense items, and their underlying documentation which PwC had previously raised with the Company.  Of the items specifically identified in the PwC Letter, the Company estimates a 2016 revenue impact of approximately RMB 2 million and a 2016 expense impact of approximately RMB 6 million.*  There can be no assurance that the Company or PwC will not identify more items as the Company finalizes the review.  The Audit Committee Chairman and the Company's Co-Chief Financial Officer have discussed the topics covered by the PwC Letter with representatives of PwC.  *The Company's Audit Committee is fully investigating these issues with assistance from external legal and accounting advisors and is working diligently toward an expeditious conclusion of the investigation.*  The Company undertakes no obligation to update its disclosures on this topic until the Audit Committee investigation is complete.  Because PwC will not be in a position to issue reports on the Company's financial statements until the Audit Committee completes its review and PwC is satisfied that any outstanding issues have been satisfactorily addressed, *the Company's 20-F filing will be delayed until such audit is completed*.

Mr. Guosheng Qi, Chief Executive Officer of Gridsum, commented, "For many years, starting well before our IPO, we have been committed to transparency and good corporate governance and remain so.  When we became aware of certain accounting issues, we immediately took measures to address this situation.  Our Audit Committee started an investigation and appointed a respected global law firm to conduct that review with the assistance of 'big four' forensic accounting specialists.  This work is still ongoing.  I have full confidence in the integrity and professionalism of all parties involved and we hope to report our results as soon as practicable after that work concludes.  Meanwhile, we continue to make good progress in our efforts to grow the Company and expand our product range and client base.  Our fundamentals and business prospects remain robust, and we look forward to continuing to work toward increasing shareholder value."

100.    On this news, Gridsum ADSs declined $1.17 per share, or 16.04%, to close at $6.12 on April 23, 2018 on unusually heavy trading volume of over 7.4 million shares.  Intra-day trading on April 23, 2018 reached a share price low of $3.68, a 49% decrease from the share price low on April 20, 2018.  Gridsum's ADSs continued to decline over the next few days as a result of the

disclosure, dropping another 10% on April 24, 2018, and $2.27, or 31.14% from its closing price

per share on April 20, 2018 to its closing price per share on April 26, 2018.  The Company's share

price has not returned to its April 20, 2018 closing price of $7.29 since.

### 2.    Nasdaq Warnings as the Audit Committee Investigates

101.    On April 30, 2018, the Company filed a Form 12b-25 with the SEC, signed by

Zhang, stating that Gridsum's annual report on Form 20-F for the year-ended December 31, 2017

could not be filed in a timely manner "due to delays associated with certain issues identified in the

course of the audit of the registrant's annual financial statements for the year ended December 31,

2017 and the investigation of such issues by the registrant's audit committee."

102.    On the same day, Gridsum issued a press release, attached as Exhibit 99.1 to a Form

6-K filed with the SEC, signed by Zhang, titled "Gridsum Receives NASDAQ Notice Relating to

Late Filing of Annual Report on Form 20-F," stating in relevant part:

> BEIJING, April 30, 2018 — Gridsum Holding Inc. ("Gridsum" or "Company")
> (NASDAQ: GSUM), a leading provider of cloud-based big-data analytics and
> artificial intelligence ("AI") solutions in China, today reported that *it has received
> a letter from the Listing Qualifications Department of The Nasdaq Stock Market
> ("Nasdaq"), dated April 27, 2018 ("Nasdaq Letter"), notifying the Company that
> it is not in compliance with the requirements for continued listing under Nasdaq
> Listing Rule 5250(c)(1), because it is unable to timely file its annual report on
> Form 20-F for the year ended December 31, 2017 ("2017 Annual Report").*
>
> *Under Nasdaq Listing Rules, the Company has 60 calendar days from the date
> of the Nasdaq Letter to submit a plan as to how it plans to regain compliance with
> Nasdaq's continued listing requirements ("Compliance Plan").*  If Nasdaq
> accepts the Company's Compliance Plan, Nasdaq may grant the Company an
> exception of up to 180 calendar days from the due date of the 2017 Annual Report,
> or until October 29, 2018, to regain compliance.  If Nasdaq does not accept the
> Compliance Plan, the Company will have the opportunity to appeal that decision
> to a Nasdaq Hearings Panel.  The Company intends to file submit its Compliance Plan
> within the prescribed 60-day period, and, if Nasdaq grants the exception, to file its
> 2017 Annual Report within the permitted period.

103.    The next day, May 1, 2018, the Company issued a press release, attached as Exhibit

99.1 to a Form 6-K filed with the SEC, titled "Gridsum Announces Proposed Investment from

FutureX Capital," announcing that the Company had entered into a convertible note purchase agreement (the "Note") with FutureX Innovation SPC, an affiliate of FutureX Capital Limited. Pursuant to the Note, FutureX would purchase a convertible note with a principal value of $40 million, convertible into Class B ordinary shares at a conversion price of $6.50 per share, a 21.5% premium to Gridsum's closing price on April 27, 2018. The Note term was 18 months bearing interest at 2.80% per annum. It was announced on May 7, 2018 that the investment was complete. Gridsum has since defaulted on the original Note terms and received a statutory demand for payment from FutureX on December 9, 2019. On March 3, 2020, the Company announced the execution of an extension agreement pursuant to which the maturity date was extended to May 31, 2020 and the interest rate increased to 24% per year effective from January 1, 2020.

104.    On May 8, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, titled "Gridsum Announces Receipt of Preliminary Non-Binding Proposal," announcing receipt of a preliminary proposal letter from FutureX Capital Limited proposing to acquire all outstanding shares of the Company for $8.70 per ADS in a going private transaction. In a May 11, 2018 press release, Gridsum informed investors that the Company's Board had formed a special committee comprised of defendants Schloss, Gao, and Melcher to evaluate the proposal. To date, the Company has not provided any further information to investors regarding this proposal. A separate non-binding proposal from defendants Qi, Yu, and their respective affiliated entities proposing to acquire Gridsum in a going private transaction for $3.80 per ADS was received by the Company on July 16, 2019. The Company formed a special committee to consider the proposal and on October 9, 2019 the special committee retained a financial advisor. On May 1, 2020, it was announced that the proposal from Qi, Yu, and their respective affiliated entities was revised with an acquisition share price of $2.00 per ADS.

105.    On June 28, 2018, the Company filed a Form 6-K with the SEC announcing the dismissal of PwC as the independent registered public accounting firm for Gridsum, as recommended by the Audit Committee and approved by the Board.

106.    On August 29, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Granted Extension by Nasdaq to Regain Compliance," announcing Nasdaq's extension of time to regain compliance "provided that the Company files its annual report on Form 20-F for the year ended December 31, 2017 ("2017 Annual Report") by October 29, 2018, and provides the Nasdaq staff with an update on the Audit Committee's internal investigation on or before September 28, 2018."   Gridsum affirmatively stated, "*The Company expects to satisfy*" these requirements.

107.    Gridsum did not satisfy Nasdaq's requirements and filed nothing on October 29, 2018.   On October 31, 2018, the Company issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Announces Receipt of Nasdaq Staff Determination Letter and Intent to Request Hearing," announcing that it had received a letter from Nasdaq stating that the Company's ADSs are subject to delisting.   The press release stated in relevant part:

> BEIJING, October 31, 2018 — Gridsum Holding Inc. ("Gridsum" or "Company") (Nasdaq: GSUM), announced that it received a letter from the Staff of the Listing Qualifications Department of the Nasdaq Stock Market ("Nasdaq") notifying the Company that since it remains delinquent in filing its Annual Report on Form 20-F for the fiscal year ended December 31, 2017 (the "2017 Annual Report"), it has not regained compliance with Nasdaq Listing Rule 5250(c)(1) (the "Rule"), which requires timely filing of periodic reports with the Securities and Exchange Commission ("SEC").  Previously, Nasdaq granted the Company an extension until October 29, 2018 to file all delinquent periodic reports.  *As described in the letter, as a result of the continued delinquency, the Company's American depositary shares are subject to delisting unless the Company timely requests a hearing before a Nasdaq Hearings Panel ("Panel").*
>
> The Company intends to timely request a hearing before the Panel to present its plan for regaining compliance with the Rule and request continued listing pending

its return to compliance.  The hearing request automatically stays the delisting for a period of 15 calendar days from the date of the deadline to request a hearing.  The Company will present information to the Panel, which will make a decision based on the plan for regaining compliance and the Company's presentation, whether to grant the Company an extension of time within which to regain compliance with the Rule for a period of up to 360 days from the original due date of the Company's first late filing.

***The Company recently concluded its audit committee investigation, announced on April 23, 2018.  The Company has made significant progress in implementing, and continues to action, a number of remedial steps to bolster substantially its financial controls and contract management processes as recommended by the audit committee.  The Company continues to make significant progress in working with its independent auditors to finalize its audited financial statements as of and for the years ended December 31, 2015, 2016 and 2017.***

108.    On November 13, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Announces Nasdaq Hearing Date," announcing the scheduling of the Company's hearing before the Panel for December 13, 2018 when the Company planned to request the continued listing of the Company's securities on Nasdaq.  According to the press release, Nasdaq "indicated that the Panel will issue its determination regarding the Company's listing status likely within 30 days of the hearing."  The Company stated that it expected "to receive a separate determination from the Panel regarding the Company's request for a further extension of the stay - at least pending the ultimate conclusion of the hearing process - prior to November 21, 2018."  The Company stated again that it "***continues to make significant progress in working with its independent auditors to finalize its audited financial statements as of and for the years ended December 31, 2015, 2016 and 2017.***"

109.    On November 23, 2018, Gridsum issued yet another press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Announces Nasdaq Stay Request Granted," announcing the "stay of any suspension action by Nasdaq pending the issuance of the Panel's determination regarding the Company's listing status following the hearing [on December 13, 2018]."  And again, for the third time, the Company stated that it

"*continues to make significant progress in working with its independent auditors to finalize its audited financial statements as of and for the years ended December 31, 2015, 2016 and 2017*."

110.    On December 17, 2018, Gridsum issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Provides Additional Information Regarding Audit Committee Investigation And Update On Anticipated Timing For Filing Audited Financial Statements And Annual Report," announcing that the Audit Committee concluded the investigation in October 2018 and determined that:

- an agreement entered into between the Company and a significant vendor, providing Gridsum the exclusive right to develop a distribution network for a key product, appeared to be an arms-length transaction;

- ***the Audit Committee was unable to reach conclusions with respect to issues relating to certain expense items due to documentation issues***;

- due to the nature of the issues relating to the Company's revenue recognition, cash flow, cost and expense items, and underlying documentation, such issues should be resolved in the audit process; and

- the Company had made significant progress in implementing, and continued to take, a number of remedial steps to bolster substantially its financial controls and contract management processes as recommended by the Audit Committee, including implementing a new expense control system, hiring additional accounting staff, hiring consultants to improve internal procedures, and providing additional training to employees.

111.    The December 17, 2018 press release also stated that the Company was making progress in finalizing its audited financial statements as of and for the years ended December 31, 2015, 2016, and 2017, and expected the 2017 annual report to be filed on or around January 31, 2019.

112.    On January 7, 2019, the Company issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC, signed by Zhang, titled "Gridsum Receives NASDAQ Notices and Files Annual Report and Interim Report," announcing that the Company had received a letter from Nasdaq "dated January 2, 2019, notifying the Company that it was not in compliance with

the requirements for continued listing" due to the lack of interim balance and income statement reporting for the six month period ended June 30, 2018 which was due by December 31, 2018. The Company also reported that on January 4, 2019 Gridsum received a letter from the Panel "indicating that the Panel had granted the Company until" January 31, 2019 to file the Company's annual report for the year ended December 31, 2017.  The Company stated that it responded to both letters on January 7, 2019 and also filed the 2017 Form 20-F and 2018 Interim Report with the SEC on January 7, 2019.

### 3.    The January 7, 2019 Restatement

113.    On January 7, 2019, the Company filed the 2017 Form 20-F with the SEC.  The 2017 Form 20-F included restated financial statements for the years ended December 31, 2015 and 2016.

114.    The restated financial statements included the following adjustments to the line items of the Company's originally disseminated 2015 financial statements:

| Consolidated Statement of Operations<br>For the Year Ended December 31, 2015<br>(RMB in Thousands, except for per share data) | | | | |
|---|---|---|---|---|
| | As Previously Reported (RMB) | Restatement Adjustment (RMB) | As Revised (RMB) | % Change |
| **Revenues** | 237,624 | (2,335) | 235,289 | 0.9 |
| **Less: Business tax and surcharges** | (2,785) | (307) | (3,092) | 11 |
| **Net Revenues** | 234,839 | (2,642) | 232,197 | 1.1 |
| **Cost of Revenues** | (35,237) | 1,845 | (33,392) | 5.2 |
| **Total operating expenses** | (245,274) | (1,463) | (246,737) | 0.6 |
| **Loss from operations** | (45,672) | (2,260) | (47,932) | 4.9 |
| **Net loss for the year** | (48,835) | (12,938) | (61,773) | 26.5 |
| **Net loss attributable to Gridsum's ordinary shareholders** | (85,168) | (12,938) | (98,106) | 15.2 |
| **Net loss per share attributable to Gridsum's ordinary shareholders, basic and diluted** | (8.52) | (1.29) | (9.81) | 15.1 |

| Consolidated Balance Sheet As of December 31, 2015 (RMB in Thousands, except for per share data) | | | | |
|---|---|---|---|---|
| | As Previously Reported (RMB) | Restatement Adjustment (RMB) | As Revised (RMB) | % Change |
| **Accounts receivable, net** | 279,537 | (6,001) | 273,536 | 2.1 |
| **Prepayment and other current assets** | 107,046 | (1,659) | 105,387 | 1.5 |
| **Total current assets** | 585,106 | (7,660) | 577,446 | 1.3 |
| **Total assets** | 625,907 | (7,661) | 618,246 | 1.2 |
| **Accounts payable** | 103,289 | (3,730) | 99,559 | 3.6 |
| **Taxes payable** | 16,484 | 9,628 | 26,112 | 58.4 |
| **Deferred revenue** | 31,308 | (12,940) | 18,368 | 41.3 |
| **Advance from customers** | 104,605 | 8,177 | 112,782 | 7.8 |
| **Accrued expenses and other current liabilities** | 70,908 | (3,616) | 67,292 | 5.1 |
| **Total current liabilities** | 360,133 | (2,481) | 357,652 | 0.7 |
| **Total liabilities** | 360,133 | (2,481) | 357,652 | 0.7 |
| **Accumulated other comprehensive loss** | (19,052) | 42 | (19,010) | 0.2 |
| **Accumulated deficit** | (191,644) | (5,222) | (196,866) | 2.7 |
| **Total Gridsum's shareholders' equity** | (210,628) | (5,180) | (215,808) | 2.5 |
| **Total equity** | (210,244) | (5,180) | (215,424) | 2.5 |

115.    As presented in the above tables, among other things, the originally disseminated

2015 financial statements presented materially false and misleading financial information as

follows:  (i) a net loss that was materially understated by 26.5%; (ii) taxes payable that was

materially understated by 58.4%; and, (iii) deferred revenue that was materially overstated by 41.3%.

116.    The 2017 Form 20-F also included the following Note 2(a) to the financial statements contained therein:

> The Group's consolidated financial statements for the years ended December 31, 2015 and 2016 have been restated in accordance with ASC 250, Accounting Changes and Error Corrections (the "restated consolidated financial statements"). In preparing its financial statements for the year ended December 31, 2017, the Group determined that it was appropriate to change its method for recognition of certain revenue, and in the process of reviewing its financial statements for the years ended December 31, 2015 and 2016, the Group also identified other adjustments relating to cost accruals, expense cutoff procedures and classification changes, which resulted in restatements of the Group's previously-issued audited consolidated financial statements for the years ended December 31, 2015 and 2016.
>
> The change in the Group's revenue recognition method applied to its sales, beginning in 2016, of public sentiment tracking services, which are a part of the Group's Social Listening Solutions suite.  The Group sells distribution rights to a public sentiment tracking service, which is provided by a third party search engine, to sub-distributors for resale to end customers.  The Group previously recognized these revenues at the time of sale to the subdistributors, when revenue recognition criteria were met in accordance with ASC 605-45.  Due to the rapid increase in revenues from this service and collection of the related accounts receivable that was slower than expected, the Group determined that it was appropriate to recognize these revenues on a cash basis, recognizing the revenues only when the fees were collected by the Group from the sub-distributors.
>
> This change in revenue recognition method reduced reported revenues in 2016 by approximately RMB42.1 million.  This reduction was partially offset by a RMB6.0 million increase due to a cutoff adjustment, and by an adjustment related to business tax and surcharges, resulting in a net reduction of RMB36.4 million in 2016.  The change in revenue recognition method also resulted in adjustments to related items in the Group's statements of operations and balance sheet.  Accounts receivable at December 31, 2016 was reduced by approximately RMB56.4 million, of which approximately RMB42.1 million reflects the change of revenue recognition method and the balance reflects classification changes and associated changes to deferred revenue.  The change in revenue recognition method had no effect on the 2015 financial results.
>
> The Group also increased accounts payable as of December 31, 2016 by approximately RMB37.4 million, in order to reconcile its accounting to that of its main media partners for SEM solutions.

Other significant adjustments to the Group's balance sheet as of December 31, 2016 included a RMB29.1 million decrease in deferred revenue due to reclassification changes and associated adjustments to accounts receivable and deferred revenue balances.

In connection with its accounting review, the Group identified material weaknesses in its internal control over financial reporting, which are described in Item 15, "Controls and Procedures," in this Annual Report on Form 20-F.

117.    The 2017 Form 20-F stated the following regarding Gridsum's internal controls:

Based on this evaluation, our management identified two material weaknesses and certain other control deficiencies in our internal controls, as defined in the standards established by U.S. Public Company Accounting Oversight Board, in our internal control over financial reporting as of December 31, 2017.  A material weakness is a deficiency, or combination of deficiencies, in internal controls, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

The two material weaknesses relate to:  (1) our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and the SEC reporting requirements to properly address complex accounting issues and prepare and review our financial statements and related disclosures in accordance with U.S. GAAP and SEC financial reporting requirements; and (2) the lack of written policies and procedures sufficient to timely record revenues and expenses in our financial statements.

Based on this assessment, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2017.  These material weaknesses resulted in the restatement of our financial statements as of and for the years ended December 31, 2015 and 2016.   For more information about the restatement and the related adjustments, see Note 2(a) "Restatement of previously issued financial statements" to our consolidated financial statements included elsewhere in this annual report on Form 20-F.

**Changes in Internal Control over Financial Reporting**

Since January 1, 2017, we have taken initiatives to improve our internal control over financial reporting to address the material weaknesses and certain other control deficiencies that have been identified, including:

- In 2017 we hired a new Co-Chief Financial Officer with responsibility for public disclosures, investor relations, and acquisitions;

- In 2017 we replaced our prior U.S. GAAP reporting team with a new U.S. GAAP reporting team; in 2018 we hired additional employees with U.S. GAAP expertise and experience with major international accounting firms;

- In 2017 we engaged an external consulting firm to assist us to assess Section 404 of the Sarbanes-Oxley Act of 2002 compliance readiness and improve

overall internal controls and this external consulting firm also provided a Section 404 of the Sarbanes-Oxley Act of 2002 training session to our senior employees;

- In 2017 we implemented new software modules for office automation, including contract management, procurement management and customer account management, and a vendor management and expense approval system requiring multi-level authorization and pre-approval of vendors (including audited financial statements if payments exceed RMB200,000);

- In 2018 we engaged the founder and chairman of one of China's largest audit and consulting firms as our advisor;

- In 2018 we distributed internal policies and handbooks on topics such as contract management, vendor management, reimbursement management and risk control management to our employees, and conducted training seminars to ensure effective implementation;

- In 2018 we engaged an independent external consulting firm with extensive U.S. GAAP reporting experience to assist our U.S. GAAP reporting team in preparation of this annual report;

- In 2018 we conducted a comprehensive "as is" and gap analysis of our IT systems and approved procurement of a customized ERP system.   A committee consisting of all our senior executives was organized to facilitate the assessment and implement any necessary changes; and

- In 2018 we engaged an independent third-party consultant to provide accounting and financial training to our senior employees.

Except for the matters described above to improve our internal control over financial reporting, there were no changes in our internal control over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

118.   The 2017 Form 20-F also included the following:

On June 28, 2018, we dismissed PricewaterhouseCoopers Zhong Tian LLP, or PwC China, and engaged Marcum Bernstein & Pinchuk LLP, or MarcumBP, as our independent registered public accounting firm in connection with the audit of our consolidated financial statements for the years ended December 31, 2015, 2016 and 2017.

The decision to authorize the dismissal of PwC China and the engagement of MarcumBP was recommended by our Audit Committee and approved by our Board of Directors.

Prior to the dismissal, PwC China informed us of certain issues it had identified in conducting its audit of our financial statements for the year ended December 31, 2017.  Those issues related to certain revenue recognition, cash flow, cost, expense

items, and their underlying documentation.  PwC China also advised us that certain of these issues would materially impact our financial statements for the year ended December 31, 2016, and accordingly, PwC China's audit report for our financial statements for the year ended December 31, 2016 should no longer be relied upon. PwC China also advised that the issues identified raised questions related to its ability to rely upon the representations of management.  PwC China has not delivered an audit report with respect to our financial statements for the year ended December 31, 2017.

*       *       *

PwC China was unable to assess what additional audit work it would need to plan and perform in order to complete to its satisfaction an audit of our 2017 financial statements.  PwC China was unable to assess what additional audit work it would need to plan and perform in order be in a position to reissue its audit opinion (or issue a new opinion) with respect to our 2016 financial statements.  Because such matters were not resolved to the satisfaction of PwC China as of the date of its dismissal, such matters constitute reportable events under Item 16F(a)(1)(v).

*       *       *

For purposes of this Item 16F, the term "reportable events" means any of the following events:

(A) The accountant's having advised the registrant that the internal controls necessary for the registrant to develop reliable financial statements do not exist;

(B) The accountant's having advised the registrant that information has come to the accountant's attention that has led it to no longer be able to rely on management's representations, or that has made it unwilling to be associated with the financial statements prepared by management;

(C)(1) The accountant's having advised the registrant of the need to expand significantly the scope of its audit, or that information has come to the accountant's attention during the time period covered by Item 16F(a)(1)(iv), that if further investigated may: (i) Materially impact the fairness or reliability of either: a previously issued audit report or the underlying financial statements; or the financial statements issued or to be issued covering the fiscal period(s) subsequent to the date of the most recent financial statements covered by an audit report (including information that may prevent it from rendering an unqualified audit report on those financial statements); or (ii) Cause it to be unwilling to rely on management's representations or be associated with the registrant's financial statements; and (2) Due to the accountant's resignation (due to audit scope limitations or otherwise) or dismissal, or for any other reason, the accountant did not so expand the scope of its audit or conduct such further investigation; or

(D)(1) The accountant's having advised the registrant that information has come to the accountant's attention that it has concluded materially impacts the fairness or

46

reliability of either (i) a previously issued audit report or the underlying financial statements, or (ii) the financial statements issued or to be issued covering the fiscal period(s) subsequent to the date of the most recent financial statements covered by an audit report (including information that, unless resolved to the accountant's satisfaction, would prevent it from rendering an unqualified audit report on those financial statements); and (2) Due to the accountant's resignation, dismissal or declination to stand for reelection, or for any other reason, the issue has not been resolved to the accountant's satisfaction prior to its resignation, dismissal or declination to stand for re-election.

119.    On this news, Gridsum's share price dropped 5.6%, from a closing price of $1.60 per share on January 7, 2019 to $1.51 per share on January 8, 2019, *an overall decrease of 88%* from the $13.00 IPO price.

120.    The 2017 Form 20-F was amended on February 11, 2017 (the "2017 Form 20-F/A") to:

- amend disclosure that appears under the heading "Item 3. Key Information—D. Risk Factors."  In particular, we updated a risk factor entitled "We identified material weaknesses in our internal controls as of December 31, 2016 and 2017, and if we fail to establish and maintain effective internal controls, our ability to report our financial results accurately or to prevent fraud may be adversely affected, and investor confidence and the market price of the ADSs may be adversely affected."

- amend disclosure that appears under the heading "Item 15. Controls and Procedures."  In particular, we updated disclosure under the paragraphs captioned "Management's Annual Report on Internal Control over Financial Reporting."

- amend disclosure that appears under the heading "Item 16F. Change in Registrant's Certifying Accountant."

- update Exhibits 12.1, 12.2, 12.3, 15.3 and 15.4.

121.    The internal controls section added the following relevant information:

In addition, in the course of performing its services, Marcum Bernstein & Pinchuk LLP *discussed with us control deficiencies associated with the following internal controls impacting its ability to complete its audit*:

- Written policies and procedures for contract management.

- *Verification of certain revenue items.*

- Documentation supporting certain transactions.

47

E.     **Defendants are Subject to SEC, GAAP, and Certain Auditing Requirements and Violated Those Requirements**

122.     GAAP are a set of principles recognized by the accounting profession as the standards, rules, and procedures necessary to define accepted accounting practices at a particular time.

123.     SEC rules and regulations require that publicly traded companies include financial statements that comply with GAAP in their annual filings with the SEC.  *See* Section 13 of the Exchange Act (15 U.S.C. § 78m); Rule 10-01(d) of Regulation S-X (17 C.F.R. § 210.10-01(d)). Regulation S-X states that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading.  17 C.F.R. § 210.4-01(a)(1).

124.     The Public Company Accounting Oversight Board ("PCAOB") is the private-sector, nonprofit corporation created by SOX to oversee the audits of public companies and other issuers.

125.     The PCAOB (AS 2815) discusses "The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles in the Auditor's Report" as follows:

> The auditor's opinion that financial statements present fairly an entity's financial position, results of operations, and cash flows in conformity with generally accepted accounting principles should be based on his or her judgment as to whether:
>
> (a)     the accounting principles selected and applied have general acceptance.
>
> (b)     the accounting principles are appropriate in the circumstances.
>
> (c)     the financial statements, including the related notes, are informative of matters that may affect their use, understanding, and interpretation.
>
> (d)     the information presented in the financial statements is classified and summarized in a reasonable manner, that is, neither too detailed nor too condensed.
>
> (e)     the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations, and cash

flows stated within a range of acceptable limits, that is, limits that are reasonable and practicable to attain in financial statements.

Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance. The auditor should consider whether the substance of transactions or events differs materially from their form.

126.     As discussed herein and shown with the restatement, Gridsum's 2015 financial statements contained in the Offering Materials did not comply with GAAP, materially misstating, among other things, Gridsum's revenues and expenses.

127.     Within weeks, if not days, of the IPO, Gridsum began improperly recognizing revenue on the consignment sales of its social listening solutions. As stated in the 2016 Form 20-F, "[i]n October 2016, we officially launched our social listening solution."

128.     As revealed by the restatement (*see* ¶ 116), there was no "sale" to sub-distributors and, therefore, the Company's revenue recognition method was improper and contrary to GAAP. The sub-distributors did not "buy" sentiment tracking services from the Company. The sub-distributors were sales agents who took possession of and then sold the Company's sentient tracking services product to third parties pursuant to a consignment arrangement between the Company and sub-distributors. *See also* ¶¶ 134-43.

129.     The Securities Act Defendants omitted the material fact that Gridsum planned to enter consignment sale arrangements, a new manner of doing business scheduled to start immediately after the IPO, failing to disclose the information in the notes to Gridsum's financial statements as of and for the year ended December 31, 2015, or in the financial statements as of and for the six months ended June 30, 2016.

130.     The Securities Act Defendants omitted the material fact that Gridsum planned to record future consignment sales as legitimate completed sales, failing to disclose the information

in the notes to Gridsum's financial statements as of and for the year ended December 31, 2015, or in the financial statements as of and for the six months ended June 30, 2016.

131.    These material omissions violated a basic directive of GAAS (AU § 150) that "informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report."  These material omissions also violated the basic directive of GAAS, AU § 337B, which requires disclosure of loss contingencies, including the tax issues as discussed in Section V.C. above.

132.    Furthermore, Gridsum's accounting policies with respect to revenue recognition, accounts payable, cost accruals, expenses, and classification errors were not truthfully disclosed in the Offering Materials.  For example, prior to the 2017 Form 20-F restatement, the Company never disclosed the fact that, in contravention of GAAP, the Company improperly: (i) recognized sales revenues on consignment transactions that were not sales; (ii) failed to record accounts payable; (iii) failed to accrue certain expenses; (iv) failed to record certain costs; and (v) misclassified financial statement items.

133.    The restatement adjustments and above omissions were material as the concept is defined by the SEC in its Staff Accounting Bulletin No. 99:

> A matter is "material" if there is a substantial likelihood that a reasonable person would consider it important.  In its Statement of Financial Accounting Concepts No. 2, the FASB stated the essence of the concept of materiality as follows:  The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

> This formulation in the accounting literature is in, substance identical to the formulation used by the courts in interpreting the federal securities laws.  The Supreme Court has held that a fact is material if there is "a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts

it, or the "total mix" of information, in the words of the Supreme Court.  In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item.

134.    The restatement resulted in decreased 2015 and 2016 revenue.  As stated in the 2017 Form 20-F, with the restatement, the Company discontinued recognizing sentiment tracking services revenue upon "sale" to sub-distributors, and instead recognized sentiment tracking services revenue upon the receipt of payment from sub-distributors after they completed sales to others (*i.e.*, "the Group determined that it was appropriate to recognize these revenues on a cash basis, recognizing the revenue only when the fees were collected by the Group from the sub-distributors").  The 2017 Form 20-F stated that this change was instituted because "[d]ue to the rapid increase in revenues from this service" the "collection of the related accounts receivable . . . was slower than expected."

135.    Accrual accounting is based upon the recognition of revenue at the time a credit sale occurs, with an appropriate provision for non-collection of receivables.  GAAP provides no justification for a change to recognize revenues on "sales" on a cash basis because collection of the accounts receivable is "slower than expected."

136.    In reality, there was no "sale" to sub-distributors and, therefore, the Company's revenue recognition method was improper and contrary to GAAP.  The sub-distributors did not "buy" sentiment tracking services from the Company.  The sub-distributors were sales agents who took possession of and then sold the Company's sentiment tracking services product to third parties pursuant to a consignment arrangement between the Company and the sub-distributors.

137.    Gridsum's 2017 Form 20-F described the change in the Company's accounting for revenue as applicable to the Company's sentiment tracking services which purportedly

commenced in 2016.  It also stated that "[t]he change in revenue recognition method had no effect on the 2015 financial results."

138.    However, the restatement of the Company's 2015 financial statements to decrease revenue and accounts receivable creates a strong inference that an adjustment similar to a change from accrual accounting to cash basis accounting applied to the 2015 restatement.  Put another way, the fact that during 2018 the Company reversed 2015 credit sales and eliminated apparently unpaid receivables that arose in connection with 2015 "sales" transactions strongly infers that the reversals applied to fictitious 2015 sales (which are non-sales just as consignment transactions are non-sales).

139.    SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" ("SAB 101"), addresses this scenario as follows:

Question 2

Facts:  Company Z enters into an arrangement with Customer A to deliver Company Z's products to Customer A on a consignment basis.  Pursuant to the terms of the arrangement, Customer A is a consignee, and title to the products does not pass from Company Z to Customer A until Customer A consumes the products in its operations.  Company Z delivers product to Customer A under the terms of their arrangement.

Question:  May Company Z recognize revenue upon delivery of its product to Customer A?

Interpretive Response:  No.  Products delivered to a consignee pursuant to a consignment arrangement are not sales and do not qualify for revenue recognition until a sale occurs.  The staff believes that revenue recognition is not appropriate because the seller retains the risks and rewards of ownership of the product and title usually does not pass to the consignee.

Other situations may exist where title to delivered products passes to a buyer, but the substance of the transaction is that of a consignment or a financing.  Such arrangements require a careful analysis of the facts and circumstances of the transaction, as well as an understanding of the rights and obligations of the parties, and the seller's customary business practices in such arrangements.  The staff believes that the presence of one or more of the following characteristics in a

transaction precludes revenue recognition even if title to the product has passed to the buyer:

1.  The buyer has the right to return the product and:

    a)  the buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates,

    b)  the buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product or subsequently consumes or uses the product,

    c)  the buyer's obligation to the seller would be changed (e.g., the seller would forgive the obligation or grant a refund) in the event of theft or physical destruction or damage of the product,

    d)  the buyer acquiring the product for resale does not have economic substance apart from that provided by the seller, or

    e)  the seller has significant obligations for future performance to directly bring about resale of the product by the buyer.

140.    As noted by the SEC in its Accounting And Auditing Enforcement Release No. 817 "In the Matter of Cypress Bioscience Inc. and Alex P. De Soto, CPA": "it is a well-established tenet of GAAP that transactions must be accounted for in accordance with their substance rather than their form."

141.    Had PwC examined the Company's "sales" agreements and correspondence, and sent detailed confirmation letters to customers, PwC could not have avoided learning of the existence of the Company's consignment arrangements.  PwC was, at a minimum, negligent in not doing so.

142.     Further, in the introductory portion of Accounting Series Release No. 173, the SEC made the following comments pertaining the importance of an auditor's need to address economic substance:

> Another problem . . . is the need for emphasizing the importance of substance over form in determining accounting principles to be applied to particular transactions and situations.  In addition to considering substance over form in particular transactions, it is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations. . . .  We believe that the auditor must stand back from his resolution of particular accounting issues and assess the aggregate impact of the particular issues upon a reasonable investor's perception of the economic substance of the enterprise for which the financial statements are being presented.

143.     In opining on the fairness of the Company's originally disseminated 2015 financial statements, PwC failed to assess the propriety of the accounting principles used by the Company and it failed to consider the importance of substance over form in determining accounting principles to be applied.

144.     Additionally, Gridsum's apparent non-recordation of invoices received from its main SEM solution media partners, its false recordation of sales transactions and non-recordation of consignment transactions, its non-recordation of invoices, its non-accrual and non-recordation of expenses for services received, and the inability to rely upon the representations of management, indicates that the Company was non-compliant with the Books and Records Provisions under the Exchange Act.  The Company failed to comply with provisions of the Exchange Act which require each registrant with securities registered pursuant to Section 12 of the Exchange Act, or required to file reports pursuant to Section 15(d), to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

145.    GAAS outlines the responsibilities of an auditor, and additionally explain

management's responsibility for its own financial statements and reporting as follows:

> The financial statements are management's responsibility. The auditor's
> responsibility is to express an opinion on the financial statements. ***Management is
> responsible for adopting sound accounting policies and for establishing and
> maintaining internal control*** that will, among other things, initiate, record,
> process, and report transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.  The entity's
> transactions and the related assets, liabilities, and equity are within the direct
> knowledge and control of management. The auditor's knowledge of these matters
> and internal control is limited to that acquired through the audit. Thus, ***the fair
> presentation of financial statements in conformity with generally accepted
> accounting principles is an implicit and integral part of management's
> responsibility***.

AU § 110.03.

146.    Defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss were, at a

minimum, negligent in performing these responsibilities.

147.    PwC was also negligent in applying and following GAAS, including the GAAS

requirement that the financial statements comply in all material respects with GAAP.

Additionally, PwC was, at a minimum, negligent in applying certain auditing standards required

by PCAOB.

148.    More specifically, in accounting, the cutoff date is the point in time that delineates

which business transactions are to be recorded in the following reporting period as opposed to the

current reporting period.  For example, December 31 is the cutoff date used to determine which

transactions are required to be recorded in December (the current calendar year) and which

transactions are required to be recorded in January (the following calendar year).

149.    Auditing standards established by the PCAOB (AS 2801: "Subsequent Events")

state:

> There is a period after the balance-sheet date with which the auditor must be
> concerned in completing various phases of his audit.  This period is known as the

"subsequent period" and is considered to extend to the date of the auditor's report. Its duration will depend upon the practical requirements of each audit and may vary from a relatively short period to one of several months. Also, all auditing procedures are not carried out at the same time and some phases of an audit will be performed during the subsequent period, whereas other phases will be substantially completed on or before the balance-sheet date. As an audit approaches completion, the auditor will be concentrating on the unresolved auditing and reporting matters and he is not expected to be conducting a continuing review of those matters to which he has previously applied auditing procedures and reached satisfaction. Certain specific procedures are applied to transactions occurring after the balance-sheet date such as (a) the examination of data to assure that proper cutoffs have been made and (b) the examination of data which provide information to aid the auditor in his evaluation of the assets and liabilities as of the balance-sheet date.

150.    The Company's restatement of its above referenced originally disseminated 2015 audited financial statements addressed cutoff issues involving cost accruals and expenses. As stated in the Company's 2017 Form 20-F: "the Group also identified other adjustments relating to cost accruals, expense cutoff procedures and classification changes, which resulted in restatements of the Group's previously-issued audited consolidated financial statements for the years ended December 31, 2015 and 2016." Other significant restatement adjustments to the Company's balance sheet as of December 31, 2015 included deferred revenue decreases of RMB12,940,000 due to reclassification changes and associated adjustments to accounts receivable and deferred revenue balances.

151.    PwC was, at a minimum, negligent in failing to perform a basic audit cutoff procedure during its audit of the Company's 2015 financial statements which would have revealed these issues.

152.    Further, PCAOB Auditing Standard No 3. ("Audit Documentation") states that audit documentation should "demonstrate that the underlying accounting records agreed or reconciled with the financial statements." PwC was, at minimum, negligent in failing to comply with this authoritative guidance, resulting in the misstatement of the Company's costs, expenses, and accounts payable in the Company's originally issued 2015 financial statements.

153.   Lastly, the Registration Statement contained a section titled "Management's Discussion And Analysis Of Financial Condition Results of Operations" (the "MD&A") which purported to discuss various essential aspects of Gridsum's business operations and prospects for the future.

154.   According to an SEC interpretive release dated May 18, 1989 (Securities Act Release No. 6835):

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.  As the Concept Release states:
>
>> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.  <u>MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company</u>.  The Item asks management to discuss the dynamics of the business and to analyze the financials.
>
> As the Commission has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

(Emphasis added.)

155.   SAB 101, drawing from Regulation S-K, Article 303, and Financial Reporting Release No. 36, also reiterates the importance of MD&A in financial statements:

> Management's Discussion and Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.  This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume

and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.  The Commission stated in Financial Reporting Release No. 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future." [Emphasis added; footnotes omitted.]

156.    Under these standards, the management of a public corporation must disclose in its periodic reports filed with the SEC, "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results.

157.    The Registration Statement contained a section titled "Management's Discussion And Analysis Of Financial Condition And Results Of Operations" purporting to discuss various aspects of the Company's business.  This section of the Registration Statement did not comply with the above guidance because the Securities Act Defendants failed to disclose that cutoff procedures and document retention were inadequate, and that the Company's accounting for revenue, costs, expenses, and accruals was improper and misleading.

158.    The disclosures within the Registration Statement's MD&A also failed to comply with the above SEC guidance in failing to disclose:  (i) the existence of a "sub-optimal" offshore capital structure; (ii) Gridsum's plans to bring the sub-optimal offshore capital structure to the Company's anchor entities after the IPO; (iii) the materially adverse tax consequences of bringing the sub-optimal offshore capital structure to the Company's anchor entities; (iv) the material understatement of the tax expense reported in Gridsum's Statement of Operations for the six months ended June 30, 2016; and (v) Gridsum's plan to launch a new sentiment tracking services product within weeks, if not days, of the IPO, and that Gridsum planned to recognize revenue

thereon when the services were transferred to sub-distributors (sales agents) on a consignment basis, which method of revenue recognition was improper.

159.   PwC completed its audit on March 9, 2016 and performed additional audit procedures through August 19, 2016 (*see* ¶ 89, PwC's dual dated audit report (AU § 530)).

160.   When an auditor's report is included in a registration statement, the nature and extent of responsibility assumed by the auditor is specified in some detail in applicable statutes and in the related rules and regulations.  Section 11(a) of the Securities Act imposes responsibility for false or misleading statements in an effective registration statement, or for omissions that render statements made in such a document misleading, on every accountant or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, report, or valuation, which purports to have been prepared or certified by him.

161.   Section 11 of the Securities Act also makes specific mention of the independent accountant's responsibility as an expert when his report is included in a registration statement filed under that act.  Section 11(b) states, in part, that no person shall be liable as provided therein if that person sustains the burden of proof that as regards any part of the registration statement purporting to be made upon his authority as an expert or purporting to be a copy of or extract from a report or valuation of himself as an expert:

> (i)    he had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, or

> (ii)   such part of the registration statement did not fairly represent his statement as an expert or was not a fair copy of or extract from his report or valuation as an expert.

162.    Section 11 of the Securities Act further provides that, in determining what constitutes reasonable investigation and reasonable ground to believe, "the standard of reasonableness shall be that required of a prudent man in the management of his own property."

163.    To sustain the burden of proof that PwC made a "reasonable investigation" as required under the Securities Act, PwC was required to have performed an audit in conformity with GAAS and to extend its procedures with respect to subsequent events from the date of the audit report up to the effective date or as close thereto as is reasonable and practicable in the circumstances. *See* AU § 711.

164.    In this regard, PwC was required under AU § 711 to arrange with Gridsum to be kept advised of the progress of the IPO registration proceedings so that PwC's review of subsequent events could be completed by the effective date. In addition, PwC was required to perform the follow at or near the effective date:

   a.    read the entire prospectus and other pertinent portions of the registration statement; and

   b.    inquire of and obtain written representations from officers and other executives responsible for financial and accounting matters (limited where appropriate to major locations) about whether any events have occurred, other than those reflected or disclosed in the registration statement, that, in the officers' or other executives' opinion, have a material effect on the audited financial statements included therein or that should be disclosed in order to keep those statements from being misleading.

165.    In addition, PwC was required (AU § 560) to:

   a.    Read the latest available interim financial statements; compare them with the financial statements being reported upon; and make any other comparisons considered appropriate in the circumstances. In order to make these procedures as meaningful as possible for the purpose expressed above, PwC was required to inquire of officers and other executives having responsibility for financial and accounting matters as to whether the interim statements have been prepared on the same basis as that used for the statements under audit.

    b.    Inquire of and discuss with officers and other executives having responsibility for financial and accounting matters (limited where appropriate to major locations) as to:

        (i)    Whether any substantial contingent liabilities or commitments existed at the date of the balance sheet being reported on or at the date of inquiry.

        (ii)    Whether there was any significant change in the capital stock, long-term debt, or working capital to the date of inquiry.

        (iii)    The current status of items, in the financial statements being reported on, that were accounted for on the basis of tentative, preliminary, or inconclusive data.

        (iv)    Whether any unusual adjustments had been made during the period from the balance-sheet date to the date of inquiry.

        (v)    Whether there have been any changes in the company's related parties.

        (vi)    Whether there have been any significant new related party transactions.

        (vii)    Whether the company has entered into any significant unusual transactions.

    c.    Read the available minutes of meetings of stockholders, directors, and appropriate committees; as to meetings for which minutes are not available, inquire about matters dealt with at such meetings.

    d.    Inquire of client's legal counsel concerning litigation, claims, and assessments.

    e.    Obtain a letter of representations, dated as of the date of the auditor's report, from appropriate officials, generally the chief executive officer, chief financial officer, or others with equivalent positions in the entity, as to whether any events occurred subsequent to the date of the financial statements being reported on by the independent auditor that in the officer's opinion would require adjustment or disclosure in these statements.

    f.    Make such additional inquiries or perform such procedures as he considers necessary and appropriate to dispose of questions that arise in carrying out the foregoing procedures, inquiries, and discussions.

166. Based upon its audit and the above-described procedures, PwC was, at a minimum,

negligent in not knowing that as of, or at least shortly prior to, the IPO, Gridsum's Statement of

Operations for the six months ended June 30, 2016 included a material tax understatement (*see*

¶¶ 85-88, 92-98) and that the notes to Gridsum's financial statements as of and for the year ended

December 31, 2015 and the six months ended June 30, 2016 contained material omissions as described herein (*see* ¶¶ 76-84, 89-90).

167.    The Underwriter Defendants were required to conduct a due diligence investigation to participate in the IPO.  The Underwriter Defendants knew and ignored or were at a minimum negligent in not knowing all of the foregoing based upon their performance of the typical IPO due diligence review of the following:

- Audited financial statements for three years.
- The most recent unaudited statements, with comparable statements to the prior year.
- Auditor's letters and replies for the past five years.
- Projections, capital budgets, and strategic plans.
- The Company's general ledger.
- The Company's internal control procedures.
- All agreements regarding inventions and licenses or assignments of intellectual property to or from the Company.
- Federal, state, local, and foreign income tax returns for last three years.
- Distribution agreements, sales representative agreements, marketing agreements, and supply agreements.
- Results of all tests, evaluations, studies, surveys, and other data regarding existing products or services and products or services under development.
- Supply or service agreements.
- Current advertising programs, marketing plans and budgets, and printed marketing materials.
- Schedule of all indebtedness and contingent liabilities.
- Schedule of inventory.
- Schedule of accounts receivable.
- Schedule of accounts payable.

**F.      Causes of Action Under Sections 11 and 15 of the Securities Act**

<u>**COUNT I**</u>
**For Violations of Section 11 of the Securities Act**
**(Against All Securities Act Defendants)**

168.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.  This Count is predicated upon the Securities Act Defendants' strict liability for making false and materially misleading statements and omissions in the Registration Statement.

169.     This Count does not sound in fraud.  Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege for this Count that the Securities Act Defendants had scienter or fraudulent intent, which are not elements of this claim.

170.     This Count is brought pursuant to Section 11 of the Securities Act on behalf of all persons who purchased Gridsum securities pursuant to and/or traceable to the Company's IPO, in which shares registered under the Registration Statement were sold.

171.     As alleged, the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements not misleading, and omitted to state material facts required to be stated therein, including:  (i) the existence of a "sub-optimal" offshore capital structure; (ii) Gridsum's plans to bring the sub-optimal offshore capital structure to the Company's anchor entities after the IPO; (iii) the materially adverse tax consequences of bringing the sub-optimal offshore capital structure to the Company's anchor entities; (iv) the material understatement of the tax expense reported in Gridsum's Statement of Operations for the six months ended June 30, 2016; (v) Gridsum's plan to launch a new sentiment tracking services product within weeks, if not days, of the IPO, and that Gridsum planned to recognize revenue thereon when the services were transferred to sub-distributors (sales agents) on a consignment basis, which method of revenue

recognition was improper; (vi) Gridsum was improperly recognizing revenue; (vii) Gridsum failed to record accounts payable; (viii) Gridsum failed to accrue certain expenses; (ix) Gridsum failed to record certain costs; (x) Gridsum misclassified certain financial statement items; (xi) PwC was, at a minimum, negligent in performing its audit of the 2015 financial statements and additional audit procedures through August 19, 2016; (xii) Gridsum's material weaknesses over internal controls extended beyond the "lack of sufficient financial reporting and accounting personnel;" (xiii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading statements; (xiv) Gridsum and certain Individual Defendants were not appropriately addressing issues with the Company's financial reporting raised by its auditor; (xv) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company; and (xvi) as a result of the foregoing, Gridsum's Offering Materials were materially false and misleading at all relevant times.

172.     As issuer of the shares, Gridsum is strictly liable to Plaintiffs and the Class (defined below) for the misstatements and omissions in the Registration Statement.

173.     Defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss are strictly liable for the contents of the Registration Statement based upon their status as officers and/or directors of the Company and/or because they signed or authorized the signing of the Registration Statement on their behalf pursuant to Section 11(a)(1)-(3) of the Securities Act.

174.     PwC is strictly liable for the contents of the Registration Statement as the auditor of Gridsum's financial statements that consented to the inclusion of its expert report and opinion pursuant to Section 11(a)(4) of the Securities Act.

175.     The Underwriter Defendants are strictly liable for the contents of the Registration Statement as named underwriters pursuant to Section 11(a)(5) of the Securities Act.

176.     None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and identified at ¶¶ 76-77, 79, 81-85, 89-90 were true and without omissions of any material facts and were not misleading.

177.     By reason of the conduct alleged herein, each the Securities Act Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

178.     Plaintiffs acquired Gridsum ADSs pursuant and/or traceable to the Registration Statement for the IPO.

179.     Plaintiffs and the Class have sustained damages.  The value of Gridsum's ADSs has declined substantially subsequent to and due to the Securities Act Defendants' violations.

180.     At the time of their purchases of Gridsum securities, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time of the filing of the initial complaint in this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

181.     By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provision of Section 11(e), from the Securities Act Defendants and each of them, jointly and severally.

## COUNT II
### For Violations of Section 15 of the Securities Act
**(Against Defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss)**

182.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

183.    This Count does not sound in fraud.  Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege for this Count that the defendants named herein had scienter or fraudulent intent, which are not elements of this claim.

184.    This Count is brought pursuant to Section 15 of the Securities Act against the defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss.

185.    Each of the defendants named in this Count acted as a controlling person of Gridsum within the meaning of Section 15 of the Securities Act by virtue of his or her position as a director and/or senior officer of Gridsum.  By reason of their senior management positions and/or directorships at the Company, as alleged above, the defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Gridsum to engage in the conduct complained of herein.  Further, the defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.  By reason of such conduct, the defendants named in this Count are liable pursuant to Section 15 of the Securities Act.

186.    Each of the defendants named in this Count was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the IPO Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

187.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and identified at ¶¶ 76-77, 79, 81-85, 89-90 were true and without omissions of any material facts and were not misleading.

188.     By virtue of the conduct alleged herein, defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered as a result of the primary Securities Act violations of Gridsum.

## VI.     VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

189.     The allegations contained in ¶¶ 190-282 below are made with respect to Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act only.  Plaintiffs disclaim any reliance upon these allegations or incorporation of these allegations in the Securities Act claims.

190.     These Exchange Act claims are brought against the following defendants: Gridsum, the Individual Defendants, and PwC, *i.e.*, the Exchange Act Defendants.

191.     Gridsum, the Individual Defendants (with the exception of Sarathy), and PwC are makers of the statements contained in the Offering Materials.  Gridsum is the issuer of the statements, each of the Individual Defendants (with the exception of Sarathy) signed his name to those statements, indicating that he was a maker thereof, and PwC as the auditor of Gridsum's financial statements consented to the inclusion of its expert report and opinion.  The materially false and misleading statements and omissions as described in Section V. above and the reasons for those statements falsity and materiality are expressly incorporated and re-alleged as if fully set forth herein.

A.       **Additional Materially False and Misleading Misrepresentations and Omissions Actionable Under the Exchange Act**

**False and Misleading Statements Relating to Gridsum's 2016 Financial Statements**

192.     On March 15, 2017, Gridsum issued a press release titled "Gridsum Reports

Unaudited Fourth Quarter and Full Year 2016 Financial Results," stating in relevant part:

### Full Year 2016 Financial Highlights

- Net revenues increased by 70.4% to RMB400.3 million (US$57.6 million) from RMB234.8 million in the prior year, driven by 68.1% growth in Enterprise revenues and 101.6% increase in e-Government and other revenues.
- Gross profit increased by 73.7% to RMB346.8 million (US$49.9 million) from RMB199.6 million in the prior year.
- Loss from operations narrowed by 19.5% to RMB36.8 million (US$5.3 million) from RMB45.7 million in the prior year.

"We are delighted to report another quarter of solid growth in both our financial and operating performance," stated Mr. Guosheng Qi, Chief Executive Officer of Gridsum.  "Our topline continued to witness significant momentum in the quarter with revenues exceeding our expectations.  This strong performance was driven by both new customer wins as well as an increase in average revenue per customer.  In 2016, we had 395 total customers, representing a 28.7% year-over-year increase. Additionally, average revenue per customer increased by 35.5% year over year to RMB1.0 million.  These solid metrics demonstrate that our innovative DNA is a core component of our success, and our commitment to strengthen our R&D capabilities remains robust.

                    *        *        *

Mr. Michael Zhang, Chief Financial Officer of the Company, commented, "Driven by a 62.7% increase in Enterprise revenues and a 116.4% increase in e-Government and other revenues, our net revenues experienced solid growth of 66.7% year over year in the fourth quarter.  Meanwhile, our 2016 full year revenues increased by 70.4% year over year.  As our business grows, we will continue to invest to further strengthen our portfolio of products and the robustness of those products, as well as to broaden Gridsum's market visibility with targeted investment into sales and marketing to fuel our continued growth.  We will also continue to expand into new markets that possess significant growth potential and believe we are well positioned, with the right strategy, to capitalize on this dynamic growth momentum and further fortify our position as China's leading cloud-based data analytics and enterprise SaaS provider."

68

## Full Year 2016 Financial Results

*       *       *

**COST OF REVENUES:**  Cost of revenues were RMB53.5 million (US$7.7 million) in the full year of 2016, as compared with RMB35.2 million in the prior year.  The increase was a result of a RMB14.7 million increase in the cost of software optimization services, a RMB3.6 million increase in cost of customer service consultants, and increased overhead allocation.  The increase primarily reflects the Company's incremental investment to enhance its data security capability.

*       *       *

**OPERATING EXPENSES:**  Total operating expenses for the full year of 2016 were RMB383.5 million (US$55.2 million), as compared with RMB245.3 million in the prior year.  As a percentage of net revenues, operating expenses declined to 95.8% from 104.4% in the prior year.

*       *       *

**NET LOSS ATTRIBUTABLE TO GRIDSUM'S ORDINARY SHAREHOLDERS:**  Net loss attributable to Gridsum's ordinary shareholders for the full year of 2016 was RMB97.4 million (US$14.0 million), as compared with RMB85.2 million in the prior year.

193.    On April 27, 2017, Gridsum filed its 2016 Form 20-F with the SEC, announcing the Company's financial and operating results for the year ended December 31, 2016.  The 2016 Form 20-F contained the same 2015 Consolidated Statement of Operations data and the same 2015 Consolidated Balance Sheet data that appeared in the Offering Materials.

194.    The 2016 Form 20-F also contained a 2016 Consolidated Statement of Operations and a 2016 Consolidated Balance Sheet which reflected the following financial data:

| Consolidated Statement of Operations<br>For The Year Ended December 31, 2016<br>Financial Data | | |
|---|---|---|
| | (RMB in Thousands) | |
| **Revenues:** | | |
| **Enterprise** | 349,957 | |
| **e-Government and other** | <u>59,414</u> | |
| **Total revenues** | | 409,371 |
| **Less: Business tax and surcharges** | | <u>(9,112)</u> |
| **Net Revenues** | | 400,259 |
| **Cost of Revenues** | | <u>(53,487)</u> |
| **Gross profit** | | 346,772 |
| **Operating expenses:** | | |
| **Sales and marketing expenses** | (145,484) | |
| **Research and development expenses** | (154,241) | |
| **General and administrative expenses** | <u>(83,797)</u> | |
| **Total operating expenses** | | <u>(383,522)</u> |
| **Loss from operations** | | (36,750) |
| **Other income/expense:** | | |
| **Foreign currency exchange gain/loss** | (829) | |
| **Interest income, net** | (1,334) | |
| **Other income, net** | <u>(446)</u> | |
| **Total other income/expense** | | <u>(2,609)</u> |
| **Loss before income tax** | | (39,359) |
| **Income tax expense** | | <u>(28,387)</u> |
| **Net loss** | | <u>(67,746)</u> |

| Consolidated Balance Sheet<br>As of December 31, 2016<br>Financial Data | | |
|---|---|---|
| | (RMB in Thousands) | |
| **Cash and Cash equivalents** | | 524,454 |
| **Time deposit** | | 69,430 |
| **Accounts receivable, net** | | 412,301 |
| **Prepayment and other current assets** | | 160,087 |
| **Total current assets** | | 1,166,272 |
| **Non-current assets:** | | |
| **Property, equipment, and software, net** | 56,107 | |
| **Other non-current assets** | 3,947 | |
| **Total non-current assets** | | 60,054 |
| **Total assets** | | 1,226,326 |
| **Short-term bank loans** | 65,093 | |
| **Accounts payable** | 12,150 | |
| **Taxes payable** | 66,589 | |
| **Deferred revenue** | 50,110 | |
| **Advance from customers** | 106,570 | |
| **Accrued expenses and other current liabilities** | 58,473 | |
| **Salary and welfare payables** | 54,779 | |
| **Total current liabilities** | 413,764 | |
| **Total liabilities** | | 413,764 |
| **Equity and shareholders' deficit** | | 812,562 |
| **Total liabilities, equity, and shareholders' deficit** | | 1,226,326 |

195.    In the 2016 Form 20-F, the Company stated in relevant part:

*Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with U.S. GAAP*, appearing elsewhere in this annual report.

196.    The 2016 Form 20-F contained Notes which again stated, "***The Company's consolidated financial statements have been prepared in accordance with U.S. GAAP.***" The Notes also included the following regarding the Company's revenues:

**(l) Revenue Recognition**

Revenues are generated from sales of the Company's marketing automation solutions and e-Government and other solutions.  The targeted customers for marketing automation solutions are enterprise customers and the targeted customers for e-Government and other solutions are governmental agencies and state-owned entities.

Revenues are recognized when:

- persuasive evidence of an arrangement exists;
- the Group's platform is made available and services have been delivered to the customer;
- the fee is fixed or determinable; and
- collection is reasonably assured.

Revenues received from the incentive programs of search engine providers are based on factors determined by these providers, such as yearly growth in the amount of advertising on the provider's search engine platform that the Company's customers purchase through its solutions, and other factors selected at the discretion of these providers.  Revenues are recorded net of value-added taxes and surcharges.

In accordance with ASC 605-45, Revenue Recognition: Principal Agent Considerations, the Company considers several factors in determining whether it acts as the principal or as an agent in the arrangement of merchandise sales and provision of various related services and thus whether it is appropriate to record the revenues and the related cost of sales on a gross basis or record the net amount earned as service fees.

Where customers purchase multiple solutions in a single contract, the Company allocates the total consideration to the various elements based on the relative selling price method and recognizes revenues as services are rendered.  In accordance with ASC 605-25, Revenue Recognition-Multiple-Element Arrangements, the following hierarchy are followed when determining the appropriate selling price for each element:  (1) vendor specific objective evidence ("VSOE"), (2) third party evidence ("TPE") and (3) best estimate of selling price ("BESP").  The Company recognizes revenues on the elements delivered and defers the recognition of revenues for the fair value of the undelivered elements until the remaining obligations have been satisfied.  Where all of the elements within an arrangement are delivered uniformly over the agreement period, revenues are recognized on a straight line basis over the contract period.

<u>Enterprise</u>

The Company generates enterprise revenue primarily by providing marketing automation solutions including bid management and data analysis solutions to enterprise customers.  The Company earns and records service fee revenues over the contractual period, in proportion to ad spending or the completion of milestones

that are stipulated in the contracts.  In addition, the Company receives revenues from the incentive programs of search engine providers based on factors determined by these providers, such as yearly growth in the amount of advertising on the provider's search engine platform that the Company's customers purchase through its solutions, and other factors selected at the discretion of these providers. Revenues from these programs are received on both a quarterly and an annual basis and are calculated in accordance with the Company's customers' usage of the search engine providers.

With respect to the bid management services, the Group considered that:  (i) the search engines are responsible for providing the advertisements service to the customers; (ii) the Group lacks the latitude to determine the prices charged by the search engine providers and earns only the fixed service fee from the customers; (iii) the hosting and maintenance of the advertisements are the responsibilities of the search engine providers; (iv) the customers have the discretion in choosing the search engines selection; (v) we receive revenues from incentive programs based on the search engine providers' policies.  The Group's responsibility is to manage the customer's advertising campaign on the search engines, according to the terms of the customer contracts so the Group views itself as an agent, and records revenues related to these services on a net basis.

<u>e-Government and Other</u>

The Company generates revenues by entering into service contracts with governmental agencies for its e-government solutions, including Law Dissector solutions for the court systems and other law communities beginning in 2015.  The Company also generates revenues by entering into contracts with state-owned television stations for its new media solutions, including TV Dissector, Streaming Dissector and Video Dissector.

**(m) Advances from Customers and Deferred Revenues**

Upon the entering of contracts, customers pay the contractual balance as prepayments.  The Company allocates the prepayments into advances from customers and deferred revenues.  Advances from customers are the balance of the advertising campaign spending that would be recognized as the cost payable to search engine providers when advertisements are placed.  Deferred revenues are the revenues to be earned by the Group for services and is recognized as revenue according to the prescribed revenue recognition criteria and policies described above.

197.    The 2016 Form 20-F included the following regarding Gridsum's net revenues:

Net revenues consist of revenues recognized from customers who used our software solutions during the period, including revenues that we receive from the incentive programs of search engine providers, less business tax and surcharge.  Historically, we have increased net revenues through our ability to increase the number of

customers, retain high quality customers and increase the average customer contribution by upselling and cross selling new solutions.  We believe this trend will continue as more customers adopt our solutions and demand more business intelligence to improve their operational efficiency, and as we continue to bring more innovative solutions to market and serve our customers.

198.    In discussing the Company's financial results, the 2016 Form 20-F attributed differences between net revenues for 2015 and 2016 as follows:

Net revenues increased by RMB165.4 million, or 70%, from 2015 to 2016, with 68% and 102% growth rates in enterprise revenues and e-Government and other revenues, respectively.  This growth was attributable to increased demand for our solutions from new and existing customers.  Total customers increased 29% to 395 customers in 2016 from 307 customers in 2015.  Enterprise revenues increased RMB141.8 million due to a 38% increase in the number of customers from 242 to 334 and a 22% increase in average customer contribution from RMB860,153 to RMB1,047,775 (US$150,911).  E-Government and other revenues increased by RMB29.9 million, due to an increase in average customer contribution from RMB453,338 to RMB974,004 (US$140,286), which was primarily driven by the higher demand for our e-Government and other solutions from customers, although the number of customers decreased from 65 to 61.

199.    The 2016 Form 20-F contained the April 27, 2017 report and opinion of PwC which stated:

To the Board of Directors and Shareholders of Gridsum Holding Inc.:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of operations and comprehensive loss, of shareholders' equity/(deficit) and of cash flows present fairly, in all material respects, the financial position of Gridsum Holding Inc. and its subsidiaries at December 31, 2016 and December 31, 2015, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2016 in conformity with accounting principles generally accepted in the United States of America.  These financial statements are the responsibility of the Company's management.  Our responsibility is to express an opinion on these financial statements based on our audits.  We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

200.    With regards to the Company's internal controls, the 2016 Form 20-F stated in

relevant part:

### Internal Control over Financial Reporting

Prior to our initial public offering in September 2016, we were a private company with limited accounting personnel and other resources with which to address our internal controls.   Our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting.  In the course of auditing our consolidated financial statements, we and our independent registered public accounting firm identified *two material weaknesses* and certain other control deficiencies in our internal controls, each as defined in the standards established by U.S. Public Company Accounting Oversight Board, in our internal control over financial reporting as of December 31, 2016.  A material weakness is a deficiency, or combination of deficiencies, in internal controls, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

*The two material weaknesses relate to:  (1) our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and the SEC reporting requirements to properly address complex accounting issues and to prepare and review our financial statements and related disclosures in accordance with U.S. GAAP and SEC financial reporting requirements; and (2) the lack of sufficient written policies and procedures for capturing certain services received before contracts were signed to timely record the related expenses in the financial statements.*

*We have taken initiatives to improve our internal control over financial reporting to address the material weaknesses and certain other control deficiencies that have been identified, including:  hiring a Co-Chief Financial Officer, a financial analyst with experience in U.S. GAAP accounting and SEC reporting; hiring two internal control supervisors to enhance the internal audit function; established an audit committee after our initial public offering, with members who have an appropriate level of financial expertise to oversee our accounting and financial reporting processes as well as our external and internal audits; and we engaged an external consulting firm to assist us to assess Sarbanes-Oxley compliance readiness and improve overall internal controls.*

*We have also taken other steps to strengthen our internal control over financial reporting, including preparing a contracts tracking database, continuing to hire qualified professionals with sufficient U.S. GAAP accounting and SEC reporting experience, providing relevant training to our accounting personnel and upgrading our financial reporting system to streamline monthly and year-end closings and integrate financial and operating reporting systems.*

*            *            *

75

**Changes in Internal Control over Financial Reporting**

*Except for the matters described above to improve our internal control over financial reporting, there were no changes in our internal control over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

201.    The 2016 Form 20-F was signed by Qi and contained certifications pursuant to SOX signed by Qi, Zhang, and Sarathy, stating, in relevant part, that the information contained in the 2016 Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

202.    The statements in ¶¶ 192-201 were materially false and misleading when made because they misrepresented and/or failed to disclose the below adverse facts pertaining to the Company's business, operations, and financial results, which were known to the Exchange Act Defendants or recklessly disregarded by them.

203.    As fully alleged in Section V., the 2015 financial data and MD&A section were materially false and misleading as subsequently admitted via the restatement.  *See*, *e.g.*, ¶¶ 78, 80, 114-15, 153-58.

204.    The 2016 financial data was also materially false and misleading as subsequently admitted via the restatement.  Specifically, the financial data as provided in the press release and in the 2016 Form 20-F Consolidated Statement of Operations was materially false and misleading as follows:

    (i)      total revenues were actually RMB371,878,000 and not RMB409,371,000;

    (ii)     business tax and surcharges were actually RMB8,055,000 and not RMB9,112,000;

    (iii)    net revenues were actually RMB363,823,000 and not RMB400,259,000;

    (iv)    cost of revenues was actually RMB55,707,000 and not RMB53,487,000;

(v)      gross profit was actually RMB308,116,000 and not RMB346,772,000;

(vi)     total operating expenses were actually RMB388,276,000 and not RMB383,522,000;

(vii)    loss from operations was actually RMB80,160,000 and not RMB36,750,000;

(viii)   foreign exchange gain or loss was actually RMB1,600,000 and not RMB829,000;

(ix)     other expenses were actually RMB2,066,000 and not RMB1,780,000;

(x)      income tax expense was actually RMB14,801,000 and not RMB28,387,000; and

(xi)     net loss for the year was actually RMB98,627,000 and not RMB67,746,000.

205.    The financial data as provided in the press release and in the 2016 Form 20-F Consolidated Balance Sheet was materially false and misleading as follows:

(i)      cash and cash equivalents were actually RMB520,452,000 and not RMB524,454,000;

(ii)     accounts receivable, net was actually RMB355,880,000 and not RMB412,301,000;

(iii)    prepayment and other current assets were actually RMB189,740,000 and not RMB160,087,000;

(iv)     total current assets were actually RMB1,139,504,000 and not RMB1,166,272,000;

(v)      property, equipment and software, net was actually RMB52,618,000 and not RMB56,107,000;

(vi)     total non-current assets were actually RMB68,996,000 and not RMB60,054,000;

(vii)    total assets were actually RMB1,208,500,000 and not RMB1,226,326,000;

77

(viii)    short-term bank loans were actually RMB65,000,000 and not RMB65,093,000;

(viii)    accounts payable was actually RMB49,564,000 and not RMB12,150,000;

(ix)    salary and welfare payables was actually RMB42,820,000 and not RMB54,779,000;

(x)    taxes payable was actually RMB66,851,000 and not RMB66,589,000;

(xi)    deferred revenue was actually RMB21,057,000 and not RMB50,110,000;

(xii)    advance from customers was actually RMB109,381,000 and not RMB106,570,000;

(xiii)    accrued expenses and other current liabilities were actually RMB76,578,000 and not RMB58,473,000; and

(xiv)    total current liabilities were actually RMB431,251,000 and not RMB413,764,000.

206.    The tables below summarize these line item changes to the Company's originally disseminated 2016 financial statements.  As presented in the tables, among other things, the 2016 financial statements were materially false and misleading as follows:  (i) revenue was materially overstated by 9.2%; (ii) gross profit was materially overstated by 11.1%; (iii) loss from operations was materially understated by 118.1%; (iv) net loss was materially understated by 45.6%; (v) accounts receivable was materially overstated by 13.7%; (vi) non-current assets was materially overstated by 14.9%; (vii) accounts payable was materially understated by 307.9%; and, (viii) accrued expenses and other current liabilities was materially understated by 30.9%.

| Consolidated Statement of Operations<br>For the Year Ended December 31, 2016<br>(RMB in Thousands, except for per share data) | | | | |
|---|---|---|---|---|
| | **As Previously Reported (RMB)** | **Restatement Adjustment (RMB)** | **As Revised (RMB)** | **% Change** |
| **Revenues** | 409,371 | (37,493) | 371,878 | 9.2 |
| **Less: Business tax and surcharges** | (9,112) | 1,057 | (8,055) | 11.6 |
| **Net Revenues** | 400,259 | (36,436) | 363,823 | 9.1 |
| **Cost of Revenues** | (53,487) | (2,220) | (55,707) | 4.2 |
| **Gross profit** | 346,772 | (38,656) | 308,116 | 11.1 |
| **Total operating expenses** | (383,522) | (4,754) | (388,276) | 1.2 |
| **Loss from operations** | (36,750) | (43,410) | (80,160) | 118.1 |
| **Foreign exchange gain or loss** | (829) | (771) | (1,600) | 93 |
| **Other expenses** | (1,780) | (286) | (2,066) | 16.1 |
| **Income tax expense** | (28,387) | 13,586 | (14,801) | 47.9 |
| **Net loss for the year** | (67,746) | (30,881) | (98,627) | 45.6 |
| **Net loss attributable to Gridsum's ordinary shareholders** | (97,396) | (30,893) | (128,289) | 31.7 |
| **Net loss per share attributable to Gridsum's ordinary shareholders, basic and diluted** | (6.47) | (2.05) | (8.52) | 31.7 |

| Consolidated Balance Sheet<br>As of December 31, 2016<br>(RMB in Thousands, except for per share data) | | | | |
|---|---|---|---|---|
| | **As Previously Reported (RMB)** | **Restatement Adjustment (RMB)** | **As Revised (RMB)** | **% Change** |
| **Cash and cash equivalents** | 524,454 | (4,002) | 520,452 | 0.8 |
| **Restricted cash** | | 4,002 | 4,002 | |
| **Accounts receivable** | 412,301 | (56,421) | 355,880 | 13.7 |
| **Prepayment and other current assets** | 160,087 | 29,653 | 189,740 | 18.5 |
| **Total current assets** | 1,166,272 | (26,768) | 1,139,504 | 2.3 |
| **Fixed assets, net** | 56,107 | (3,489) | 52,618 | 6.2 |
| **Intangible assets** | | 5,313 | 5,313 | |
| **Deferred tax assets** | | 7,118 | 7,118 | |
| **Total non-current assets** | 60,054 | 8,942 | 68,996 | 14.9 |
| **Total assets** | 1,226,326 | (17,826) | 1,208,500 | 1.5 |
| **Short-term loans** | 65,093 | (93) | 65,000 | 0.1 |
| **Accounts payable** | 12,150 | 37,414 | 49,564 | 307.9 |
| **Salary and welfare payables** | 54,779 | (11,959) | 42,820 | 21.8 |
| **Taxes payable** | 66,589 | 262 | 66,851 | 0.4 |
| **Deferred revenue** | 50,110 | (29,053) | 21,057 | 57.9 |
| **Advance from customers** | 106,570 | 2,811 | 109,381 | 2.6 |
| **Accrued expenses and other current liabilities** | 58,473 | 18,105 | 76,578 | 30.9 |
| **Total current liabilities** | 413,764 | 17,487 | 431,251 | 4.2 |
| **Total liabilities** | 413,764 | 17,487 | 431,251 | 4.2 |
| **Statutory reserve** | | 6,662 | 6,662 | |
| **Accumulated other comprehensive loss** | (10,879) | 792 | (10,087) | 7.3 |
| **Accumulated deficit** | (268,081) | (42,766) | (310,847) | 15.9 |
| **Total Gridsum's shareholders' equity** | 812,231 | (35,313) | 776,918 | 4.3 |
| **Total equity** | 812,562 | (35,313) | 777,249 | 4.3 |

207.    These restatement adjustments were material as defined by SEC Staff Accounting Bulletin No. 99.  *See* ¶ 133.

208.    Further, as with the 2015 financial statements, the 2016 financial statements failed to comply with GAAP, certain SEC rules and regulations, auditing standards, and GAAS.  *See also* Section V.E.

209.    Specifically, as discussed in ¶¶ 113-121, the 2017 Form 20-F admitted that Gridsum had changed its revenue recognition methods for certain "sales" to sub-distributors because collection of the accounts receivables was "slower than expected."  GAAP provides no justification for such a change, and, in reality, there was no "sale" to sub-distributors, rather a consignment transaction, and therefore, the Company's revenue recognition method was improper. Due to the failure of the Company to account for the consignment transactions in accordance with their substance, the overall impression created by the Company's 2016 financial statements was inconsistent with the business realities of the Company's financial position and operations, and as a result they were deceptive and materially misleading.

210.    Additionally, as stated in the Company's 2017 20-F, "the Group also identified other adjustments relating to cost accruals, expense cutoff procedures and classification changes, which resulted in restatements of the Group's previously-issued audited consolidated financial statements for the years ended December 31, 2015 and 2016."  Other significant restatement adjustments to the Company's balance sheet as of December 31, 2016 included deferred revenue decreases of RMB29,053,000 due to reclassification changes and associated adjustments to accounts receivable and deferred revenue balances.

211.    PwC's audit opinion (¶ 199) was materially false and/or misleading and/or failed to disclose that:  (i) the consolidated balance sheet and the related consolidated statements of

operations and comprehensive loss, of shareholders' deficit and of cash flows did not present fairly, in all material respects, the financial position of the company at December 31, 2015 and 2016, and the results of operations and cash flow for each the two years in the period ended December 31, 2016 in conformity with GAAP; (ii) PwC failed to conduct its audits of the 2015 and 2016 financial statements in accordance with the standards of PCAOB (*see* ¶¶ 147-52, 250-60); (iii) PwC did not plan and perform its audit to obtain reasonable assurance about whether the financial statements were free from material misstatements; (iv) PwC did not adequately examine evidence supporting the amounts and disclosures in the financial statements, assess the accounting principles used, or evaluate the overall financial statement presentation, and PwC's audits did not provide a reasonable basis for PwC's opinion; and (v) Gridsum's 2015 and 2016 financial statements were not presented fairly in accordance with GAAP and were not audited in accordance with GAAS.

212. Further, the statements in ¶¶ 192-201 were materially false and/or misleading and/or failed to disclose that: (i) Gridsum failed to comply with provisions of the Exchange Act which require companies to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions of the registrant and maintain internal controls; (ii) Gridsum's material weaknesses over internal controls extended beyond the "lack of sufficient financial reporting and accounting personnel" and "lack of sufficient written policies;" (*see* ¶¶ 117-18, 120-21) (iii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading financial reports; (iv) Gridsum and certain Individual Defendants were not addressing issues with the Company's financial reporting raised by its auditor; (v) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the

Company; and (vi) as a result of the foregoing, Gridsum's public statements were materially false and misleading at all relevant times.

**The April 2018 False Statement**

213. As discussed at ¶ 99, on April 23, 2018, Gridsum issued a press release disclosing an April 16, 2018 letter from PwC identifying issues found with the Company's revenue recognition, cash flow, costs, expenses, and documentation underlying these issues in conducting its audit of the Company's year ended December 31, 2017 financial results. The press release notified investors that an investigation would be conducted and that "PwC's audit report for the Company's financial statements for the year ended December 31, 2016 should no longer be relied upon."

214. The April 23, 2018 press release was materially false and misleading because it omitted to disclose that, as later revealed in Gridsum's 2017 Form 20-F, PwC "***also advised that the issues identified raised questions related to its ability to rely upon the representations of management.***"

### B. Loss Causation

215. During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Gridsum securities and operated as a fraud or deceit on Class Period purchasers of Gridsum ADSs.

216. The Exchange Act Defendants' materially false and/or misleading statements and omissions concealed Gridsum's true financial condition. As detailed above, when the truth about Gridsum's misleading financial statements was revealed, the price of Gridsum securities declined significantly as the prior artificial inflation was removed from the Company's stock price.

217. As a result of their purchases of Gridsum ADSs during the Class Period, at artificially inflated prices, Plaintiffs and the Class suffered damages under the federal securities

laws.  The Exchange Act Defendants' omissions and false and misleading statements had the intended effect and caused Gridsum's ADSs to trade at artificially inflated levels throughout the Class Period, trading as high as $18.29 per share on October 4, 2016.

218.    The artificial inflation created by the Exchange Act Defendants' misrepresentations and omissions was partially removed when the Company announced on April 23, 2018 that its financial statements for the year-ended December 31, 2016 should no longer be relied upon and that the Company's Audit Committee was investigating issues identified by PwC relating to certain revenue recognition, cash flow, cost, and expense items.  *See* ¶ 99.

219.    Following this disclosure, Gridsum's share price declined by $1.17 per share, or 16.04%, on heavier than usual trading volume of over 7.4 million shares, to close on April 23, 2018 at $6.12 per share.  Intra-day trading on April 23, 2018 reached a share price low of $3.68, a 49% decrease from the share price low on April 20, 2018.  Gridsum's ADSs continued to decline over the next few days as a result of the disclosure, dropping another 10% on April 24, 2018, and $2.27, or 31.14% from its closing price per share on April 20, 2018 to its closing price per share on April 26, 2018.  The Company's share price has not returned to its April 20, 2018 closing price since.

220.    However, the disclosures made on April 23, 2018 were not sufficient to fully remove the inflation from Gridsum's share price because the disclosures only partially revealed the full truth of concealed financial conditions, risks, and trends of the Company.

221.    The truth was fully revealed on January 7, 2019, when, as alleged above, Gridsum filed its 2017 Form 20-F with the SEC.  The 2017 Form 20-F included restatements of the Company's 2015 and 2016 financial statements, including, but not limited to, a 2015 net loss understatement by 26.5% and a 2016 net loss understatement by 45.6%.  The January 7, 2019

restatement also included the previously omitted fact that PwC had "advised that issues identified raised questions related to its ability to rely upon the representations of management."

222.   Following this corrective disclosure, the price of Gridsum's shares fell 5.6%, from a closing price of $1.60 per share on January 7, 2019 to $1.51 per share on January 8, 2019, dropping to a historic low of $1.49 per share on January 11, 2019.

223.   The damages suffered by Plaintiffs and the Class were the direct and proximate result of the Exchange Act Defendants' materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning the Exchange Act Defendants' prior misrepresentations and fraudulent conduct was revealed.

### C.   Additional Allegations of Scienter

224.   As alleged herein, each of the Exchange Act Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information.  Throughout the Class Period, the Exchange Act Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.  Such actions caused the price of Gridsum shares to be artificially inflated.

225.   In their respective roles as officers and/or directors of Gridsum, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period.  In its role as auditor of Gridsum, PwC was able to, and did, cause the audited financial statements to be disseminated to the investing public in the Company's SEC filings.  As a result, each had the opportunity to falsify the information provided to the public regarding Gridsum's business and performance.

### 1. Gridsum's $87 Million IPO

226. Defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss' fraudulent scheme and materially false and misleading statements and omissions ensured the success of the Company's entry into the United States public equity markets. The disclosures of defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss in the Registration Statement omitted to inform investors of, among other things: (1) the existence of a "sub-optimal" offshore capital structure; (2) Gridsum's plans to bring the sub-optimal offshore capital structure to the Company's anchor entities after the IPO; (3) the materially adverse tax consequences of bringing the sub-optimal offshore capital structure to the Company's anchor entities; (4) the material understatement of the tax expense reported in Gridsum's Statement of Operations for the six months ended June 30, 2016; (5) Gridsum's plans to launch a new sentiment tracking services product within weeks, if not days, of the IPO, and that Gridsum planned to recognize revenue thereon when the services were transferred to sub-distributors (sales agents) on a consignment basis, which method of revenue recognition was improper; and (6) that the reported financial information was inaccurate. In fact, the Registration Statement explicitly stated that the audited consolidated financial statements for the years-ending December 31, 2013, 2014 and 2015 were "prepared in accordance with U.S. GAAP," and gave explicit details on relevant accounting policies such as revenue recognition (*see, e.g.*, ¶¶ 76, 82).

227. Defendants Qi, Zhang, Yu, Chui, Fan, Bai, Gao, Melcher, and Schloss' materially false and misleading statements allowed Gridsum to sell 7.7 million ADSs at $13.00 per share during its IPO, garnering proceeds of more than $87 million, more than doubling the Company's cash on hand, cash it needed to continue to operate. *See, e.g.*, Bishop, S., "Is Gridsum Holding Inc.'s (GSUM) Balance Sheet a Threat to Its Future?", Simply Wall St., Aug. 31, 2017,

https://simplywall.st/news/is-gridsum-holding-incs-gsum-balance-sheet-a-threat-to-its-future/;

*see also* ¶ 103 ($40 million convertible note with FutureX Capital).

### 2.    Admitted Knowledge and Core Operations

228.    Gridsum was (and still is) a relatively small company with only 929 employees as of December 31, 2016, and only 118 of those in the general and administrative department.  Just a few years prior, in 2013, the Company only had 268 employees.  Qi founded the company in 2005 and most of the directors have been with the Company since 2013 or before.   Gridsum's Registration Statement and 2016 Form 20-F both admit:

> Our success and future growth depend largely upon the continued services of our executive officers. . . .   The loss of one or more of our executive officers, particularly our chief executive officer and chairman, Guosheng Qi, or the failure of our executive team to work with our employees and lead our company effectively, could adversely affect our business.

229.    Additionally, the Registration Statement and 2016 Form 20-F state that the Company's "chief operating decision maker has been identified as the chief executive officer, who reviews consolidated results when making decisions about allocating resources and assessing performance of [Gridsum]."

230.    Qi, Zhang, and Sarathy repeatedly admitted to having knowledge of Gridsum's financial condition through their public statements.  For example:

- Mr. Michael Zhang, Chief Financial Officer of the Company, commented, "Driven by strong top-line growth during the third quarter, we expanded our margin performance and improved bottom line year over year.  Thanks to a favorable sales mix, gross margin expanded by 389 bps to 88.2% and operating loss declined significantly to RMB15.4 million from one year ago.  By continuing to focus on leveraging our brand, scale and industry leadership in China, we anticipate improved top line growth and operating leverage as our proprietary cloud platform continues to attract new customers and drive revenue growth going forward." *Zhang, November 21, 2016 Press Release.*

- Ming, it's a very good question.  So we have very good visibility on annual offers.  So the beginning of the year, we have more than 75% revenue

visibility for clients. But we have less quarterly visibility because the way they spend the annual budget between quarters can vary, but that is a heavy seasonal overlay. *Sarathy, May 25, 2017 Earnings Conference Call.*

- "We delivered strong financial and operating results once again in the second quarter of 2017," stated Mr. Guosheng Qi, Chief Executive Officer of Gridsum. "Our topline maintained its robust growth trajectory, primarily driven by solid customer base expansion and increased Average Revenue Per User ('ARPU'). We remain on target to grow our customer count by 30% to 40% in 2017. In particular, we were very effective in cross-selling and upselling our products and services to existing clients. *Qi, August 24, 2017 Press Release.*

231. Further, each of them signed the SOX certifications for the 2016 Form 20-F attesting that the information contained in the 2016 Form 20-F "fairly presents, in all material respects, the financial condition and results of operations of the Company."

232. Significantly, as admitted by the Company on April 23, 2018, PwC had "***previously raised with the Company***" the issues that caused the financial statements for the year ended December 31, 2016 to no longer be reliable.

233. By virtue of their executive and/or directorship positions within a small Company, where the accuracy of the financial statements was or should have been a key focus given the admitted weaknesses, and the admitted knowledge above, the Individual Defendants knew, or were reckless in not knowing, non-public material facts concerning the financial statements.

### 3. The Magnitude and Extent of the Restatement

234. The magnitude and extent of the restatement adjustments supports a strong inference of scienter as to all the Exchange Act Defendants. In contravention of GAAP, the Company's 2015 and 2016 revenue and income was materially overstated, the Company's costs and expenses were materially understated, and the Company's business records and internal controls were materially inadequate.

235.    Specific to PwC, the magnitude of the restatement adjustments supports a strong inference that PwC's audits of the Company's 2015 and 2016 financial statements were so deficient that it was the functional equivalent of no audit at all; that PwC either identified and ignored, or recklessly failed to investigate, extremely questionable "red flags" and transactions which were material in amount.

### 4.    Accounting Violations

236.    PCAOB guidance (AS 2805: "Management Representations") states:

> During an audit, management makes many representations to the auditor, both oral and written, in response to specific inquiries or through the financial statements. Such representations from management are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit.

> \*        \*        \*

> If a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made.  Based on the circumstances, the auditor should consider whether his or her reliance on management's representations relating to other aspects of the financial statements is appropriate and justified.

237.    As disclosed in the Company's 2017 Form 20-F, PwC identified a situation wherein the application of audit procedures contradicted managements' representations thereby raising a management integrity issue which led PwC to believe that it could not rely on the legitimacy of documents presented to PwC during its 2017 audit.  Specifically, the 2017 Form 20-F disclosed:

(i)    PwC "was unable to assess what additional audit work it would need to plan and perform in order to complete to its satisfaction an audit of our 2017 financial statements."

(ii)    PwC "was unable to assess what additional audit work it would need to plan and perform in order be in a position to reissue its audit opinion (or issue a new opinion) with respect to our 2016 financial statements."

238.    The fact that PwC, one of the largest audit firms in the world with an abundance of audit resources available to be brought to bear, could not find a way to audit around management's representations (including documents furnished by the Company) and determined that the Company's financial statements were non-auditable due to an inability to rely upon the representations of management supports a strong inference of the scienter of Individual Defendants.

### 5.       The Audit Committee Defendants

239.    Gao, Melcher, and Schloss were members of Gridsum's Audit Committee at all relevant times.  As reported by the Company, Schloss, the Audit Committee Chair, "meets the criteria of an audit committee financial expert as set forth under the applicable rules of the SEC."

240.    According to Gridsum's SEC filings, the Audit Committee performs the following functions:

> The Audit Committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company.  It is responsible for, among other things:
>
> - appointing the independent auditor and pre-approving all auditing and non-auditing services permitted to be performed by the independent auditor;
> - reviewing with the independent auditor any audit problems or difficulties and management's response;
> - reviewing and approving all proposed related party transactions;
> - reviewing and discussing audited annual financial statements with management and the independent auditor;
> - reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;
> - annually reviewing and reassessing the adequacy of our Audit Committee charter;
> - meeting separately and periodically with management and the independent auditor; and
> - reporting regularly to the Board of Directors.

241.    As members of the Audit Committee, specifically tasked with overseeing the Company's accounting, financial reporting processes, and audits of the financial statements,

defendants Gao, Melcher, and Schloss knew, or were reckless in not knowing, non-public material information regarding the financial statements.

### 6.      Qi's Personal Guarantee of Company Loans

242.    According to the Registration Statement, in June 2016, Beijing Gridsum entered into a $3.8 million short-term guaranteed revolving credit facility, for which Qi provided a personal guarantee.  As of June 30, 2016, the Company had borrowed $1.5 million under the credit facility.

243.    The 2016 Form 20-F stated that "several short-term guaranteed loan agreements" were entered into during 2016 and that the "guarantees on these loans were provided by Guosheng Qi . . . or Beijing Haidian Sci-tech Enterprises Financing Guarantee Co., Ltd., a third-party guarantor."  As of December 31, 2016, Gridsum's short-term loans amounted to $9.4 million.

244.    The 2017 Form 20-F stated that the Company entered into short-term guaranteed loan agreements in 2017 as well, also with guarantees provided by Qi.  As of December 31, 2017, the Company's short-term loans amounted to $40.9 million.

245.    Qi was motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements to protect his personal assets as a guarantor on Company bank loans.

### 7.      Additional PwC Scienter Allegations

246.    In addition to the above, a strong inference of PwC's scienter is shown through the following.  First, if PwC had examined the Company's "sales" agreements, PwC could not have avoided learning of the existence of the Company's consignment arrangements.  If PwC had examined the Company's correspondence (*i.e.*, in customer collection files) concerning the extremely old accounts receivable (*i.e.*, receivables that arose during 2015 and remained unpaid during PwC's 2017 audit of the Company's 2016 financial statements), PwC could not have

avoided learning of the existence of the Company's consignment arrangements.  If PwC had sent detailed confirmation letters to customers to obtain information regarding the validity of the outstanding receivables and the terms of the business arrangement between the customers and the Company, PwC could not have avoided learning of the existence of the Company's consignment arrangements.  PwC either knowingly, or recklessly disregarded, the existence of the consignment arrangements.

247.    Second, given the inordinate age of a significant portion of the Company's accounts receivable, there is no question that the judgments that were made by PwC in connection with its audit of the Company's "sales" and receivables were such that no reasonable auditor would have made the same judgments if confronted with the same facts.

248.    Third, according to the Company's 2017 Form 20-F, the Company's restatement of the originally disseminated 2016 audited financial statements referenced above resulted in an increase in accounts payable "in order to reconcile its accounting to that of its main media partners for SEM solutions."  In other words, in connection with the restatement, the Company reviewed the vendors' billing statements which it received and identified non-recorded vendor invoices which it then recorded.  The comparison (matching) of vendor billing statements (accounts receivable from the vendors perspective) with Company recorded vendor invoices (accounts payable from the Company's perspective) is a basic bookkeeping procedure and an essential cutoff auditing procedure (*see* ¶ 149) that PwC knowingly or recklessly did not perform.

249.    PwC's failure to perform a basic audit cutoff procedure (reconciling vendor statements with Company-recorded invoices) during its audit of the Company's 2016 financial statements caused the 2016 accounts payable to be understated by RMB37,414,000.  This supports the contention that PwC's audit of accounts payable was so deficient that it amounted to no audit

at all.  As discussed in ¶¶ 148-52 and 209-11, other cutoff issues involving cost accruals and expenses were also addressed in the restatement of the 2015 and 2016 financial statements.

250.    Fourth, PwC's failure to comply with authoritative guidance on audit planning, professional due care, and audit documentation supports a strong inference of scienter.

251.    The Registration Statement disclosed a material weakness in the Company's internal controls as of December 31, 2015 as follows:

> A material weakness is a deficiency, or combination of deficiencies, in internal controls, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.  The material weakness relates to our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and the Securities and Exchange Commission, or the SEC, reporting requirements to properly address complex accounting issues and to prepare and review our financial statements and related disclosures in accordance with U.S. GAAP and SEC financial reporting requirements.

252.    The 2016 Form 20-F stated that an additional material internal control weakness was identified as of year end 2016:

> The two material weaknesses relate to: (1) our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and the SEC reporting requirements to properly address complex accounting issues and to prepare and review our financial statements and related disclosures in accordance with U.S. GAAP and SEC financial reporting requirements ; and (2) the lack of sufficient written policies and procedures for capturing certain services received before contracts were signed to timely record the related expenses in the financial statements.

253.    PCAOB guidance (Auditing Standard No. 9 – "Audit Planning"), states: "Planning the audit includes establishing the overall audit strategy for the engagement and developing an audit plan, which includes, in particular, planned risk assessment procedures and planned responses to the risks of material misstatement."  This authoritative guidance further states:

> The auditor should modify the overall audit strategy and the audit plan as necessary if circumstances change significantly during the course of the audit, including changes due to a revised assessment of the risks of material misstatement or the discovery of a previously unidentified risk of material misstatement.

254. As of the completion of work in connection with the Company's Offering Materials, PwC was cognizant of the lack of sufficient financial reporting and accounting personnel with appropriate knowledge of GAAP and SEC reporting requirements to properly address complex accounting issues and to prepare the Company's financial statements and related disclosures in accordance with GAAP and SEC financial reporting requirements. Moreover, PwC had identified the fact that expenses were not being recorded (purportedly due to the lack of sufficient written policies and procedures for recording expenses (the Company stated that it was not "capturing certain services received before contracts were signed")).

255. Therefore, PwC was required by professional standards to exercise an appropriate degree of due professional care and professional skepticism during its 2016 audit of the Company's expenses (which included its audit of vendor invoices). Had PwC done so, there would have been no need to restate the Company's originally issued financial statements to reflect the correction of non-recorded accounts payable and the appropriate recognition of costs and expenses.

256. PCAOB guidance (AS 1015) regarding "Due Professional Care" states that:

- Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

- Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting.

- Due professional care requires the auditor to exercise professional skepticism, Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence.

- Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process.

- The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor

should not be satisfied with less than persuasive evidence because of a belief that management is honest.

257. PCAOB Auditing Standard No. 13 ("The Auditor's Responses to the Risks of Material Misstatement") notes that:

Due professional care requires the auditor to exercise professional skepticism. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of the appropriateness and sufficiency of audit evidence. The auditor's responses to the assessed risks of material misstatement, particularly fraud risks, should involve the application of professional skepticism in gathering and evaluating audit evidence. Examples of the application of professional skepticism in response to the assessed fraud risks are (a) modifying the planned audit procedures to obtain more reliable evidence regarding relevant assertions and (b) obtaining sufficient appropriate evidence to corroborate management's explanations or representations concerning important matters, such as through third-party confirmation, use of a specialist engaged or employed by the auditor, or examination of documentation from independent sources.

258. If PwC had complied with this authoritative guidance, PwC would have examined billing statements from vendors and compared the vendors' assertions regarding outstanding (unpaid) invoices with the Company's record of unpaid invoices (accounts payable). If this had been done, there would have been no need to restate the Company's originally issued 2016 financial statements to correct a material understatement of accounts payable.

259. If PwC had complied with the above authoritative guidance, PwC would also have examined Gridsum's method of identifying and accruing expenses in connection with services received from others, particularly in connection with pending and recently consummated contracts, and PwC would have identified non-recorded cost accruals and expenses.

260. PCAOB Auditing Standard No 3. ("Audit Documentation") states that audit documentation should "demonstrate that the underlying accounting records agreed or reconciled with the financial statements." If PwC had complied with this authoritative guidance, the misstatement of the Company's costs, expenses, and accounts payable as reflected in the Company's originally issued 2015 and 2016 financial statements would have reflected appropriate

amounts and there would have been no need to restate in order to correct the understatement of the amounts of these items.  By either knowingly or recklessly failing to ascertain that the underlying accounting records agreed or reconciled with the financial statements as required by PCAOB auditing standards, PwC blinded itself to glaringly obvious red flags.

261.    Fifth, PwC knew it was required to adhere to standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. PwC, in issuing its unqualified audit opinions on the Company's originally disseminated 2015 and 2016 audited financial statements, knew that by doing so it was engaging in a gross departure from GAAS or issued such opinions with reckless disregard for whether or not GAAS was being complied with.

262.    Last, in connection with the services which PwC provided to the Company in connection with the IPO, PwC personnel were frequently present at the Company's corporate headquarters during 2016 and they frequently spoke with Company personnel and had continual unrestricted access to and knowledge of the Company's confidential corporate financial, operating, and business information.  There was no restriction on the scope of PwC's audit.

### D.    No Safe Harbor

263.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein. The statements alleged herein all relate to then-existing facts and conditions.

264.    To the extent that statements alleged to be false and/or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and the Exchange Act Defendants had

actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

**E.      Causes of Action Under Sections 10(b) and 20(a) of the Exchange Act**

<div align="center">

**COUNT III**
**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Exchange Act Defendants)**

</div>

265.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

266.     This Count is asserted against Gridsum, each of the Individual Defendants, and PwC for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

267.     At the time the Registration Statement was filed and throughout the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gridsum securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Gridsum securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, these defendants, and each of them, took the actions set forth herein.

268.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, the Exchange Act Defendants (with the exception of Sarathy) participated directly or indirectly in the preparation and/or issuance of the Registration Statement.  Each of the Individual Defendants (with the exception of Sarathy) signed as a maker of the representations contained therein, which were materially false and misleading, as alleged.

269.    Pursuant to the above plan, scheme, conspiracy and course of conduct, defendants Gridsum, Qi, Zhang, Sarathy, and PwC participated directly or indirectly in the preparation and/or issuance of the annual report, SEC filings, and press releases described above, including statements made to securities analysts and the media that were designed to influence the market for Gridsum securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Gridsum's finances and business prospects, including that:  (i) Gridsum was improperly recognizing revenue; (ii) Gridsum failed to record accounts payable; (iii) Gridsum failed to accrue certain expenses; (iv) Gridsum failed to record certain costs; (v) Gridsum misclassified certain financial statement items; (vi) Gridsum's material weaknesses over internal controls extended beyond the "lack of sufficient financial reporting and accounting personnel;" (vii) Gridsum's material weaknesses had already caused the Company to issue materially false and misleading financial reports; (viii) Gridsum and certain Individual Defendants were not appropriately addressing issues with the Company's financial reporting raised by its auditor; (ix) PwC audit was not appropriately performed in accordance certain auditing standards; and (x) consequently, Gridsum's financial statements were inaccurate and misleading, and did not fairly present, in all material respects, the financial condition and results of operations of the Company.

270.   By virtue of their positions at Gridsum, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Gridsum and the Individual Defendants.  Said acts and omissions of the Individual Defendants were committed willfully or with reckless disregard for the truth.  In addition, the Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

271.   By virtue of its position as auditor for Gridsum, PwC had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, PwC acted with reckless disregard for the truth in that it failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to PwC.  Said acts and omissions of PwC were committed willfully or with reckless disregard for the truth.  In addition, PwC knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

272.   Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors or as the auditor of Gridsum, the Individual Defendants and PwC had knowledge of the details of Gridsum's internal affairs.

273.   The Individual Defendants and PwC are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual

Defendants and PwC were able to and did, directly or indirectly, control the content and/or issuance of the audited financial statements of Gridsum.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Gridsum's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Gridsum securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Gridsum's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Gridsum securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Exchange Act Defendants and were damaged thereby.

274.    During the Class Period, Gridsum securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Gridsum securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Gridsum securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The

market price of Gridsum securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

275.     By reason of the conduct alleged herein, Gridsum, the Individual Defendants, and PwC knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

276.     As a direct and proximate result of Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.   Gridsum, the Individual Defendants, and PwC are liable for damages in connection with those losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT IV
### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

277.     Plaintiffs repeat and re-allege each and every allegation above as if fully set forth herein.

278.     During the Class Period, the Individual Defendants participated in the operation and management of Gridsum, and conducted and participated, directly and indirectly, in the conduct of Gridsum's business affairs.  Because of their senior positions and/or directorships, they knew the adverse non-public information about Gridsum's misstatements of income and expenses and false financial statements.

279.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Gridsum's

financial condition and results of operations, and to correct promptly any public statements issued by Gridsum which had become materially false or misleading.

280.     Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to and did control the contents of the various reports, press releases and public filings which Gridsum disseminated in the marketplace during the Class Period concerning Gridsum's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Gridsum to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Gridsum within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Gridsum securities.

281.     Each of the Individual Defendants, therefore, acted as a controlling person of Gridsum.  By reason of their senior management positions and/or being directors of Gridsum, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Gridsum to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Gridsum and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

282.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Gridsum.

## VII.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

283.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who (1) purchased or otherwise acquired Gridsum securities during the Class Period, and/or (2) purchased or otherwise

acquired Gridsum securities pursuant to and/or traceable to Gridsum's Offering Materials in connection with its IPO, and were damaged upon the revelation of the alleged corrective disclosures (the "Class").   Excluded are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

284.   Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gridsum securities were actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other Class members may be identified from records maintained by Gridsum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

285.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

286.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

287.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.     whether the Offering Materials contained any material misrepresentations or omissions;

b.   whether Defendants have a viable good faith defense to the strict liability imposed by Section 11 of the Securities Act;

c.   whether Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Section 11 of the Securities Act;

d.   whether the Individual Defendants were control persons of Gridsum for the purposes of Section 15 of the Securities Act and Section 20(a) of the Exchange Act;

e.   whether the statements made by the Exchange Act Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Gridsum, or omitted facts necessary to make the statements not misleading;

f.   whether the Exchange Act Defendants caused Gridsum to issue false and misleading financial statements during the Class Period;

g.   whether the Exchange Act Defendants acted knowingly or recklessly in issuing false and misleading misrepresentations or omissions;

h.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

i.   whether the prices of Gridsum securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

j.   whether the members of the Class have sustained damages with respect to their Exchange Act claims and, if so, what is the proper measure of damages.

288.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

289.   With respect to the Exchange Act claims, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. Gridsum's securities are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company's ADSs traded on the Nasdaq and Gridsum was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiffs and the Class purchased, acquired, and/or sold Gridsum securities between the time the Exchange Act Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

290. Based upon the foregoing, Plaintiffs and the Class are entitled to a presumption of reliance upon the integrity of the market.

291. Alternatively, Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Gridsum Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

     D.      Awarding such other and further relief as this Court may deem just and proper.

## IX.    DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: May 7, 2020              Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

/s/ *Lawrence P. Eagel*
Lawrence P. Eagel
Marion C. Passmore (admitted *pro hac vice*)
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
Email: eagel@bespc.com
      passmore@bespc.com
      fortunato@bespc.com

*Attorneys for Lead Plaintiff William Barth and*
*Lead Counsel for the Proposed Class*

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
Thomas J. McKenna
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
      tjmckenna@gme-law.com

*Attorneys for Named Plaintiff Xuechen Li*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of May, 2020, a true and correct copy of the foregoing

THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL

SECURITIES LAWS was served by CM/ECF to all parties registered to the Court's CM/ECF

system.

<div style="text-align:center">

/s/ *Lawrence P. Eagel*
Lawrence P. Eagel

</div>