UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEIFA XU, *individually and on behalf of all
others similarly situated*,

Plaintiff,

– *against* –

GRIDSUM HOLDING INC., GUOSHENG QI,
MICHAEL PENG ZHANG, RAVI SARATHY,
GUOFA YU, PERRY LIN CHUI, XIANG FAN,
YANCHUN BAI, XUDONG GAO, THOMAS
ADAM MELCHER, PETER ANDREW
SCHLOSS, PRICE WATERHOUSECOOPERS
ZHONG TIAN LLP, GOLDMAN SACHS
(ASIA) LLC, CITIGROUP GLOBAL
MARKETS INC., and STIFEL, NICOLAUS &
COMPANY INCORPORATED,

Defendants.

**AMENDED OPINION &
ORDER**

18 Civ. 3655 (ER)

RAMOS, D.J.:

This is a putative shareholder class action against Gridsum Holding, Inc., an overseas

holding company, as well as Gridsum's former accounting firm, the underwriters of its 2016

initial public offering, and various of Gridsum's current and former officers and directors.

Plaintiffs allege violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"),

15 U.S.C. §§77k, 77o, and Sections 10(b) and 20(a) of the Securities Exchange Act of 1944

("Exchange Act"), 15 U.S.C. §§ 78j, 78t.  The shareholders seek to hold the defendants liable for

misstatements arising out of Gridsum's initial public offering materials and subsequent financial

statements.

On March 30, 2020, this Court issued an Opinion and Order regarding Plaintiffs' Second

Amended Complaint ("SAC").  *See Peifa Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655 (ER),

2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020).  In its Opinion, the Court dismissed the Securities

Act claims against Gridsum, the underwriters, and one of the individual defendants, but granted Plaintiffs leave to replead these claims.  The Court also dismissed Price WaterhouseCoopers Zhong Tian LLP ("PwC") because it had not been properly served, and denied Plaintiffs' motion for alternative service on the other individual defendants.  The Court, however, denied Plaintiffs' motion to dismiss the Exchange Act claims relating to Gridsum's 2016 Form 20-F and an April 2018 press release.

Plaintiffs filed their Third Amended Complaint ("TAC") on May 7, 2020.  Before the Court are three separate motions to dismiss the TAC:  One on behalf of Gridsum and individual defendant Melcher, another on behalf of PwC, and one more on behalf of individual defendant Chui.  *See* Docs. 210, 213, 216.[1]  For the reasons discussed below, the Court GRANTS the Defendants' motions to dismiss all newly-alleged or realleged claims in the TAC.

## I.      FACTUAL BACKGROUND

The facts underlying this case were more fully set out in the Court's March 30, 2020 Opinion and Order regarding Defendants' motion to dismiss the SAC.  *See Peifa Xu v. Gridsum Holding Inc.*, No. 18 Civ. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020).  The Court assumes familiarity with the March 2020 Opinion, but provides an abbreviated summary here.

### A.      Defendants

#### i.      Gridsum Holding Inc.

Defendant Gridsum is a holding company that, through its subsidiaries, operates a portfolio of Chinese software firms.  ¶¶ 45–47.[2]  It designs and develops data analysis software, including cloud-based analytics and AI solutions.  ¶ 47.  It moves to dismiss the TAC's Securities

---

[1] The underwriter defendants joined the motions and briefs filed by Gridsum and Melcher.  *See* Docs. 218, 225.

[2] Unless otherwise noted, citations to "¶ _" refer to the TAC, Doc. 209.

Act claims, all of which rest on statements made in connection with its September 2016 Initial

Public Offering ("IPO").  *See infra* § III.

### ii.    Individual Defendants

The individual defendants with motions to dismiss before the Court are:

- Thomas Melcher, who served as a director of Gridsum until March 30, 2019.  ¶ 33.  He signed the company's Registration Statement.  *Id.*  Melcher moves with Gridsum to dismiss claims against him under the Securities Act.  *See infra* § III.

- Perry Chui, who served as a director of Gridsum from 2010 until sometime before April 27, 2017.  ¶ 29.[3]  He signed the company's Registration Statement.  *Id.*  Chui moves to dismiss claims against him under both the Securities Act and the Exchange Act.  *See infra* §§ III, IV.

All other individual defendants have either been dismissed or will respond to the TAC by

April 23, 2021.[4]

### iii.    Underwriter Defendants

Plaintiffs also sued Goldman Sachs (Asia) LLC, Citigroup Global Markets, Inc., and

Stifel, Nicolaus & Company, Incorporated (collectively, the "Underwriter Defendants").  These

companies served as underwriters in connection with Gridsum's IPO.  ¶¶ 36–38.  The

Underwriter Defendants have joined Gridsum and Melcher's motions to dismiss claims against

them under the Securities Act.  *See infra* § III.  Plaintiffs did not bring Exchange Act allegations

against them.

---

[3] Chui has submitted a declaration indicating that he resigned on September 28, 2016.  *See* Doc. 215, Decl. of Perry Chiu, at ¶ 5.

[4] On October 14, 2020, Plaintiffs dismissed individual defendants Guofa Yu, Xiang Fan, Yanchun Bai, Xudong Gao, and Peter Schloss.  *See* Doc. 229.  Individual defendants Qi, Zhang, and Sarathy waived service on October 16, 2020 and the parties have stipulated that they will answer or otherwise respond to the TAC by no later than 60 days from the filing of this Opinion.  *See* Doc. 234.

### iv.   PwC

PwC served as Gridsum's auditor from at least 2015 until June 28, 2018.  ¶ 35.  It consented to the use of its audit reports in the Registration Statement.  PwC moves to dismiss both Securities Act and Exchange Act claims against it.  *See infra* § VI.  The Court previously granted PwC's motion to dismiss the SAC because PwC had not been properly served.  *See Xu*, 2020 WL 1508748 at *13.   However, the Court did not previously reach the merits of claims against PwC.

### B.   Gridsum's Initial Public Offering

Prior to September 2016, Grisdum was a private company.  It first filed a draft registration statement with the SEC on July 10, 2015.  ¶ 71.  After several drafts and amendments, Gridsum's Registration Statement was declared effective on September 22, 2016.  ¶¶ 71–72.  Gridsum filed its prospectus the following day, commencing its IPO of 6.7 million American Depository Shares ("ADS") at $13.00 per share.  ¶ 73.

Gridsum's Registration Statement included the company's audited financial statements and balance sheets for 2013, 2014 and 2015, which it represented as having been "prepared in accordance with U.S. GAAP [Generally Accepted Accounting Principles]."  ¶ 76.  These statements showed Grisdum's net revenue, loss, income tax expense, and other relevant information.  The Registration Statement also included an unaudited interim consolidated financial statement for the six months ended June 30, 2016.  ¶ 76.  This statement showed that Gridsum had incurred no income tax expense in the first six months of 2016.  ¶ 85.

The Registration Statement also made representations about Gridsum's internal control over financial reporting.  ¶ 90.  It disclosed that Gridsum had identified "one material weakness and certain other deficiencies in our internal control over financial reporting," as defined in the

standards established by the Public Company Accounting Oversight Board of the United States ("PCAOB").  *Id.*  Specifically, it identified "our lack of sufficient financial reporting and accounting personnel with appropriate knowledge of U.S. GAAP and SEC reporting requirements."  *Id.*

Finally, the Registration Statement also made representations about how Gridsum recognized revenue for purposes of the filing, namely that it did so when:

- persuasive evidence of an arrangement exists;
- [Gridsum's] platform is made available and services have been delivered to the customer;
- the fee is fixed or determinable; and
- collection is reasonably assured.

¶ 82.

On September 30, 2016, the Underwriter Defendants exercised their option to purchase just over a million additional shares.  ¶ 74.  In total, Gridsum sold over 7.7 million ADS, amounting to approximately $87.1 million in proceeds.  *Id.*

### C.    The March 15, 2017 Press Release and Earnings Call

On March 15, 2017, after the IPO, Gridsum issued a press release containing its unaudited financial results for the end of 2016.  ¶ 92.  This press release reported a 2016 income tax expense of ¥ 28,387,000.[5]  *Id.*  This expense was later adjusted to ¥ 14,801,000.  ¶ 87.

That same day, Gridsum held a conference call.  A Citigroup analyst asked about the increase in income tax expense for 2016, stating the following:

I thought that previously we were guided that we probably don't need to pay the income tax until couple of years later.  So, can you give us what's the change for this? Thank you.

¶ 92.

---

[5] Gridsum's financial statements use the Chinese Yuan (referred to herein as "¥").

Defendant Zhang provided the following response:

[T]he tax comes from a sub-optimal structure we initially had in place to move the offshore capital to onshore entities post-IPO. We have since put in place a more efficient structure. So, do not see this tax liability as a recurring dynamic.

*Id.*

Defendant Zhang then confirmed, in response to a follow-up question from the analyst, that it was his understanding that the tax liability would be a one-time occurrence. *Id.*

### D. The 2016 Form 20-F

On April 27, 2017, Gridsum filed its 2016 Form 20-F with the SEC. ¶ 94. This 20-F confirmed the tax liability incurred in 2016, described above. As with the Registration Statement, it included language stating that its financial statements were prepared in accordance with GAAP. ¶¶ 195–96. It also contained the same statements about Gridsum's revenue recognition practices as appeared in the Registration Statement. ¶ 196.

The Form 20-F also identified a lack of accounting personnel familiar with GAAP as a material weakness over Gridsum's internal controls. ¶ 200. This time, however, Gridsum also identified another material weakness: the "lack of sufficient written policies and procedures for capturing certain services received before contracts were signed to timely record the related expenses in the financial statements." *Id.* Gridsum indicated that it has taken a number of steps since the IPO to improve its controls, such hiring additional personnel and establishing an audit committee on the board of directors. *Id.*

### E. The 2018 Press Release and Subsequent Events

On April 23, 2018, Gridsum issued a press release announcing that the "audit report for the Company's financial statements for the year ended December 31, 2016 should no longer be relied upon." ¶ 99. The press release stated that this action was taken in response to several

actions by PwC.  According to the press release, PwC had informed the Company on April 16, 2018 of "certain issues" it identified while conducting its audit of financial results for 2017 relating to "revenue recognition, cash flow, cost, expense items, and their underlying documentation which PwC previously raised with the Company."  *Id.*  The press release indicated that 2016 revenue could be impacted by ¥ 2 million and 2016 expenses could be impacted by ¥ 6 million.  *Id.*  Gridsum's ADS listed on NASDAQ dropped over 16 percent that day and continued to drop thereafter.  ¶ 100.  On April 30, 2018, Gridsum filed a notice with the SEC that its Form 20-F for 2017 would be delayed, and that its audit committee would be conducting an investigation.  ¶ 101.

On May 1, 2018, Gridsum announced a proposed investment from Future X Capital via a convertible promissory note worth $40 million.  ¶ 103.  One week later, on May 8, Gridsum announced that Future X had issued a proposal to purchase all outstanding shares and bring the company private.  ¶ 104.  Although Gridsum announced the formation of a committee to evaluate the proposal in May 2018, the company had not made any announcement related to the proposal as of the date of the TAC.  *Id.* [6]

### F.     The 2017 Form 20-F

On January 7, 2019, after several months of delays due to the ongoing audit committee investigation and delisting procedures with NASDAQ, Gridsum filed its 2017 Form 20-F with the SEC.  ¶ 113.  The Form 20-F included both 2017 financial information and restatements of Gridsum's 2015 and 2016 statements of operations.  *Id.*  These included several restatements regarding revenue, tax expenses, and accounts receivable and payable for 2015 and 2016, which

---

[6] The TAC notes that Gridsum has also since received a separate non-binding proposal to acquire the company from defendants Qi, Yu and their respective affiliated entities.  *Id.*

form the basis of many of Plaintiffs' claims in this case.  As discussed in more detail in the

March 2020 Opinion, however, the Court found the misstatements in the 2015 financial

statement to be immaterial.  *See Peifa Xu*, 2020 WL 1508748, at *9.  The crux of the Court's

reasoning in this regard was that the line-item differences pointed to by Plaintiffs were relatively

small in the scheme of Gridsum's overall operations.[7]

The Court, however, found that alleged misstatements in the 2016 financial statement, as

well as in the April 2018 press release, could provide a basis for a securities fraud claim under

the Exchange Act.  *Id.* at *13.  Among the misstatements identified were, for example, a 9.2%

overstatement of Gridsum's revenue and a 45.6% understatement of Gridsum's net loss.  ¶ 206.

The 2017 Form 20-F also disclosed that the drop in net revenue and the balance sheet changes

were caused, at least in part, by a "change in [Gridsum's] method for recognition of certain

revenue."  ¶ 116.  This referred to the company's prior practice of categorizing proceeds from

sales to certain subdistributors "at the time of sale."  *Id.*  Gridsum stated that this change in its

revenue recognition applied to its sales, beginning sometime in 2016, of a new "public sentiment

tracking services" product.  *Id.*  In the restatements, however, Gridsum reversed course and only

recognized such proceeds when it actually collected cash from the sub-distributor, ultimately

reducing the reported revenue.  *Id.*  It also stated that it increased accounts payable as of

December 31, 2016, to "reconcile its accounting" with that of its partners for certain SEM

solutions, or products regarding search engine marketing.  *Id.*

The 2017 Form 20-F also revealed that Gridsum had dismissed PwC on June 28, 2018,

and another auditor had been retained.  ¶ 118.  The Form revealed that PwC had previously

---

[7] For example, the Court noted that "the change in income tax paid amounts to 4.5 percent of net revenues," and that
Plaintiffs provided no additional facts showing why this change would be significant to a reasonable investor.  *Id.* at
*8–9.

warned Grisdum of "questions related to its ability to rely upon the representations of [Gridsum]," and that PwC's audit of Gridsum's 2016 financial statements should not be relied upon. *Id.* Gridsum's share price decreased 5.6% in the day after this announcement, from 1.60 to $1.51 per share. ¶ 119.

The 2017 Form 20-F was later amended to disclose additional control deficiencies, including "[v]erification of certain revenue items" and "[d]ocumentation supporting certain transactions." ¶ 121.

### G.   Procedural History

Plaintiff Xu filed his complaint against Gridsum on April 25, 2018.  On September 17, 2018, the Court consolidated this action with another putative class action filed against Gridsum, *Li v. Gridsum Holding Inc.*, No. 18-cv-5749, and appointed William Barth as lead plaintiff.  Doc. 30.  Plaintiffs filed a First Amended Complaint on December 4, 2018 and Second Amended Complaint on March 1, 2019.  Docs. 50, 104.  As discussed *supra*, on March 30, 2020 the Court granted the motion to dismiss the Securities Act claims against Gridsum, Melcher, and the Underwriter Defendants, denied the motion to dismiss the Exchange Act claims against Gridsum, and granted the motion to dismiss all claims against PwC based on improper service.  Plaintiffs filed the TAC May 7, 2020.  Doc. 209.  On October 14, 2020, Plaintiffs voluntarily dismissed claims against defendants Yu, Fan, Bai, Gao and Schloss.  Doc. 229.  Defendants Qi, Zhang, and Sarathy, who had not previously been properly served, waived served on October 16, 2020.  Doc. 234.

## II.     LEGAL STANDARD

### A.     Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 557). However, this "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the

plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at

556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof

of those facts is improbable . . . .").  "For purposes of this rule, the complaint is deemed to

include any written instrument attached to it as an exhibit or any statements or documents

incorporated in it by reference."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.

2002) (internal quotation marks omitted).

###    B.    Rule 9(b)

A complaint alleging securities fraud must also satisfy the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting

fraud with particularity.  *See SEC v. Lyon*, 529 F. Supp. 2d 444, 449 (S.D.N.Y. 2008).  These

requirements apply whenever a plaintiff alleges fraudulent conduct, regardless of whether

fraudulent intent is an element of a claim.  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)

("By its terms, Rule 9(b) applies to 'all averments of fraud.'").  Specifically, Rule 9(b) requires

that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent

statements; (2) the speaker; (3) where and when the statements were made; and (4) why the

statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98,

108 (2d Cir. 2012).  Conditions of a person's mind — such as malice, intent, or knowledge —

may be alleged generally.  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R.

Civ. P. 9(b)).

These heightened pleading standards, when viewed together with the more general

standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*, make clear

that "plaintiffs must provide sufficient particularity in their allegations to support a plausible

inference that it is more likely than not that a securities law violation has been committed."  *In re*

*Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd* 604 F. App'x 62 (2d Cir.

2015) (citing *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,

553 F.3d 187, 196 (2d Cir. 2009)).

## III.   SECURITIES ACT CLAIMS

Section III addresses only the Securities Act allegations against Gridsum, the Underwriter

Defendants, and Melcher.  Claims against PwC are analyzed in Section V.

### A.   Plaintiffs' New Securities Act Claims

Plaintiffs allege several new Section 11 claims in the TAC.  These relate to statements

contained in Gridsum's interim consolidated financial statement for the first half of 2016, which

was included in the Registration Statement and indicated that Gridsum had not incurred any

income tax liability during the first six months of 2016.  First, Plaintiffs allege that the interim

statement contained a "material understatement of the tax expense reported . . . for the six

months ended June 30, 2016."  ¶ 171.  Second, they allege Gridsum failed to disclose that this

understatement was due to "the existence of a sub-optimal offshore capital structure," which

Gridsum "initially had in place to move the offshore capital to onshore entities post-IPO."  ¶ 92.

Third, they allege that Gridsum did not disclose in its IPO offering materials its "plan to launch a

new sentiment tracking services product within weeks, if not days, of the IPO," which is

significant because it planned to "recognize revenue thereon when the services were transferred

to sub-distributors . . . on a consignment basis."  ¶ 171.

Plaintiffs also re-plead their previous claim that Grisdum's material weaknesses over

internal controls extended beyond the "lack of sufficient financial reporting and accounting

personnel" disclosed in the Registration Statement.  *Id.*  Plaintiffs did not otherwise supplement

their allegations regarding alleged material misstatements in the 2015 financial statements, which the Court dismissed in its March 2020 Opinion.

### B.    The Applicable Standard of Review

To state a claim under Section 11 of the Securities Act, a plaintiff must allege that a defendant issued or signed a securities registration statement that "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k.  While Section 11 provides for strict liability for statements made by issuers, officers and underwriters in registration statements, courts have found that such claims sometimes "sound in fraud" and therefore trigger the stricter pleading requirements of Rule 9(b).  *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 213 (S.D.N.Y. 2004).  This may occur when the wording and imputations of the claims suggest fraud, or the complaint otherwise uses "fraud-based buzzwords" to indicate the fraudulent nature of the claims.  *Id.* at 214.

The Court previously held that Plaintiffs' Section 11 claims did *not* sound in fraud.  It cited the fact that the Section 11 claims were clearly set off from the Section 10b fraud claims, and that the core allegations were consistent with a theory of a failure to investigate or to possess a reasonable belief that the 2015 financials were not false or misleading.  *Peifa Xu*, 2020 WL 1508748 at *7 (citing *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007)).

Defendants again argue that the newly-alleged claims sound in fraud.  They cite the fact that the same series of events and allegedly false statements that provide the basis for Plaintiffs' Section 11 claims also provide the basis for newly-alleged fraud claims.  *See* Doc. 211, Defs' Br., at 13–14.  However, this was also true of the Second Amended Complaint, and the Court found this insufficient to trigger Section 9(b), given Plaintiffs' efforts to differentiate the claims,

and given Plaintiffs' allegations of essentially negligent behavior.  Defendants also argue that the new allegations regarding Gridsum's failure to disclose its capital restructuring plan inherently "sound in fraud."  While the Court acknowledges that some of Plaintiffs' allegations could be understood to insinuate fraudulent behavior, the Court will apply Rule 8(a) because Plaintiffs plead only negligence in connection to their newly pleaded claims.  *See* ¶ 176.  In any event, even if the new allegations were analyzed under Rule 9(b), Plaintiffs would still fail to state a claim for the reasons discussed below.

### C.   Plaintiffs' Newly-Alleged Claims

#### i.   Plaintiffs' Newly-Alleged Claims are Barred by the Securities Act's Statute of Repose

As a threshold issue, Defendants argue that these new claims—i.e., all claims regarding the 2016 interim financial statement or Gridsum's failure to disclose certain business strategies— are barred by the Securities Act's three year statute of repose.  Under the Securities Act, new claims must be asserted "[i]n no event . . . more than three years after the security was bona fide offered to the public."  15 U.S.C. § 77m.  The statute of repose is a "substantive right in those protected to be free from liability after a legislatively-determined period of time."  *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013) (internal citation, alteration and quotation marks omitted).  Unlike statutes of limitation, statutes of repose are not subject to equitable tolling, nor may they be circumvented by application of the "relation back" doctrine under Federal Rule 15(c).  *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 451–52 (S.D.N.Y. 2017) (holding that a claim, which was untimely under the Securities Act's statute of repose, could not relate back to an earlier filing under Rule 15(c)).  Because the Registration Statement became effective on September 22, 2016, additional claims arising from it would be barred by the statute of repose if filed on or after September 23, 2019.

In response, Plaintiffs argue that these claims were timely because Plaintiff Li filed a complaint on June 25, 2018, which was later consolidated with this case. *See Li v. Gridsum Holding, Inc.*, No. 18 Civ. 5749 (ER) (S.D.N.Y.).  In Li's complaint, he alleged that documents in Gridsum's public offering materials—including its interim financial statement for the first half of 2016—were "materially false and misleading."  Li Compl. ¶¶ 19, 31.  Plaintiffs reason that because the 2016 interim financial statement was part of the basis for Li's claims, and because Section 11 claims have been raised in every subsequent complaint, there is no statute of repose issue.

Plaintiffs' argument, however, rests on the inaccurate assumption that Li's Section 11 claims—or any other claims brought in this case since then—sufficiently put Defendants on notice of the newly-brought claims regarding, *inter alia*, the alleged tax understatement for the first half of 2016.  But Li's Complaint only alleged that Gridsum's financial statements were inaccurate and misleading because they failed to disclose "material adverse facts about the Company's business, operational and compliance policies" and the fact that Gridsum "lacked effective internal control over financial reporting."  Li Compl. ¶ 31.  It stated nothing about the existence of a "sub-optimal" offshore capital structure, the impact this structure would have on Gridsum's tax liability for the first half of 2016, or Gridsum's obligation to disclose these facts.  Nor did it mention anything about Gridsum's obligation to disclose its plan to launch a new sentiment tracking service, or any impact this might have on Gridsum's revenue recognition practices.

Nor is it sufficient that Li's complaint referenced the 2016 interim financial statement as misleading more generally under Section 11.  This argument has already been rejected in this District.  *See Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 264 (S.D.N.Y. 2019).  In

*Barilli*, plaintiffs brought an untimely Section 11 claim based on an alleged misstatement contained in a company's prospectus about whether it had received financing for a new project. *Id.* at 263.  However, the *Barilli* court found that this claim was barred by the statute of repose, notwithstanding the fact that other Section 11 claims—arising out of different misstatements in the same document—had previously been alleged in an earlier, timely-filed complaint.  *Id.* at 264.[8]  The Court also noted that permitting plaintiffs to add new claims as amendments after the repose period lapsed, simply because other misstatements had been timely alleged, would abridge defendants' substantive rights under the statute of repose.  *Id.* (citing *IndyMac MBS, Inc.*, 721 F.3d at 106).  The same is true here.  The Court thus finds *Barilli* persuasive and indistinguishable.

Plaintiffs' new allegations are therefore dismissed as beyond the statute of repose. However, even if they were not time-barred, Plaintiffs' newly-pleaded allegations would still fail to state a claim, as discussed below.

### ii.   The Alleged Misstatement of Gridsum's 2016's Tax Liability

Plaintiffs allege that the 2016 interim financial statement, which stated that there had been no income tax liability incurred as of June 30, 2016, was materially misleading.  The 2016 year-end financial statement ultimately disclosed a tax liability of ¥ 28,387,000, which was later restated down to ¥ 14,801,000.  ¶¶ 87, 92.[9]  This discrepancy between the interim statement and the year-end statement was allegedly due to, in Defendant Zhang's words, a "sub-optimal

---

[8] The *Barilli* court's passing reference to the fact that all claims arising from the prospectus perhaps should have been brought under Section 12, not Section 11, does not impact the statute of repose analysis here.  *See id.* at 249 n. 14.  This observation applied to all Section 11 claims in the case, whether timely or untimely.  Thus, the *Barilli* court's reasoning on the statute of repose issue rested solely on the fact that plaintiffs had brought new, untimely Section 11 claims, which arose out of different misstatements than the previously alleged Section 11 claims.

[9] The Court uses the January 2019 restatement as the relevant comparator figure for its materiality analysis, as this contains the most recent information regarding Gridsum's interim financials as of June 30, 2016.

structure [Gridsum] initially had in place to move the offshore capital to onshore entities post-IPO." ¶ 92. Plaintiffs therefore argue that this interim statement was misleading because Gridsum knew that that this tax liability would ultimately be incurred by the end of 2016, and thus it was obligated to disclose its anticipated liability on a proportionate basis, rather than representing it as zero. ¶ 95 (citing Accounting Standards Codification ["ASC"] 740); *see also* Doc. 221, Pls. Opp. at 20 (alleging that Gridsum was obligated to project potential tax liabilities pursuant to SEC guidance). Plaintiffs also argue this change was material because it resulted in a 24.9% understatement of Gridsum's reported net losses. *See* Pls. Opp. at 24 (citing ¶ 88).

Defendants argue that the tax liability of zero was true at the time, because the relevant restructuring did not occur until *after* the IPO. Defs' Br. at 20. They also argue that any misstatement was not material, because the understated tax liability amounted only to 4.9% of Gridsum's reported net revenue as of June 30, 2016 (or 2.03% compared to Gridsum's net revenue for the end of 2016). Doc. 223, Defs' Reply, at 10 n. 14; *see also* Defs' Br. at 21 (citing this Court's previous determination that a misstatement of Gridsum's 2015 tax liability, amounting to a 4.5% change in net revenue, was not material).

Here again, Plaintiffs have not shown that any understatement was material. In the March 2020 Opinion regarding the 2015 financial statements, the Court emphasized that the materiality analysis must be made "in the context of the company's 'total operations.'" *Peifa Xu*, 2020 WL 1508748 at *9 (citing *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 27 (2d Cir. 2013)). It noted that Plaintiffs had not shown why a large increase in taxes payable was material in the larger context of Gridsum's operations, given that this line item represented such a small portion of its revenue stream as a whole. *Id.* Here, the omitted projected tax liability also constituted less than 5% of Gridsum's net revenue. Similarly, Plaintiffs' argument that

Gridsum's nondisclosure of this projected tax liability resulted in a nearly 25% understatement of its net losses in the 2016 interim statement is not persuasive.  This percentage is only slightly larger than the roughly 22% understatement of net losses attributable to Gridsum's understated tax liability in the restated 2015 financials, and the Court has already found misstatements in this document to be immaterial.  *See* 2020 WL 1508748 at *15 (chart showing Gridsum's 2015 consolidated statement of operations).

As a whole, the TAC does not sufficiently explain why the Court should analyze the interim 2016 financial statement differently than it has already analyzed the 2015 statement. This is particularly true given that Plaintiffs only allege that Gridsum was obligated to put forth a prorated *estimate* of its half-year liability.  The TAC also alleges no other facts supporting the materiality of this alleged omission, aside from an analyst's question on a 2017 conference call regarding whether such tax liabilities were likely to reoccur.[10]  Without more, the Court cannot find that Plaintiffs plead a material understatement.

### iii.    Failure to Disclose Other Business Plans

The TAC also alleges that Gridsum failed to include in its Registration Statement information about plans to bring its "sub-optimal" structure to its anchor entities after the IPO, or its plans to launch a new sentiment tracking services product in October 2016.  ¶¶ 158, 171.  It alleges that these facts should have been included in Gridsum's Discussion and Analysis of Financial Condition Result of Operations ("MD&A") section of the Registration Statement, which is intended to set forth a quantitative analysis of the company's future prospects.  ¶¶ 153–54.

---

[10] At the time of this March 2017 conference call, the public would have believed that the tax understatement was even more significant than it ultimately proved to be, as this occurred before the January 2019 issuance of Gridsum's Form 20-F, which restated the relevant tax liability from ￥28,387,000 to ￥14,801,000.

To survive a motion to dismiss on these claims, Plaintiffs must allege that Defendants (1) had an affirmative duty to disclose the information; and (2) that the misstatement or omission was material as of the date of the statement. *See Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 415 (S.D.N.Y. 2008) (internal citations omitted). In general, there is no duty to disclose a specific business plan, unless it is necessary as an update because the company had previously "hyped a specific [alternative] plan." *See Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 810 (2d Cir. 1996) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)) (quotation marks omitted).

Plaintiffs cannot meet their burden regarding either omission. First, Plaintiffs point to Gridsum's interim 2016 financial statement, which they allege materially understated Gridsum's income tax liability as a result of the undisclosed "sub-optimal" capital restructuring plan. However, this change in tax liability was not material for the reasons discussed in the above subsection. Thus, the 2016 interim financial statement, and its statement of no income tax liability as of June 30, 2016, cannot serve as basis to make the nondisclosure of the underlying proposed capital restructuring plan materially misleading.

Similarly, regarding the alleged nondisclosure of Gridsum's plan to launch its sentiment tracking services product, Plaintiffs point to the January 2019 restatement of Gridsum's *end of year* 2016 financial documents. These 2016 financials were restated in part due to Gridsum's revenue recognition practices surrounding the new sentiment tracking services product. However, Plaintiffs do not explain how these eventual accounting irregularities or their impact "both existed, and were known or knowable, at the time of the offering" so as to provide a basis for Gridsum's duty to disclose the anticipated product launch at the time. *See Lin*, 574 F. Supp. 2d at 421. Indeed, the product was launched in October 2016, the month following the IPO, and

several months after the time period covered by the 2016 interim statement. ¶ 158. While Section 11 claims do not require an allegation of scienter, Plaintiffs must still raise an inference that a statement or omission was materially misleading *at the time it was made. See Lin*, 574 F. Supp. 2d at 421. Here, this would logically require allegations regarding what facts existed, or were reasonably anticipated, about this product launch at the time of the IPO, such as the substance or impact of future revenue recognition policies associated with the new product. Plaintiffs do not provide such facts, other than emphasizing that the product was introduced in the month following the IPO.[11]

Plaintiffs also do not cite to other specific statements regarding Gridsum's future business plans or intentions that would have rendered the omission of either of these statements materially misleading. *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 651 (S.D.N.Y. 2015) (company had no duty to disclose plans to make certain purchases, even when those purchases presented a change in strategy, unless such disclosure was necessary to make prior statements not misleading). Thus, in the absence of more specific facts otherwise establishing that these omissions were material or violated a duty to disclose, the Court cannot find that Plaintiffs state a claim here. *Cf. In re Travelzoo Inc. Securities Litigation*, No. 11 Civ. 5531, 2013 WL 1287342, at *6 (S.D.N.Y. Mar. 29, 2013) (company had no duty to disclose "a *potentially* adverse effect that the launch of one of its products could have" on the rest of its business) (emphasis in original).[12]

---

[11] Indeed, to the extent that Plaintiffs' theory here is that Defendants' obligation to disclose the product launch stemmed from fraudulent plans—known at the time of the IPO—to improperly recognize revenue from these sales in the future, this claim would undoubtedly "sound in fraud" and thus be subject to the heightened pleading standard of Rule 9(b). And Plaintiffs would not be able to carry their burden under this standard because they do not plead with particularity why omissions regarding these plans would have been fraudulent at the time they were made.

[12] Plaintiffs also reference SB Bulletin 101, which states that companies must disclose "known trends or known demands, commitments, events or uncertainties" that might affect previously reported financial statements.

### D.    Gridsum's Failure to Disclose Additional Internal Control Weaknesses

Plaintiffs previously alleged that Gridsum failed to disclose in its Registration Statement that its material weaknesses over internal controls extended beyond a "lack of sufficient financial reporting and accounting personnel."  ¶ 91.  The Court previously dismissed this claim because Plaintiffs did not specify what those other weaknesses were.  The TAC now includes allegations, based on disclosures revealed in Gridsum's 2016 and 2017 Forms 20-F and an amendment thereto, that Gridsum failed to disclose its "lack of written policies and procedures sufficient to timely record revenues and expenses in our financial statements."  ¶ 117 (citing Gridsum's 2017 Form 20-F).  Plaintiffs also cite control deficiencies relating to a lack of "written policies and procedures for contract management," "verification of certain revenue items," and "documentation supporting certain transactions."  ¶ 121 (citing an amendment to Gridsum's 2017 Form 20-F).

These allegations, however, are too conclusory to state a claim.  Besides simply quoting the 2017 20-F and its amendment, the TAC does not sufficiently refer to facts supporting the substance of these deficiencies.[13]  Moreover, the TAC does not explain why the omission of these deficiencies would communicate information that was materially different from Gridsum's prior disclosure that it lacked accounting personnel who were familiar with GAAP, or who could properly address complex accounting issues.[14]  To be clear, this determination does not mean

---

However, such SEC guidance is not binding on the Court.  *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 163 (2d Cir. 2000).  In any event, this argument would fail for the reasons already discussed in this subsection.

[13] To the extent these deficiencies relate to Gridsum's allegedly improper recognition of revenue from purported sales to subdistributors, the TAC alleges that this began *after* the September 2016 IPO.  *See* ¶ 127.

[14] Indeed, this Court has already determined that the actual magnitude of accounting errors in Gridsum's 2015 financial documents—which would reflect any differences in Gridsum's line items as a result of these identified control deficiencies—was immaterial as a matter of law.  *See Peifa Xu*, 2020 WL 1508748 at *9.

that the nondisclosure of such accounting deficiencies are necessarily immaterial as a matter of law.  Indeed, in some cases they might be material, regardless whether they are disclosed with other weaknesses.  But in this case, Plaintiffs have not adequately alleged facts supporting this inference, so as to "nudge[] their claims across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   Plaintiffs' remaining Section 11 claims are therefore dismissed.

### E.      Section 15 Claims against Melcher

To establish a prima facie Section 15 control person claim, a plaintiff must allege "(a) a primary violation by a control[] person, and (b) control by the defendant of the primary violator." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) (internal citation and quotation marks omitted).  The Court previously dismissed the Section 15 claim against Melcher because Plaintiffs had not adequately alleged a primary violation.  *See Peifa Xu,* 2020 WL 1508748, at *10.  Because Plaintiffs' Section 11 claims are dismissed as set forth in the above subsections, the Court again dismisses the Section 15 Claim against Melcher.

### IV.      EXCHANGE ACT CLAIMS

The Court previously dismissed Exchange Act claims based on the Registration Statement, but denied the motion to dismiss regarding the 2016 Form 20-F and 2018 press release.  In the TAC, the Plaintiffs appear to incorporate by reference their new Section 11 allegations regarding the restated 2016 interim financial report into the TAC's section alleging Exchange Act violations.  *See* ¶ 191, *see also* Pls. Opp. at 26.  To the extent the TAC therefore seeks to allege new Exchange Act claims against Gridsum and Melcher based on the Section 11 allegations discussed above, these claims are dismissed for the reasons set forth in § III, *supra*.

This dismissal, of course, does not impact the March 2020 Opinion denying the motion to dismiss 10b claims arising out of the 2016 financial statement and April 2018 press release, and denying the motion to dismiss the Section 20(a) claim against Melcher.

## V.   CLAIMS AGAINST CHUI

Chui states that he resigned from Gridsum's Board of Directors on September 28, 2016. Doc. 215, Declaration of Perry Chui, ¶ 5.  Thus, the TAC only brings allegations against Chui based on the Registration Statement.  *See* Pls. Opp. at 29–30.  Chui joins the arguments made by Gridsum, Melcher and the Underwriter Defendants, and also moves to dismiss all Exchange Act claims against him based on lack of personal jurisdiction.  *See* Doc. 214, Chui Br.  However, there is no need to determine whether this Court is also without personal jurisdiction over Chui, because all claims against him stem from the Registration Statement and are thus dismissed for the reasons set forth in §§ III–IV, *supra*.  Chui's motion to dismiss is therefore GRANTED.

## VI.   CLAIMS AGAINST PWC

In the March 2020 Opinion, this Court dismissed claims against PwC because it had not been properly served.  *Peifa Xu*, 2020 WL 1508748 at *13.  PwC has since accepted service of the TAC.  Doc. 217, PwC Br., at 1 n.1.  Thus, all claims against PwC are now properly before the Court.

PwC prepared audit opinions in connection with Gridsum's 2015 and 2016 financial statements.  Both opinions stated that, in PwC's view, "the [financial statements] present fairly, in all material respects, the financial position of Gridsum Holding Inc. . . ." and that it had planned and performed the audit to "obtain reasonable assurance about whether the financial

statements are free of material misstatement."   ¶ 89.[15]   The opinions cautioned, however, that "[t]hese financial statements are the responsibility of the Company's management.   Our responsibility is to express an opinion on these financial statements based on our audits."   *Id.*

### A.     Securities Act Claims

Plaintiffs allege that PwC is liable under Section 11 for misstatements and omissions in the Registration Statement.   This is because the Registration Statement included Gridsum's 2015 financial statement, which in turn included PwC's 2015 Opinion.[16]   However, for the reasons discussed in § III, *supra*, Plaintiffs have alleged no material misstatements in connection with the Registration Statement.

Plaintiffs do not allege Section 11 violations in connection with the 2016 Opinion, because this was not included in Gridsum's Registration Statement.   Thus, the Section 11 claim against PwC must also be dismissed.

### B.     Exchange Act Claims

Plaintiffs also allege that PwC is liable under Section 10b for both the 2015 and 2016 Opinions.   To state a claim under Section 10b, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."   *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

---

[15] While this text is taken from the 2015 Opinion, the 2016 Opinion contained the same operative language.  *See* ¶ 199.

[16] While the 2016 interim financial statement was unaudited, Plaintiffs argue that PwC is still liable for any material misstatements in it because PwC was still being advised of the IPO registration process, and was thus obligated to make certain inquiries about the interim statement under PCAOB standards.  Pls Opp. at 24–25.

### i.      The 2015 Audit Opinion

As discussed in § III, Plaintiffs insufficiently allege Section 11 liability arising out of the 2015 Audit Opinion.  Thus, the 2015 Opinion cannot provide a basis for a fraud claim.  Claims stemming from the 2015 Opinion are therefore dismissed.

### ii.      The 2016 Audit Opinion

The 2016 Opinion presents a more difficult question.  Plaintiffs argue that PwC is liable for fraud based on its statement that "the accompanying [financial documents] present fairly, in all material respects, the financial position of Gridsum," as well as its statement that it had "conducted [its] audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board."  *See* ¶ 199, *see also* Pls. Opp. at 33–34.  Part of Plaintiffs' argument is also that certain audit procedures were not performed.  ¶ 249.

PwC argues that there was no misstatement, because the 2016 Opinion was just that—a statement of opinion—and that Plaintiffs have not adequately pleaded that it was materially misleading under the standards set forth by the Supreme Court in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015).  PwC also argues that Plaintiffs have not adequately alleged that it acted with scienter.  Because the latter issue is dispositive, the Court limits its discussion to scienter, and assumes for the purposes of this discussion that any misstatements in the audit opinion are actionable.

### iii.      Plaintiffs Do Not Adequately Allege Scienter

Section 10(b) and Rule 10b–5 require plaintiffs to allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (internal citation and quotation marks omitted).  Under Rule 9(b) and the PSLRA, a plaintiff must allege facts leading to a "strong inference" of scienter.

*See* 15 U.S.C. § 78u–4(b)(2)(A). A "strong" inference is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). This burden may be met by either alleging facts "showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Ganino*, 228 F.3d at 168–69). If plaintiffs do not plead a motive to commit fraud, "the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (citing *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

When plaintiffs seek to hold an auditor liable for fraud, such circumstantial allegations "must, in fact, approximate an actual intent to aid in the fraud," such as "conduct[ing] an audit so deficient as to amount to no audit at all," or "disregard[ing] signs of fraud so obvious that the defendant must have been aware of them." *Id.* (internal citations and quotation marks omitted). Allegations of GAAP violations, errors, or even a lack of due diligence are insufficient without evidence of corresponding fraudulent intent. *See id.*

As a threshold issue, the TAC alleges no facts showing that PwC had any motive to perpetuate fraud. Indeed, Plaintiffs acknowledge that auditors generally have no such motive. *See* Pls. Opp. at 40 n. 22; *see also In re Petrobras Secs. Lit.*, No. 14-cv-9662 (JSR), 2016 WL 1533553, at *2 (S.D.N.Y. Feb. 19, 2016) (observing that an auditor will ordinarily have a motive to "maintain their professional reputation" that is at least as strong as any motive to maintain a relationship with an individual client). Thus, Plaintiffs must plead facts suggesting in the aggregate that the audit was so deficient so as to effectively be no audit at all, or that PwC

ignored red flags that were so obvious that it must have been aware of fraudulent behavior. Plaintiffs cannot carry this burden, for three reasons.

First, many of Plaintiffs' allegations regarding scienter are framed in the conditional. *See, e.g.*, ¶ 246 ("If PwC had examined the Company's 'sales' agreements, PwC could not have avoided learning of the existence of the Company's consignment arrangements"); ¶ 260 ("if PwC had complied with [PCAOB Auditing Standard No. 3] . . . the misstatement of the Company's . . . 2015 and 2016 financial statements would have reflected appropriate amounts . . ."). The Second Circuit has held that without additional supporting facts, such allegations do not suffice to raise an inference of scienter under the PLRSA's heightened pleading instructions. *See In re Advanced Battery Techs., Inc.*, 781 F.3d at 646 (citing *South Cherry St., LLC v. Hennesee Grp. LLC*, 573 F.3d 98, 110, 112 (2d Cir. 2015)). This makes sense, as such allegations suggest that Defendants failed to perform certain procedures or to act according to certain standards, but do not provide additional insight as to Defendants' state of mind.

Second, Plaintiffs allege several auditing standards that PwC failed to meet. *See, e.g.*, ¶ 256 (citing AS 1015, a guidance regarding "Due Professional Care"); ¶ 257 (citing PCAOB Auditing Standard No. 13, requiring the exercise of "professional skepticism" in the presence of fraud risks). However, in addition to these standards being somewhat vague and thus potentially the subject of reasonable disagreement, *see In re Amtrust Fin. Servs., Inc. Sec. Litig.*, No. 17 Civ. 1545 (LAK), 2019 WL 4257110, at *31 (S.D.N.Y. Sept. 9, 2019), these allegations are not supported by additional facts to suggest that that PwC's alleged failure to abide by these standards of care was motivated by fraudulent intent. While Plaintiffs allege that PwC "was frequently present at the Company's corporate headquarters" and had full "access to and knowledge of the Company's corporate financial, operating and business information," this does

not state a claim that PwC's failure to use this access pursuant to a greater standard of care was done fraudulently. *See Iowa Pub. Emps. Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 332 (S.D.N.Y. 2013) ("[A]uditor access is not tantamount to auditor awareness."); *see also In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (finding allegations of wide access to company documents insufficient to support an inference of scienter, even when concerns about internal controls had been raised).

Third, Plaintiffs allege facts suggesting that PwC eventually did identify and raise several internal control issues relevant to this case. *See, e.g.*, ¶¶ 213–14.  In light of this, Plaintiffs do not plead facts supporting a strong inference that PwC must have been aware of, and ignored, red flags.  Courts must view allegations of red flags in the aggregate. *See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 429 (S.D.N.Y. 2014). Here, Plaintiffs allege that PwC informed Gridsum that its 2016 Audit Report could no longer be relied upon because, over the course of the following year's audit, PwC identified "issues relat[ing] to certain revenue recognition, cash flow, cost, expense items, and their underlying documentation" that PwC "had previously raised with the Company." ¶ 99.  Gridsum later revealed that PwC had stated that these issues "raised questions related to its ability to rely on the representations of management." ¶ 214.  Plaintiffs argue, however, that in the course of the 2016 audit PwC still failed to perform a basic audit cutoff procedure to reconcile vendor statements with Company-recorded invoices, despite knowing of Gridsum's internal control weaknesses. ¶ 249.  While this allegation, in a vacuum, might constitute evidence that PwC ignored a "red flag," it is not enough to offset the countervailing facts in the record that undermine a strong inference of scienter.

These countervailing facts also distinguish this case from *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596 (S.D.N.Y. 2009) and the other "red flag" cases cited by Plaintiffs.  *See also In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 258 (S.D.N.Y. 2015) (denying summary judgment for auditor when plaintiff alleged six potential "red flags"); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214 (HB), 2014 WL 285103, at *5–6 (Jan. 27, 2014) (motion to dismiss denied when auditors had a history of audit deficiencies and plaintiffs alleged no countervailing non-fraudulent behavior).  In *Varghese*, for example, which denied a motion to dismiss a 10b claim against an auditor, there was no allegation that the auditor raised issues with the company so as to provide a basis for a countervailing inference of non-fraudulent behavior.  Moreover, Plaintiffs in *Varghese* alleged that the auditor had actual knowledge of multiple "serious internal control weaknesses," as well as a resignation letter from a former board member regarding myriad corporate governance issues.  *See* 672 F. Supp. 2d at 603, 610.  Thus the "red flags" alleged in *Varghese* were more severe and voluminous, and not undermined by other alleged conduct by the auditor.

On the whole, Plaintiffs' allegations support the inferences that PwC's 2016 audit opinion was deficient, even negligent, and that PwC likely did not perform procedures that it should have.  But they do not support the inference that these errors were done fraudulently.

## VII.   CONCLUSION

For the reasons discussed above, Defendants' motions to dismiss are GRANTED. Specifically:

- All claims arising under Section 11 of the Securities Act against Defendants Gridsum, Melcher, the Underwriter Defendants, PwC and Chui are DISMISSED.

- All claims arising under Section 15 of the Securities Act against Chui and Melcher are DISMISSED.

- All claims arising under Section 10(b) of the Exchange Act against Chui and PwC are DISMISSED.

- All newly-alleged claims arising under Section 10(b) of the Exchange Act against Gridsum and Melcher, and Section 20(a) of the Exchange Act against Melcher, in relation to Gridsum's Registration Statement, are DISMISSED.

- All claims arising under Section 20(a) of the Exchange Act against Chui are DISMISSED.

However, nothing in this Opinion alters the Court's previous decision denying Gridsum and Melcher's motion to dismiss claims under Section 10(b) of the Exchange Act, and denying Melcher's motion to dismiss the Section 20(a) claim, arising from Gridsum's 2016 financial statement and 2018 press release.  These claims survive, as set forth in the Court's March 2020 Opinion and Order.  Defendants Gridsum, Melcher, Sarathy, Qi, and Zhang are directed to respond to the TAC by April 23, 2021.

The Clerk of Court is respectfully directed to terminate the motions, docket numbers 210, 213, and 216, and to terminate Defendants Chui, Goldman Sachs (Asia) LLC, Citigroup Global Markets, Inc., Stifel, Nicolaus & Company, Inc., and PricewaterhouseCoopers Zhong Tian LLP.

It is SO ORDERED.

Dated:   February 23, 2021
         New York, New York

_____

EDGARDO RAMOS, U.S.D.J.