UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__8/29/2022__

---

PEIFA XU, *individually and on behalf of all others similarly situated*,

Plaintiff,

– *against* –

GRIDSUM HOLDING INC., GUOSHENG QI, MICHAEL PENG ZHANG, RAVI SARATHY, GUOFA YU, PERRY LIN CHUI, XIANG FAN, YANCHUN BAI, XUDONG GAO, THOMAS ADAM MELCHER, PETER ANDREW SCHLOSS, PRICE WATERHOUSECOOPERS ZHONG TIAN LLP, GOLDMAN SACHS (ASIA) LLC, CITIGROUP GLOBAL MARKETS INC., *AND* STIFEL, NICOLAUS & COMPANY INCORPORATED,

Defendants.

---

**OPINION & ORDER**

18-cv-3655-GHW

Woods, D.J.:

On April 23, 2018, Gridsum Holding, Inc., an overseas holding company that, through its subsidiaries, operates a portfolio of Chinese software firms, issued a press release announcing that the "audit report for [its] financial statements for the year ended December 31, 2016 should no longer be relied upon." ¶¶ 45–47, 99.[1]  Plaintiffs, a putative class of Gridsum's shareholders, argue that the press release was materially false and misleading because it failed to disclose that Gridsum's auditor—PricewaterhouseCoopers Zhong Tian LLP ("PwC")—advised Gridsum that it could no longer "rely upon the representations of management." ¶ 214.

At issue is whether defendants Guosheng Qi, Michael Peng Zhang, and Ravi Sarathy (collectively, the "Individual Defendants") were "makers" of the April 2018 press release and,

---

[1] Unless otherwise noted, citations to "¶" refer to the Third Amended Complaint, Doc. 209.

therefore, can be held liable for its statements.  Because Qi had "ultimate authority" over the press release, he was a "maker" of its statements, and the Individual Defendants' motion to dismiss is denied as to him.  But because there are insufficient allegations that Zhang or Sarathy was a "maker" of the statements in the press release, the motion to dismiss is granted as to them.

## I.    BACKGROUND

The facts underlying this case are described in detail in this Court's March 2020 and February 2021 Orders.  *See* Docs. 201, 236.  The Court assumes the reader's familiarity with those opinions and will not repeat all of the facts of this case here.  For present purposes, an abbreviated summary suffices.

Plaintiffs brought this action against Gridsum, its former accounting firm, the underwriters of its 2016 initial public offering, and various of its current and former officers and directors, alleging violations of Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1944.  Plaintiffs seek to hold the defendants liable for a series of alleged misstatements and omissions in Gridsum's initial public offering materials and subsequent financial statements, including the April 2018 press release.

### a.  **The Individual Defendants**

The Individual Defendants are current officers of Gridsum.  Qi co-founded Gridsum in 2005 and has served at all relevant times as its Chief Executive Officer ("CEO") and chairman of its Board of Directors (the "Board").  ¶ 25.  Qi also serves as a member of the Board's Compensation and Nominating and Corporate Governance Committees.  *Id.*  According to Gridsum's 2017 Form 20-F, as of December 31, 2018, Qi beneficially owned 29.9% of Gridsum's total ordinary shares.  *Id.*  And Qi beneficially owns all of the Class A shares, giving him nearly 70% of the voting power as Class A shares are entitled to ten votes per share.  *Id.*

2

According to Gridsum's registration statement and 2016 Form 20-F, Qi is Gridsum's "chief operating decision maker" with respect to "allocating [Gridsum's] resources and assessing [its] performance."  ¶ 230.

Zhang is Gridsum's Vice President of Corporate Development.  ¶ 26.  He served as Gridsum's Chief Financial Officer ("CFO") from February 2014 to April 2017 and as co-CFO from April 2017 until September 30, 2019.  *Id.*

Sarathy is Gridsum's current CFO.  ¶ 27.  He served as Chief Strategy Officer from October 2016 to April 2017, and as co-CFO, with Zhang, from April 2017 until September 30, 2019.  ¶ 27.

### b.  The April 2018 Press Release

On April 23, 2018, Gridsum issued a press release titled "Gridsum Reports Suspension of Audit Report on Financial Statements."  ¶ 99.  The press release was attached to a Form 6-K,[2] which was filed with the Securities and Exchange Commission ("SEC").  *Id.*  The press release stated, in relevant part:

> Gridsum Holding Inc. ("Gridsum" or "Company") . . . today reported that on April 20, 2018, PricewaterhouseCoopers Zhong Tian LLP ("PwC"), the Company's independent registered public accounting firm, notified the Company's Board of Directors and Audit Committee that PwC's audit report for the Company's financial statements for the year ended December 31, 2016 should no longer be relied upon.  Therefore, investors should not rely on that audit opinion.

> In its letter, dated April 16, 2018 ("PwC Letter"), PwC informed the Company of certain issues it had identified in conducting its audit of the Company's financial results for the year ended December 31, 2017.  Those issues relate to certain revenue recognition, cash flow, cost, expense items, and their underlying documentation which PwC had previously raised with the Company.  Of the items specifically identified in the PwC Letter, the Company estimates a 2016 revenue impact of approximately RMB 2 million and a 2016 expense impact of approximately RMB 6 million.  There can be no assurance that the

---

[2] A Form 6-K functions as a cover page for SEC filings, *see infra* Section III(a)(ii)(2).  In this case, the Form 6-K contains Gridsum's title ("Gridsum Holding Inc.") and its address and phone number, as well as a description, "Report of Foreign Private Issue Pursuant to Rule 12a-16 or 15d-16 under the Securities Exchange Act of 1934," and a commission file number.  *See* Doc. 248-2.  The Form is signed by Zhang and is dated April 23, 2018.  *Id.*

Company or PwC will not identify more items as the Company finalizes the review. The Audit Committee Chairman and the Company's Co-Chief Financial Officer have discussed the topics covered by the PwC Letter with representatives of PwC. The Company's Audit Committee is fully investigating these issues with assistance from external legal and accounting advisors and is working diligently toward an expeditious conclusion of the investigation. The Company undertakes no obligation to update its disclosures on this topic until the Audit Committee investigation is complete. Because PwC will not be in a position to issue reports on the Company's financial statements until the Audit Committee completes its review and PwC is satisfied that any outstanding issues have been satisfactorily addressed, the Company's 20-F filing will be delayed until such audit is completed.

¶ 99. The press release also included the following quotation from Qi:

For many years, starting well before our IPO, we have been committed to transparency and good corporate governance and remain so. When we became aware of certain accounting issues, we immediately took measures to address this situation. Our Audit Committee started an investigation and appointed a respected global law firm to conduct that review with the assistance of 'big four' forensic accounting specialists. This work is still ongoing. I have full confidence in the integrity and professionalism of all parties involved and we hope to report our results as soon as practicable after that work concludes. Meanwhile, we continue to make good progress in our efforts to grow the Company and expand our product range and client base. Our fundamentals and business prospects remain robust, and we look forward to continuing to work toward increasing shareholder value.

*Id.*

Gridsum's American Depository Shares ("ADS") listed on NASDAQ dropped over 16 percent that day and continued to drop thereafter. ¶ 100. On April 30, 2018, Gridsum filed a notice with the SEC that its Form 20-F for 2017 would be delayed, and that its audit committee would be conducting an investigation. ¶ 101.

### c. Procedural History

On March 30, 2020, the Court issued an opinion and order in response to a motion to dismiss filed by Gridsum and one of its former directors, Thomas Melcher. *See* Doc. 201. In that opinion, the Court considered, among other claims, Plaintiffs' claims under Section 10(b) of the Exchange Act. In particular, and as relevant here, Plaintiffs alleged that the April 2018 press

release was materially false and misleading because it omitted to disclose that, as later revealed in Gridsum's 2017 Form 20-F, PwC "also advised that the issues identified raised questions related to its ability to rely upon the representations of management."  Doc. 104 ¶ 179.

In its opinion, the Court found that Plaintiffs had properly pleaded an omission under the Exchange Act and, as such, denied Defendants' motion to dismiss the Exchange Act counts as to Gridsum.  Doc. 201 at 23.  However, the Court granted the motion to dismiss those counts as to Melcher, finding that "plaintiffs never alleged that Melcher signed or otherwise 'made' . . . the April 2018 press release."  *Id.*  In other words, because Melcher was not a "maker" of the April 2018 press release, he could not be held liable for its alleged misstatements.

Plaintiffs filed a third amended complaint ("TAC"), *see* Doc. 209, on May 7, 2020, which several of the defendants, in three separate motions, moved to dismiss.[3]  While those motions were pending, the Individual Defendants (all of whom work and reside outside the United States) entered the case, having agreed to voluntarily accept service of summons.  *See* Docs. 230–32.  In response to the motions to dismiss, the Court issued an opinion and order on February 23, 2021, dismissing a number of claims[4] and directing Gridsum, Melcher, and the Individual Defendants to respond to the TAC's surviving claims, namely, the remaining claims under Sections 10(b) and 20(a) of the Exchange Act.  *See* Doc. 236.

---

[3] These were filed by Gridsum and Melcher, individual defendant Perry Lin Chui, and PwC.  *See* Docs. 210, 213, 216.

[4] These are:  all claims arising under Section 11 of the Securities Act against Gridsum, Melcher, PwC, and Chui, as well as Goldman Sachs (Asia) LLC, Citigroup Global Markets, Inc., and Stifel, Nicolaus & Company, Incorporated (collectively, the "Underwriter Defendants"); all claims arising under Section 15 of the Securities Act against Chui and Melcher; all claims arising under Section 10(b) of the Exchange Act against Chui and PwC; all newly-pleaded claims arising under Section 10(b) of the Exchange Act against Gridsum and Melcher, and Section 20(a) of the Exchange Act against Melcher, in relation to Gridsum's Registration Statement; and all claims arising under Section 20(a) of the Exchange Act against Chui.  *See* Doc. 236 at 29–30.

On April 23, 2021, Gridsum and Melcher filed an answer to the TAC.  Doc. 239.  And on

June 3, the Individual Defendants moved to dismiss the TAC, arguing that they—like Melcher—

were not "makers" of the April 2018 press release and, as such, cannot be held liable for its

alleged misstatements.  Therefore, the issue before the Court is a narrow one:  whether the

Individual Defendants were "makers" of the April 2018 press release.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a

complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."

*Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555–56 (2007)).  Courts follow a "two-pronged approach" in

determining plausibility.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "First, although a court

must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to

legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (brackets

and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).  Second, a court

determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give

rise to an entitlement to relief.'"  *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting

*Iqbal*, 556 U.S. at 679).  This analysis is a "context-specific task that requires the reviewing court

to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

A securities fraud claim under Section 10(b) of the Securities Exchange Act ("Exchange

Act") and Rule 10b–5 thereunder is subject to the heightened pleading requirements of Federal

Rule of Civil Procedure 9(b) and the PSLRA.  *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir.

2000).  Rule 9(b) requires that the complaint "state with particularity the circumstances

constituting fraud."   To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."   *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).   The PSLRA imposes similar requirements on claims brought under the Exchange Act:   "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."   15 U.S.C. § 78u–4(b)(1).   The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission.   15 U.S.C. § 78u–4(b)(2).   A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In the securities context, a court may consider not only the complaint itself, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## III.   DISCUSSION

### a.   "Makers" of the Press Release

In *Janus Capital Group, Inc. v. First Derivative Traders*, the Supreme Court held that, in order to be liable for a violation of Rule 10b–5—which makes it unlawful for "any person,

directly or indirectly, . . . [t]o make any untrue statement of a material fact" in connection with

the purchase or sale of securities, 17 C.F.R. § 240.10b–5(b)—a defendant must have "made" the

allegedly material misstatements.  564 U.S. 135, 141 (2001).  "Make," the Court explained,

means "to state," not "to create."  *Id.* at 142, 144–45.  The Court then set out the following rule

for determining whether a defendant is the "maker of a statement":  "For purposes of Rule 10b–

5, the maker of a statement is the person or entity with ultimate authority over the statement,

including its content and whether and how to communicate it."  *Id.* at 142; *see also id.* at 144

("Without [ultimate] authority, it is not necessary or inevitable that any falsehood will be

contained in the statement").  The Court further explained:

> Without control, a person or entity can merely suggest what to say, not "make" a
> statement in its own right.  One who prepares or publishes a statement on behalf of
> another is not its maker.  And in the ordinary case, attribution within a statement or
> implicit from surrounding circumstances is strong evidence that a statement was made
> by—and only by—the party to whom it is attributed.  This rule might best be exemplified
> by the relationship between a speechwriter and a speaker.  Even when a speechwriter
> drafts a speech, the content is entirely within the control of the person who delivers it.
> And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 142–3.  "In the post-*Janus* world, an executive may be held accountable where the

executive had ultimate authority over the company's statement; signed the company's statement;

ratified and approved the company's statement; or where the statement is attributed to the

executive."  *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*,

525 F. App'x 16 (2d Cir. 2013).

While explicit attribution can be a strong indication of *Janus*'s "ultimate authority," it

also can be found if implicit in surrounding circumstances, or, in other words, evidenced by

various indicia of control.  *See City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,

814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011) (quoting *Janus*, 564 U.S. at 142–43); *see also In Re*

*Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 261–62 (S.D.N.Y. 2020) ("Whether

the defendant is the 'maker' of the misstatement may depend on inferential or circumstantial evidence."); *IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*, 91 F. Supp. 3d 456, 473 (S.D.N.Y. 2015) (finding "ultimate authority" where defendants owned overwhelming majority of company shares; defendants' employees formed majority of the company's board; defendants decided whether to sell the company; defendants' employees allegedly negotiated the agreement at issue; and one of defendants' executives signed the agreement at issue); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 540–41 (S.D.N.Y. 2016) (finding "ultimate authority" where defendant's CEO signed registration statement, defendant edited and approved offering documents, and defendant's logo prominently displayed on offering documents); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 271 (S.D.N.Y. 2012) (finding "ultimate authority" where defendant vetted and approved documents containing omissions and misstatements and where it filed those documents with the SEC).

At the outset, the Court notes that Plaintiffs do not allege that any of the Individual Defendants signed, ratified, or approved the press release.  Instead, Plaintiffs generally allege that all three Individual Defendants "participated directly or indirectly in the preparation and/or issuance of the . . . press release[]," and that, as a result of their positions as CEO and Co-CFOs, they controlled its content.  ¶¶ 269, 273, 280.

As to the conclusory allegation that the Individual Defendants "participated" in the preparation or issuance of the release, Plaintiffs do not offer any factual enhancement that would elevate the allegation to be something other than merely conclusory.  The allegation does not pass muster under Rule 8.  Much less do they provide sufficient detail to meet the heightened pleading standard under Rule 9.  In any event, the *Janus* Court expressly rejected the notion that it was sufficient for a defendant to have been involved in "creating" the challenged statement by

"participating in the drafting of" the statement or by "prepar[ing] or publish[ing] a statement on behalf of another."  564 U.S. at 144–46.

In any event, to the extent that Plaintiffs allege additional "indicia of control," these are enough to show that Qi had "ultimate authority" over and, therefore, was a "maker" of the press release, but they are not enough as to Sarathy and Zhang.  In other words, while Plaintiffs put forth sufficient facts when taken together to adequately plead that Qi "made" the press release, their arguments as to Sarathy and Zhang fall short.  As such, Qi can be held liable for the press release's alleged misstatements and omissions, but Sarathy and Zhang cannot.

### i.   Qi was a "Maker" of the Press Release

Plaintiffs plausibly allege that Qi had "ultimate authority" over the press release's content.  In particular, Plaintiffs point to a number of indicia of control which, when taken together, are sufficient to adequately plead that Qi was a "maker" of the press release.  As set out above, Qi is Gridsum's co-founder and CEO; he is also the chairman of its Board and a member of the Board's Compensation and Nominating and Corporate Governance Committees.  ¶ 25.  As of December 31, 2018, Qi beneficially owned 29.9% of Gridsum's total ordinary shares, and he beneficially owns all its Class A shares.  *Id.*  According to Gridsum's registration statement and 2016 Form 20-F, Qi is Gridsum's "chief operating decision maker" with respect to "allocating [Gridsum's] resources and assessing [its] performance."  ¶ 229.

Beyond this, the press release contains a lengthy statement from Qi.  *See* ¶ 99.  In that statement, Qi explains, "When we became aware of certain accounting issues, we immediately took measures to address this situation."  *Id.*  Qi details the steps taken to review and investigate the "issues," and asserts his "full confidence in the integrity and professionalism of all parties involved," as well as his "hope to report [the] results [of the investigation] as soon as

10

practicable[.]" *Id.*  Qi's several-sentence statement makes up a third of the press release and directly follows the release's discussion of "certain issues" PwC identified in conducting an audit of Gridsum's financial results.

It is clear that the "accounting issues" to which Qi refers in his statement are the same "issues" identified by PwC and referenced in the first two paragraphs of the press release.  As stated above and as relevant here, Plaintiffs argue the press release is materially false and misleading because it omitted to disclose a specific detail about PwC's report, namely that PwC also advised Gridsum that the issues it identified "raised questions related to its ability to rely upon the representations of management." *Id.*  As Plaintiffs point out, this detail is not mentioned in the press release:  it is omitted from the opening paragraphs of the release as well as from Qi's statement.  In any event, Qi's statement indicates that he had knowledge of the "issues" that prompted the release, as well as of Gridsum's strategy and next steps in responding to those issues.  In other words, Qi's statement within the release—reporting on Gridsum's work to "address th[e] situation" and setting out his hope and confidence in that work—plausibly alleges that Qi had at least some degree of control over the message and its content, and more broadly suggests his general authority over Gridsum's communications.

Qi's status as co-founder, CEO, and Board member; his share-ownership and voting power; his decision-making authority; and his statement within the release—evidencing knowledge of the identified issues and control over company communication, as well as the content of the release in which his quotation was embedded,—together support an inference that he was a "maker" of the release.  Courts in this district have found similar indicia of control sufficient to show that defendants had "ultimate authority" over statements and, as such, were "makers" under *Janus*.  *See, e.g.*, *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 240

(S.D.N.Y. 2018) (finding defendant was "maker" of company press release where he was president, treasurer, secretary, and sole board member of company, and where the release contained statements made by him); *IOP Cast Iron Holdings*, 91 F. Supp. 3d at 473 (defendants were "makers" where (1) they owned an overwhelming majority of the company's shares; (2) their employees formed a majority of the company's board; (3) they decided whether to sell the company; (4) their employees allegedly negotiated the Stock Purchase Agreement; and (5) one of their executives signed the Agreement on behalf of the company); *Roseville*, 814 F. Supp. 2d at 418 (defendant holding company was a "maker" of registration statements signed by EnergySolutions, Inc. where it was sole owner of outstanding stock in EnergySolutions at the time of the IPO, was selling stockholder in both offerings, and controlled more than 50% of EnergySolutions' voting power).

Construed in Plaintiffs' favor, all these facts are sufficient to plead that Qi had ultimate authority over the press release as a whole, not merely his quote within it. Qi's authority is "implicit from surrounding circumstances" alleged in the complaint. *Janus*, 564 U.S. at 142. In other words, with all factual allegations assumed to be true and all reasonable inferences drawn in Plaintiffs' favor, Plaintiffs' allegations are sufficient at this stage to meet the heightened pleading requirements of a securities fraud claim, and to plead that Qi was a "maker" of the alleged omissions of the press release within the meaning Section 10(b) under *Janus*. As such, the motion to dismiss as to Qi is denied.

### ii.   Neither Sarathy nor Zhang was a "Maker" of the Press Release

As to Sarathy and Zhang, however, Plaintiffs do not allege sufficient facts showing that either was a "maker" of the press release. As such, neither can be held liable for the press release's alleged misstatements and omissions.

### 1.  That Sarathy and Zhang were CFOs is Not Enough

At the outset, as to the allegation that Sarathy and Zhang controlled the content of the release simply because they were senior executives, plaintiffs do not cite to any law showing that an officer's position within a company—without more—is enough to render that officer a "maker" of the company's statements.[5]  As this Court has found with respect to the viability of the group-pleading doctrine after *Janus*, *see infra* Section III(b), "a mere presumption that a person worked on a statement by virtue of his . . . role within the company must [] fall short" of "*Janus*'s requirement that the individual have ultimate authority over the statement."  *In re Banco Bradesco*, 277 F. Supp. 3d 600, 641 (S.D.N.Y. Sept. 29, 2017) (internal quotation marks and citation omitted).  Accordingly, that Sarathy and Zhang were co-CFOs is not enough to make them "makers" of the press release.

### 2.  Reference to Conduct of "the Co-Chief Financial Officer" in the Release is Not Enough

Beyond this, plaintiffs make much of the fact that the press release contains a reference to Gridsum's "Co-Chief Financial Officer."  Specifically, the press release states that the "Audit Committee Chairman and the Company's Co-Chief Financial Officer have discussed the topics covered by the PwC Letter with representatives of PwC."  *See* ¶ 99.

But the press release does not specify who the "Co-Chief Financial Officer" is—whether it is Sarathy or Zhang or someone else[6]—and, in any event, even if the press release had referred

---

[5] On this point, plaintiffs cite to *In re Lehman Bros. Sec. and ERISA Litig.*, 2013 WL 5730020, at *2 (S.D.N.Y. Mar. 22, 2012) where the court found the CEO and CFO "undoubtedly" had "ultimate authority" over statements, but ignore that in that case, the CEO and CFO *also* certified those statements.  In the instant case, none of the individual defendants is alleged to have certified the statements at issue.

[6] On this point, plaintiffs suggest that the press release contains a "typo" and was meant to refer to *both* Sarathy and Zhang.  Specifically, plaintiffs argue that the press release should have read "Co-CFOs"—not "Co-CFO"—and that the "'s' was not included by mistake[.]"  Doc. 249 at 6 n.4.  As the Individual Defendants argue, here plaintiffs urge the Court to "read something that is not there."  This the Court will not do.  Plaintiffs point to no evidence

to Sarathy or Zhang by name, such a reference is not enough to establish either as its "maker." Plaintiffs do not cite to any law supporting the argument that a reference to or description of an officer or her actions in a statement is evidence that that officer is the statement's "maker."

In any event, Sarathy and Zhang at most are identified—or described—in the press release—and even then, only by title. This is not enough. That the press release refers generally to discussions between the Audit Committee Chairman and the Company's Co-Chief Financial Officer does not suggest that Sarathy or Zhang had authority over or responsibility for the release. To be held liable for a statement under Section 10(b), a defendant must have made the statement; it is not sufficient that the defendants be referenced in the statement. *Krasner v. Rahfco Funds LP*, No. 11 Civ. 4092 (VB), 2012 WL 4069300, at *1, 5 (S.D.N.Y. Aug. 9, 2012).[7] Indeed, the Audit Committee Chairman also is referenced in the press release, but that he is referenced does not make him the release's "maker." Any suggestion to the contrary—that a person is a statement's "maker" because that person's actions are described in the statement— defies logic.

### 3. That Zhang Signed the Form 6-K is Not Enough

As to the argument that Zhang is the "maker" of the press release because he signed the Form 6-K attached to the press release, this argument also fails. Zhang did not sign the release

---

suggesting that the release was meant to refer to both Co-CFOs, and in support of their argument—raised for the first time in their opposition to the Individual Defendants' motion to dismiss—they cite only "logic[]." *Id.*

[7] For their part, the Individual Defendants rely on *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, where the Second Circuit rejected a "creator standard" of liability for secondary actors and held that "secondary actors can be liable in a private action under Rule 10b-5 for only those statements that are explicitly attributed to them[,]" and that the "mere identification of a secondary actor as being involved . . . [is] insufficient." 603 F.3d 144, 155 (2d Cir. 2010). But that rule, relating only to "secondary actors," is inapplicable here. In *Pac. Inv. Mgmt. Co.*, the Second Circuit defined "secondary actors" as "lawyers . . . , accountants, or other parties who are not employed by the issuing firm whose securities are the subject of allegations of fraud." *Id.* at 148 n.1. As Sarathy and Zhang were Gridsum's Co-CFOs at the time of the issuance of the press release, they clearly cannot be considered "secondary actors."

itself, but only signed the Form 6-K to which the press release was attached.  Rule 13a-16 of the

SEC requires that foreign private issuers use a Form 6-K when making filings.  17 C.F.R. §

240.13a-16(a).  In other words, a Form 6-K functions as a cover page for SEC filings, and the

filing of a Form 6-K, as the Individual Defendants point out, is purely ministerial.  That Zhang

signed the Form 6-K—the cover page—attached to the press release does not mean he is the

"maker" of the press release.  As the *Janus* court made clear, "[o]ne who prepares or publishes a

statement on behalf of another is not its maker."  564 U.S. at 142; *see also Alpha Cap. Anstalt v.

Schwell Wimpfheimer & Assocs.*, No. 17 Civ. 1235 (GHW), 2018 WL 1627266, at *10 (S.D.N.Y.

Mar. 30, 2018) (*Janus* expressly rejected the notion that it was sufficient for a defendant to have

been involved in . . .  publishing a statement on behalf of another.") (quotation marks omitted).

In support of their argument, Plaintiffs cite to *In re Banco Bradesco*, 277 F. Supp. 3d,

where this Court found a defendant was adequately alleged to have "made" various

misstatements in press releases where he signed the Forms 6-K furnishing those press releases to

the SEC.  But plaintiffs ignore that in addition to signing the Forms 6-K, the defendant in that

case *also* signed the press releases.  *See* Doc. 251-1, 251-2.  In the instant case, Zhang signed

*only* the Form 6-K.  As such, *Banco Bradesco*, where the Court says nothing about whether a

person who signs the Form 6-K—and nothing else—is a "maker" of the document attached to

the Form 6-K, is inapposite here.

### b.  The Group Pleading Doctrine No Longer Applies

Plaintiffs argue that even if they do not meet the "maker" test set out in *Janus*, the

Individual Defendants should nonetheless be held liable for the alleged misstatements and

omissions under the group pleading doctrine.  But, as this Court held in *Bando Bradesco*, after

*Janus*, the group-pleading doctrine is no longer viable.

The group-pleading doctrine allowed securities fraud plaintiffs to rely on a presumption that group-published documents were the collective work of—and therefore attributable to—corporate insiders. *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 530 (S.D.N.Y. 2010) (citation omitted). This doctrine was recognized by the Second Circuit at least as early as 1987. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

At the outset, this Court noted that since *Janus*, courts in this district have reached opposing conclusions regarding its impact on the group-pleading doctrine's viability. *See, e.g.*, *In re UBS AG Securities Litigation*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *10 (S.D.N.Y. Sept. 28, 2012) (finding "a theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision."); *City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) (rejecting argument that *Janus* abrogated the group-pleading doctrine). The Second Circuit has not yet addressed the question, but the doctrine has been expressly rejected by other Courts of Appeals.[8]

As this Court explained in *Banco Bradesco*, the *Janus* Court expressly rejected the notion that it was sufficient for a defendant to have been involved in "creating" the challenged statement by "participating in the drafting of" the statement or by "prepar[ing] or publish[ing] a statement on behalf of another." 564 U.S. at 144–46. And, as this Court further noted, the group-pleading

---

[8] Even before *Janus*, several other circuits have rejected the group-pleading doctrine following the passage of the PSLRA. *See, e.g.*, *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007) ("We agree and hold the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA."); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 364 (5th Cir. 2004) (the group-pleading doctrine "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'"); *Pugh v. Trib. Co.*, 521 F.3d 686, 693 (7th Cir. 2008) ("We have rejected the 'group pleading doctrine.'").

Case 1:18-cv-03655-GHW   Document 255   Filed 08/29/22   Page 17 of 18

doctrine significantly predates *Janus*, and it was not designed to create a presumption of ultimate authority.

> Instead, it create[d] a presumption that group-published documents are "the collective work" of corporate insiders, *see In re Am. Int'l Grp.*, 741 F. Supp. 2d at 530.  But in *Janus*, the Court held that participation in the creation of a statement was not enough. 564 U.S. at 144–45.  If undeniable proof that an individual worked on a statement does not meet *Janus*'s requirement that the individual have "ultimate authority over the statement, including its content and whether and how to communicate it," *id.* at 142, a mere presumption that a person worked on a statement by virtue of his or role within the company must also fall short.

277 F. Supp. 3d at 640.

As this Court found, a presumption that corporate insiders, as a group, are "makers" of a statement because the statement is deemed to be attributed to those insiders is inconsistent with *Janus*'s description of attribution as a limiting mechanism.  *See* 564 U.S. at 142–43.  In other words, while under *Janus* attribution can be a means of determining who among the many who participated in creating and disseminating a statement had the ultimate authority over the statement, group pleading would simply sweep in that entire group, if not an even larger one.

In light of this—and in particular given the particularity requirements imposed on securities fraud pleadings by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA")—this Court found that the group-pleading doctrine is insufficient to meet the requirements of *Janus* and thus is no longer viable.  Accordingly, rather than rely on the presumption created by the group-pleading doctrine, a securities fraud plaintiff must allege facts showing, either directly or circumstantially, that the individual defendants named in the complaint possessed ultimate authority over the statements at issue.  *See Banco Bradesco*, 277 F. Supp. 3d at 641.

As such—because the group-pleading doctrine is no longer viable—the Court rejects Plaintiffs' argument that, pursuant to that doctrine, the Individual Defendants are liable for the press release's alleged misstatements and omissions.

## IV.  LEAVE TO AMEND

The Court grants Plaintiffs leave to replead the dismissed claims against Zhang and Sarathy.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). While leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party[,]" those circumstances do not apply in this case with respect to the dismissed claims against Zhang and Sarathy. *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (*quoting McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  Any amended complaint must be filed within fourteen days after the entry of this opinion.

## V.  CONCLUSION

For the reasons discussed above, the Individual Defendants' motion to dismiss is GRANTED as to Sarathy and Zhang, and is DENIED as to Qi.

The Clerk of Court is respectfully directed to terminate the motion pending at Doc. 246.

It is SO ORDERED.

Dated:    August 29, 2022
          New York, New York

_____
Gregory H. Woods, U.S.D.J.